# Case Nos. 19-15168-H, 20-11137-H, 21-13593-H

---

# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝖘𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕰𝖑𝖊𝖇𝖊𝖓𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

---

**UNITED STATES OF AMERICA,**

*Appellee,*

**v.**

**BYRAM MONECK JAVAT and LUIS ALBERTO SOTO,**

*Appellees*

---

**CALH HOLDING CORP. and PENNCO, LLC,**

*Third-Party Petitioners-Appellants,*

**v.**

**UNITED STATES OF AMERICA,**

*Plaintiff-Appellee*

---

On Appeal from the United States District Court for the
Southern District of Florida
Case No. 1:18-cr-20668-MM

---

**BRIEF OF APPELLANT – LUIS ALBERTO SOTO**

---

Rhonda A. Anderson
RHONDA A. ANDERSON, P.A.
2655 LeJeune Road, Suite 540
Coral Gables, Florida 33134
Tel:        305-567-3004
Email:      randersonlaw@gmail.com
*Attorney for Appellant, Luis Alberto Soto*

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, Defendant-Appellant Luis Soto hereby certifies that the following is a complete list of the individuals and entities who have an interest in the outcome of this case:

Abbott Laboratories

Adams, John

Amicorp Trustees (Delaware), Inc.

Anderson, Rhonda A.

Armando, William

Bayer Corporation (BAYRY)

Beaton, Marcos

Becerra, Robert J.

Becerra Law, P.A.

Becton Dickinson and Company

Binhak, Stephen James

Black Srebnick, P.A.

Braun Medical, Inc.

Brown, Kristine M.

Calh Holding Corp

Calh Trust

Calloway, Mark T.

Campbell Soup Company (CPB)

Chopra, Sunil

Citibank (C)

Daskos, Emanuel George

Dray, Simon Patrick

Edelstein, David M.

Fajardo Orshan, Ariana

Fougere, Joshua

Garber, Hon. Barry L.

Geiger, Brett

Grande, Carlos Daniel

Geiger, Brett

Grande, Carlos D.

Greenberg, Benjamin G.

Harris, Robert Charles

Hendrix, David Stockton

Hoernlein, Michael R.

Javat, Byramji Moneck

Kehoe, Gregory William

Klugh, Richard

Kruppa, Andrew

Kubica, P. Jan

Lehr, Alison Whitney

Ludlow, David

Matzkin, Daniel

McAliley, Hon. Chris M.

Middlebrooks, Hon. Donald M.

Noto, Kenneth

Orshan, Ariana Fajardo

O'Sullivan, Hon. John J.

Pace, Christopher R.J.

Pennco, LLC

Pennco Trust

Proton Healthcare, Ltd.

Rabin, Samuel J. Jr.

Rhonda A. Anderson, P.A.

Rosen, Adrienne E.

Schoeppl, Carl, Jr.

Schoeppl Law

Shipley, John

Silvaggi, Alyssa

Simonton, Hon. Andrea M.

Smachetti, Emily M.

Sombuntham, Nalina

Soto, Luis Alberto

Srebnick, Howard

TD Ameritrade, Inc.

The Edelstein Firm

The Law Office of Stephen James Binhak

Torres, Hon. Edwin G.

Truist Bank (TFC)

Turken, David Samuel

Ursini, Louis Mario III

Waxman, Benjamin

WH Legal

By: */s/ Rhonda A. Anderson*
Rhonda A. Anderson
RHONDA A. ANDERSON, P.A.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Luis Soto requests oral argument. Due to the complexity of the issues and record in this matter, Appellant believes that oral argument will materially assist the Court in deciding these issues. The Appellant further adopts and incorporates herein the Statement Regarding Oral Argument in the Initial Brief of Byram Javat.

## STATEMENT REGARDING THE ADOPTION
## OF BRIEFS OF OTHER PARTIES

Pursuant to FRAP 28(I) and 11th Cir. Rule 28-1-(f), Luis Soto adopts by reference the brief filed by Byram Moneck Javat, including the following issues:

I.     The District Courts Sentencing Guideline errors – overstatement of loss and number of victims and imposition of inapplicable enhancements under U.S.S.G. § 2B1.1 — compel reversal.

II.    The restitution judgment should be vacated.

IV.    The Defendants' convictions must be vacated because the fraud statutes do not encompass his/their alleged or admitted conduct.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE
  DISCLOSURE STATEMENT.........................................................I

STATEMENT REGARDING ORAL ARGUMENT ..............................v

OF BRIEFS OF OTHER PARTIES ........................................................v

TABLE OF CONTENTS..................................................................... vi

TABLE OF AUTHORITIES ............................................................ viii

STATEMENT OF SUBJECT MATTER AND APPELLATE
  JURISDICTION .............................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................2

COURSE OF PROCEEDINGS AND RELEVANT FACTS...................3

  The District Court Overrules Objections to the Presentence
  Investigation Report...........................................................................8

  The District Court Overrules Objections to Restitution...............16

  The District Court Overrules Objections to Forfeiture ...............24

STANDARD OF REVIEW .................................................................26

SUMMARY OF THE ARGUMENT ...................................................26

ARGUMENT .......................................................................................30

  I.      THE DISTRICT COURT DENIED SOTO THE RIGHT TO
  PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE
  FIFTH AND SIXTH AMENDMENTS BY EXCLUDING EXPERT
  TESTIMONY THAT WAS: (1) RELEVANT TO SOTO'S STATE
  OF MIND REGARDING ONE OR MORE ELEMENTS OF THE
  CHARGED OFFENSES, (2) HAD A SUBSTANTIAL IMPACT ON
  THE CREDIBILITY OF AN IMPORTANT GOVERNMENT
  WITNESS, AND/OR (3) TENDED TO PLACE THE
  PROSECUTION'S STORY IN A SIGNFICIANTLY DIFFERENT
  LIGHT. ..................................................................................30

  II.     THE DISTRICT COURT ABUSED ITS DISCRETION
  ADMITTING IRRELEVANT, PREJUDICIAL AND
  SPECULATIVE "OTHER CRIMES, WRONGS OR ACTS"
  HEARSAY EVIDENCE WITHOUT SUFFICIENT FOUNDATION
  AND PROOF THAT THE ACT WAS SIMILAR TO THE

OFFENSES CHARGED, AND THAT THE TRANSACTION
INVOLVED THE GRAY MARKET DIVERSION OF GOODS................40

III.    THERE WAS INSUFFICIENT EVIDENCE THAT SOTO
HAD KNOWLEDGE OF AND INTENTIONALLY AGREED TO
PARTICIPATE IN A SCHEME TO DEFRAUD TO OBTAIN
GOODS AT SUBSTANTIALLY LOWER PRICES. ..................................45

   A.    The Evidence Failed to Prove a "Scheme to Defraud".............45

   B.    The evidence failed to show that Soto had knowledge of
the fraudulent statements made to entice manufacturers
or distributors to offer deeply discounted prices. .....................49

IV.    THE DISTRICT COURT ERRED IN DENYING SOTO'S
REQUEST FOR A MINOR ROLE REDUCTION. ....................................51

V.    THE DISTRICT COURT ERRED IN DENYING SOTO'S
OBJECTION TO SPECIAL SKILL ENHANCEMENT...............................52

CONCLUSION.....................................................................................................53

CERTIFICATE OF COMPLIANCE WITH RULE 32(G) ....................................54

CERTIFICATE OF SERVICE ..............................................................................55

# TABLE OF AUTHORITIES

## Cases

*Iannelli v. United States*, 420 U.S. 770 (1975) ........................................................53

*Impression Prods v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523 (2017) ...........................33

*United States v. Bernal-Benitez,* 594 F.3d 1303 (11th Cir. 2002) ...........................55

*United States v. Cruickshank,* 837 F.3d 1182 (11th Cir. 2016) ...............................55

United States v. Galvez, 108 F.Supp.2d 1369 (S.D. Fla. 2000) ...............................11

*United States v. Garber,* 607 F.2d 92 (5th Cir.1979) ...............................................32

*United States v. Gordon*, 580 F.2d 827 (5th Cir.), *cert. denied*, 439 U.S. 1051 (1978) ........................................................................................................................54

*United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003) .......................................27

*United States v. Hurn*, 368 F.3d 1359 (11th Cir. 2004).................................... passim

*United States v. Krawczak,* 331 F.3d 1302 (11th Cir. 2003) ...................................27

*United States v. Lankford*, 955 F.2d 1545 (11th Cir. 1992) ....................... 31, 32, 40

*United States v. Michel,* 588 F.2d 986 (5th Cir.), *cert. denied*, 444 U.S. 825 (1979) ....................................................................................................................................54

*United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992) ...............................47

*United States v. Ramos*, 933 F.2d 968 (11th Cir. 1991) ..........................................36

*United States v. Rodriguez De Varon,* 175 F.3d 930 (11th Cir.1999).....................56

*United States v. Rodriguez,* 917 F.2d 1286 (11th Cir. 1990)...................................32

*United States v. Ruan*, 966 F.3d 1101 (11th Cir. 2020)...........................................38

*United States v. Sheffield,* 992 F.2d 1164 (11th Cir. 1993) .............................. 39, 40

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) ............................ passim

## Statutes

18 U.S.C. § 670 ........................................................................................................14

18 U.S.C. § 981 ........................................................................................................25

18 U.S.C. § 982(a)(2)(A) .........................................................................................25

18 U.S.C. §1343 ................................................................................................ 45, 48

19 C.F.R. §§ 133.2(3) ........................................................32

19 C.F.R. 133.2(e)...................................................... 33, 50

19 C.F.R. 133.23 ...............................................................32

19 C.F.R. 133.23(b) ..........................................................33

28 U.S.C. § 1291 .................................................................1

Cal Civ Code § 1797.81 ....................................................32

Cal Civ Code Div. 3, Pt. 4, Title 1.7, Ch. 4 ....................32

Title 18, United States Code, Section 982(a)(2)(A) ........24

Title 18, United States Code, Section 982(b)(1).............24

Title 21, United States Code, Section 853 .......................24

U.S.S.G. § 2B1.1(b)(2)(A)(i),(ii) ....................................14

U.S.S.G. § 2B1.1(b)(8)(B) ...............................................14

U.S.S.G. § 2B1.1(b)(9)(A) ...............................................14

U.S.S.G. § 3B1.1........................................................v, 15

U.S.S.G. §2B1.1 ...............................................................10

U.S.S.G. §3B1.2, App. Note 3(C) ...................................52

U.S.S.G. §3B1.3. cmt. (n. 4) ...........................................53

## Other Authorities

*Grey Market Goods and modern Int'l Commerce: A Question of Free Trade*, *Fordham Int'l Law Journal*, Vol. 10, Issue 2, Article 6 ......................................34

*Grey Market Litigation in the United States District Courts*, *N. Carolina Journal of Int'l Law*, Vol. 11, No. 2, Article 9, Spring 1986 ................................34

https://www.cbp.gov/trade/programs-administration/customs-brokers/ becoming-customs-broker ................................................................56

https://www.suretybondsdirect.com/educate/differences-between-freight-brokers-and-freight-forwarders#:~:text=Freight%20Broker%20vs.&text=A%20freight%20forwarder%20arranges%20transportation,freight%20within%20their%20home%20country ......................................45

*Legal Review of Gray Market Goods*, https://www.rrlaw.com/grey-market-goods33

## Rules

11th Cir. R. 26.1-1 ............................................................................................ i

11th Cir. Rule 28-1-(f) ...................................................................................... v

Fed. R. A. P. 26.1 ............................................................................................. i

Fed. R. A. P. 32(a)(5) ....................................................................................59

Fed. R. A. P. 32(a)(7)(B)(iii) .........................................................................59

Fed. R. A. P. 4(a)(1)(B) ...................................................................................1

Fed. R. A. P. 28(I) ...........................................................................................v

Fed. R. A. P. 32(a) .........................................................................................59

Fed. R. A. P. 32(a)(6) .....................................................................................59

Fed. R. A. P. 32(a)(7)(B) ...............................................................................59

Fed. R. Crim. P. 29 ...........................................................................................7

Fed. R. Crim. P. 29(c) .......................................................................................8

Fed. R. Crim. P. 32(c)(1)(B) ..........................................................................17

Fed. R. Crim. P. 32(d)(2)(D) ..........................................................................17

Fed. R. Crim. P. 32(e)(2) ................................................................................17

Fed. R. Crim. P. 33 ...........................................................................................8

Fed. R. Crim. P. 34 ...........................................................................................8

Fed. R. Evid. 403 ...................................................................................... 44, 48

Fed. R. Evid. 404(b) .............................................................................. 7, 44, 47

## Regulations

64 Fed. Reg. 9058 .................................................................................. 33, 35, 54

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The jurisdiction of this Court is invoked under 28 U.S.C. § 1291. Defendant/Appellant timely noticed this appeal pursuant to the Rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Did the district court deny Soto the right to present a complete defense in violation of the Fifth and Sixth Amendment of the U.S. Constitution by excluding expert testimony that was (1) relevant to Soto's state of mind regarding one or more elements of the charged offenses, (2) had a substantial impact on the credibility of an important government witness and/or (3) tend to place the prosecution's story in a significantly different light?

2.      Did the district court abuse its discretion admitting irrelevant, prejudicial and speculative "other crimes, wrongs or acts" hearsay evidence without sufficient foundation and proof that the act was similar to the offenses charged, and that the transaction involved the gray market diversion of goods?

3.      Whether the evidence was insufficient to show that Soto had knowledge of and intentionally agreed to participate in a scheme to defraud to obtain goods at substantially lower prices?

4.      Did the district court err in denying Soto's request for a minor role reduction?

5.      Did the district court err in denying Soto's objection to a special skill enhancement?

## COURSE OF PROCEEDINGS AND RELEVANT FACTS

Javat and Soto were charged in a seven-count Superseding Indictment with, *inter alia*, conspiracy to commit wire fraud in connection with the purchase and resale of "FDA regulated consumer goods."[1] DE#145:4. According to the prosecution, the "victim" consumer goods manufacturers engaged in an industry-wide price discrimination practice of soliciting much higher domestic prices in the United States from their wholesale resellers, while offering discounts to wholesalers selling into foreign markets (*i.e.*, "for export only"). DE#145:2 ("Manufacturers … sometimes sell their products to foreign distributors at deep discounts for a variety of reasons, including as a way to open new markets and because they do not have to pay for advertising or promotion abroad."). The price effect of this practice was to attempt to prop up the domestic price of consumer products, and to avoid price competition from foreign markets.

The alleged fraud theory was that Javat misrepresented to the manufacturers that he was purchasing the goods for export and thus was able to purchase the goods "at discounted prices *not generally* offered to distributors and wholesalers in the United States." DE#145:5 (emphasis added). Javat then re-sold the goods into the U.S. domestic market. The Superseding Indictment did not identify the vendor-victims. Javat filed a Motion for a Limited Bill of Particulars, asking the court to

---

[1] None of the goods were prescription medications.

identify the vendor-victims and the "allegedly fraudulent transactions that will be the subject of the Government's case-in-chief," DE#249, which the court denied. DE#296.

The defendants challenged the government's prosecution theory, arguing that deception to induce a transaction is insufficient, economic harm is necessary, and here the vendors had no property right to control the ultimate resale destination of the goods at issue. DE#91, 92, 119, 163, 164, 165, 170, 188.

> [T]he indictment does not permit an inference as to any seller's legal entitlement to potential revenue. The right to discriminatory pricing by a seller is not universally recognized. If a buyer lies regarding a matter about which a seller offers preferential pricing — such as lower prices for one or another gender at a bar — not every jurisdiction (even in the United States) would permit such discriminatory pricing or recognize a property right in the discriminatory pricing.

DE#188:3.

Thus, the defendants argued that his misrepresentations regarding the destination of the goods were deceptive but not fraudulent—that the self-serving claims of vendors that they would have abstained from the transactions had they known the true destination of the goods did not state a cognizable fraud theory, given that the vendors profited from the transactions. *See United States v. Takhalov*, 827 F.3d 1307, 1310 (11th Cir. 2016) ("deceiving does not always involve harming another person; defrauding does. That a defendant merely induced the victim to enter into a transaction that he otherwise would have avoided is therefore insufficient to

4

show wire fraud"). The district court rejected these challenges, concluding that the defendants "caused those companies to lose money in the form of potential revenue and profit." DE#197:4.

Javat twice sought leave to subpoena the manufacturers for relevant pricing data, including the lowest prices actually charged by the manufacturers to U.S. distributors, arguing that "[t]he requested documents are necessary for Mr. Javat to establish the 'discounted prices' his companies paid are *frequently*, even if "*not generally* offered to distributors and wholesalers in the United States…" DE#179:3 (emphasis added). The manufacturer "victims" opposed the subpoenas for a variety of reasons, one being that "pricing strategies, analysis of sales practices, and individual contracts are commercially sensitive and proprietary." *E.g.*, DE#212:10. In response, Javat posited: "How, then, is the Government proposing that the jury will decide whether Mr. Javat fraudulently obtained goods at 'discounted prices not generally offered to distributors and wholesalers in the United States…,' DE#145:5, if the prices charged to other customers are 'closely guarded' secrets?" DE#248:17 n.4. Ultimately, the government successfully moved the court to quash Javat's subpoenas, see DE#236, 295, 324, arguing, among other things, that "the sentencing hearing is the time for [Javat] to seek information that may bear upon his loss for Guideline purposes." DE#274:13.

Having unsuccessfully challenged the Superseding Indictment's theory of prosecution, Javat pled guilty to Count 1 charging wire fraud conspiracy in exchange for the government dismissing the remaining counts. DE#339; DE#418:3. At his change of plea hearing, Javat admitted that he conspired "to obtain FDA-regulated products at deeply discounted prices, *not generally available to domestic distributors*, through fraudulent misrepresentations and, then, resell those products in the United States for a significant profit." DE#418:14-15 (emphasis added). The vendors "sold their products to Javat at deeply discounted prices, that they would not have otherwise offered but for the false and fraudulent representations" regarding exportation. DE#418:15. At the plea, the Court notified Javat that he "could be subject to forfeiture of some assets." DE#418:12.

Soto proceeded to trial. For his part, Soto was a licensed customs broker who cleared the diverted goods into the United States after Javat had arranged for them to be shipped overseas and back, creating the impression that the goods were being distributed overseas. Most, if not all, of the products were manufactured in the United States and labeled for U.S. distribution. *See, e.g.*, DE#396:236 (Trial Transcript). Soto did not communicate with the vendors. He did not transmit, nor was he copied on, any of the correspondence/emails with the vendors that contained misrepresentations regarding the destination of the goods.

Over Soto's objections under the hearsay rules and Fed. R. Evid. Rule 404(b), the district court admitted evidence of email communications in 2015 and 2017 between Soto and individuals unrelated to the Javat companies who the government asserted engaged in gray market diversion. DE#299, 314, 327. The government claimed that the emails themselves, (Govt. Exhibits U32-U34) showed that Soto knew that his diverter-customers were lying to suppliers and then "exporting products to bring them back" to conceal their lie. DE#314.

At the Soto trial, the government presented evidence regarding the diversion of products from five vendor-manufacturers: Bayer (aspirin), Parkell (dental supply), Sklar Instruments (surgical instruments), Andover Healthcare (bandages), and DeMet's Candy Company (chocolate candy). Representatives of four of those vendors testified (no one from DeMet's). They claimed that they would not have sold the goods to Javat had they known that Javat intended to divert the goods into the U.S. domestic market; but none identified or quantified an actual financial loss caused by selling goods to Javat at the so-called export price.

At the close of the government's case and before closing arguments, Soto moved for judgment of acquittal pursuant to Rule 29, Fed. R. Crim. P., which was denied. DE#398:30-32 (Transcript of 08-23-2019). Soto was found guilty of all counts charged (Counts 1 and 3-7) and remanded into custody. Post-trial, Soto filed

a motion for judgments of acquittal, a new trial and arrest of judgment pursuant to Rules 29(c), 33 and 34, Fed. R. Crim P., which was denied. DE#373, 387.

In anticipation of sentencing, Javat moved, *again*, for leave to subpoena relevant manufacturer pricing data for sentencing loss purposes. DE#423. This time, Javat argued that "the suggested 'list price' upon which the Government now seeks to rely for computing loss for sentencing purposes is not an accurate reflection of the actual price that the sellers would have obtained had they declined to sell the goods to Javat at the 'discounted' price." DE#423:3. And that "relying on a seller's aspirational 'list' price for sales to its domestic distributors, admittedly different from the 'discounted' price it offered 'for export only,' does not accurately reflect how much, if any, revenue/profits sellers would have generated had they declined to sell to Javat at the discounted price." DE#423:5. The Court denied the motion. DE#431.

### The District Court Overrules Objections to the Presentence Investigation Report

Defendants timely objected to the government's proposed loss calculation contained in the PSR, which by then characterized as alleged victims more than 40 vendors. See DE#439:17(¶47). The number one factor driving the sentencing guidelines computation—and ultimate sentence—was the loss calculation. No manufacturer loss evidence or testimony was provided; instead, the PSR relied on

the government's methodology of estimating "the amount of the discount/purchase price obtained [by Javat] based on the fraud." DE#439:14(¶39); accord DE#420:23 ("the difference between [the manufacturer/vendor's] U.S. list price and the prices that the manufacturers offered Javat."). As the government explained in its Response to Javat's Objections to the PSR:

> In seeking to determine the loss amount, we first calculated the approximate amount of the "deep discount" (*i.e.*, the approximate percentage off the domestic price) that Javat sought or received by defrauding his victims. Having done so, we believe that a 50% average discount is a reasonable and highly conservative figure for the purposes of sentencing.

DE#420:22.

Thus, the government relied upon its extrapolation from QuickBooks records seized from co-defendant Sipprell that, if an average discount of 50% was given to Javat for all purchases, a like amount could have been lost by the manufacturers— even though the government offered no evidence that any willing buyer was prepared to pay the vendor the aspirational "list price" for those products.[2] Of course, Javat's companies would not have purchased the products at the vendors' aspirational prices, the whole point of the alleged scheme being to induce the

---

[2]    The government's methodology would presumably conclude that a car dealer sustains a "loss" when it offers a discount from the "MSRP" (Manufacturer's Suggested Retail Price), *i.e.*, sells an automobile for "under sticker."

vendors to accept the lowest price resell the products at a higher price in the domestic market.

According to the QuickBooks records, during the charged conspiracy period, Javat's companies purchased approximately $36.5 million worth of products. Applying the government's methodology, the district court ultimately found that Javat "received an average discount of 50% because of their fraudulent representations," (i.e., Javat should have paid $73 million for those products but for the misrepresentations), so the loss attributable to Javat was $36.5 million, DE#459:7,[3] resulting in a 22-level upward adjustment under U.S.S.G. §2B1.1. DE#500:35.

For his part, Javat argued that the government failed to prove that all forty-plus vendors (1) relied on misrepresentations as to destination when setting the price of goods, (2) would have declined to enter into the transactions had they known the goods would be distributed domestically, or (3) sustained any loss by selling the goods at the price paid by the Javat companies. DE#416:2-3. For his part, Javat would have declined the transactions at the aspirational "list" prices, in which case the vendors would have generated no revenue and earned no profits from the transactions.

---

[3] The PSR reported that during the conspiracy period Javat sold approximately $62,772,601,28 worth of products, which they had obtained for approximately $36,500,321.83, for a total profit of $26,272,279.45. DE#402:14(¶38).

Javat proposed a methodology that would compute losses based on the "reasonable replacement cost of the goods obtained (or sought to be obtained) by theft. DE#500:24-25 (citing *United States v. Galvez*, 108 F.Supp.2d 1369, 1372, 1374 (S.D. Fla. 2000) (Jordan, J.) (where "the perfume that [defendant] helped steal was packaged in wholesale lots and owned by a wholesale dealer at the time of the offense," court found that "the victim's reasonable replacement cost may be used as a loss figure")). Because Javat paid the vendors an amount sufficient to cover, and was typically greater than, the cost of goods sold (i.e., the replacement cost) in each transaction, Javat argued both before and at sentencing that loss was zero: "Loss, ordinarily, is not loss of interest, loss of opportunities or loss of consequential damages. The guidelines contemplate loss to be out-of-pocket loss." DE#500:22 (Sentencing Transcript); see also DE#436:1-2 (Javat's Reply Memorandum) ("Loss, under the sentencing guidelines, does not include consequential damages.").

In support of Javat's loss computation, at sentencing Javat presented the unrebutted expert opinion of H. Stephen Grace, Jr., Ph.D. (Economics), who reviewed the record of the case, including the Soto trial. In general, he observed:

A. sellers obtained profits from sales to Mr. Javat, even factoring in overhead and other costs;

B. no evidence of another buyer willing to pay the list price at the time or in the volume transacted by Mr. Javat; thus, the record does

not show that a seller's declining of the transactions with Mr. Javat would have resulted in higher profits (notwithstanding the higher profit margin that the government relies on in its sentencing filings);

C.    sales to Mr. Javat that were diverted to the domestic secondary market likely created additional profits, as there was no evidence at trial of any sales that the sellers would have made that would have replaced or exceeded the profits made on sales to Mr. Javat;

D. with one notable exception, it likely was the overstock of goods, additional capacity or other factors which created opportunities for sellers to engage in sales beyond the point of saturation in the domestic market at formal or other non-discounted domestic prices. The seller-companies would have no economic reason to institute an export price structure unless they had greater production capacity or stocked goods [sic] than needed for the domestic market (at formal domestic pricing levels). In other words, if the seller-companies could sell all of their goods at the domestic list price, they would have declined to sell at the lower export price in favor of the higher domestic list price;

E.  the price discount received by Mr. Javat, no matter how great a reduction that might have been from the list (or average or lowest

price set or negotiated by the sellers) for the domestic market, does not automatically equate to lost profits for companies that sold to Mr. Javat;

F.  any assumption that there was another domestic buyer (for the goods sold to Mr. Javat) to whom the seller was willing to sell at a greater price than that paid by Mr. Javat suffers from several economic-rationality obstacles.

G.  although there would be additional domestic sales of the sellers' products—potentially resulting in a lower price to consumers—due to sales to Mr. Javat, that would not have any necessary short- or long-term economic downside for the sellers' consumer goods market, particularly where the secondary market dealt with smaller and otherwise uncaptured markets.

H.  reduced costs paid by Mr. Javat were, at least in part, likely passed on to consumers. This impact would have been beneficial for domestic consumers in need of the products without harming the export market or overall domestic price level, given the limited market share of such transactions and the apparent absence of any capacity constraints or supply shortages on the part of the sellers;

I. both consumers and sellers may have gained economically from the operation of the diversion of products in this case, and given

that health products were involved, it appears that the diversion market

may have benefitted public health interests.

J. the persistence of diversion markets and the beneficial effects

in ultimately maximizing sales volume and profit.

DE#466-1 (admitted at the Sentencing Hearing, DE#500:29-32).

Javat also introduced a summary exhibit, a Power Point presentation of "excerpts from the [Soto] trial regarding testimony of witnesses saying they have different price structures and comparing it to, for example, pretrial disclosures by the government witnesses about price structure, that the list price is not always the actual price." DE#466-2 (admitted at the Sentencing Hearing, DE#500:32-34). Soto adopted Javat's objections. DE#500:57-58.

In addition to overruling Javat's objection to the **22**-level enhancement for loss, the district court also overruled objections to a **2**-level enhancement under § 2B1.1(b)(2)(A)(i),(ii) for ten or more victims, DE#439:19(¶55), DE#550:44; a **4**-level enhancement under § 2B1.1(b)(8)(B) because the offense involved conduct described in 18 U.S.C. § 670 and defendant was in the "supply chain for the pre-retail medical product," DE#439:19(¶56), DE#500:53; and a **2**-level enhancement under § 2B1.1(b)(9)(A) because the offense involved the misrepresentation that the defendant was acting on behalf of a charitable or a government agency, DE#439:19(¶57), DE#500:54. In the final analysis, the district court overruled

Javat's objections to enhancements totaling **30** levels and arrived at a Total Offense Level of 41, with a corresponding guideline range of 324-405 months incarceration.[4] Had the district court sustained Javat's objections, Javat would have faced a Total Offense Level of 11 and a corresponding guideline range of 8-14 months incarceration. If the district court had only sustained Javat's objection to loss, the Total Offense Level would have been (41 - 22 =) 19, with a corresponding guideline range of 30-37 months incarceration.

Soto unsuccessfully objected to the 2-level enhancement for "special skill," DE#400:19(¶62), DE#500:64;[5] and unsuccessfully sought a downward adjustment for minor role in the offense. DE#500:64-68. The district court computed at Total Offense Level of 37, DE#500:137, with a corresponding guideline range of 210-262 months. Had the district court sustained Soto's objections, Soto would have instead faced a Total Offense Level of 5 and a corresponding guideline range of 0-6 months incarceration.

Ultimately, the district court varied downward and imposed a sentence of 120-months incarceration upon Javat, DE#500:114, and 72-months incarceration upon Soto, DE#500:138, finding that

---

[4] Javat did not contest a 4-level increase for role in the offense. See U.S.S.G. § 3B1.1.

[5] The probation officer acknowledged that the PSR contained a scrivener's error ascribing three levels instead of two. DE#500:63.

[t]he loss amount here is substantial, but it also somewhat misrepresents the harm caused by the Defendants' conduct in the sense that the victims were in fact compensated for the goods sold to the Defendants. Although the victims were unmistakably defrauded, *they chose to sell their products at the discounted price. Presumably, under their individual circumstances even the discounted prices made economic sense.* Other factors such as volume, preferential customers, payment terms, or abundance of supply may have motivated the victim companies to sell their products at discount, even had Defendants not intervened and defrauded the companies.

DE#459:10-11 (emphasis added). Javat and Soto timely filed notices of appeal from the written judgment. *See* DE#475,476.

### The District Court Overrules Objections to Restitution

Following imposition of the sentence of incarceration, the district court set a restitution hearing for March 3, 2020. In the days leading up to it, the government confirmed its methodology for computing restitution: "the difference between what Javat and his cohorts actually paid these victims and what these victims *would have charged Javat* for the products if he had told the truth (*i.e.*, the domestic distributor price)." DE#523:2. On February 25, 2020, the government filed a notice identifying as vendor-victims the same five vendors discussed at the Soto trial, plus four others. By February 28, 2020, the number was twelve, at which point Javat unsuccessfully moved to strike the newly disclosed victim claims, or in the alternative to continue the hearing, complaining that the government's late disclosure circumvented Fed. R. Crim. P. 32(c)(1)(B), (d)(2)(D), and (e)(2). DE#526:3. *See* DE#526, 527.

At the March 3, 2020 hearing, the government presented no live witnesses, relying instead on the records submitted by the vendors reflecting purported discounts from their list prices. Javat reiterated his objection that there was

> no evidence that but for these transactions the seller had a willing buyer at a higher price at the time it sold the goods to Mr. Javat. Our understanding is that these sellers, for the most part, I think all of them, there was no limit of supply. There was excess capacity and so there was no lost opportunity for the seller when it chose to sell it at the export price rather than a different buyer at the domestic price.

DE#551:7. In response, the district court recalled "the evidence at trial showed that at least several of these victims would never have sold the products at the price they sold …so I reject that general principle you have." *Id.*

Relying on the self-serving summary charts presented by the vendor-victims and having quashed defense subpoenas seeking the underlying pricing data, the district court adopted the government's loss methodology and the corresponding extrapolated loss figures, over objection, as follows:

- Bayer ($630,296.64), relying on a "chart that sets forth the difference between the U.S. price and the price that was offered to [Javat's Company] Proton," DE#551:28-29.

- Parkell ($1,149,059.75), relying on a chart showing "the difference in prices for each of the shipments that Parkell did with [Javat's Company] Uniworld, … subtracting the number that Uniworld ultimately paid from their [the vendor's] U.S. distributor price for each of these shipments." DE#551:32-33.

- Sklar ($585,325.99) relying on a self-made "loss table." DE#551:45-47.[6]

- Andover Healthcare ($912,957.49), relying on "an itemized list of Andover products comparing the price that was extended to [Javat Company] Saif, and [contrasting] that with Andover HC Advantaged Extended." Javat objected because the government offered "no testimony as to what that means, as to what Andover HC extended, if that's ever given to Andover's customers, how much." "Andover products were made to order," and the government presented no evidence that the sale to Javat displaced another sale at a higher (or even the same) price. DE#551:50-52.

- DeMet's Candy ($859,248), relying on the "off-invoice allowance" reflected in the invoices, without any testimony to explain the suggested "discount." DE#551:53.

- Pascal ($631,604.44), relying on a chart accompanied by a "letter from counsel which sets forth the basis for their loss calculation." Pascal was not mentioned at the Soto trial and no witness testified at the hearing. DE#551:54-57.[7]

---

[6] Javat noted that "[d]uring the subpoena litigation Sklar maintain[ed] various inconsistent positions with regard to its pricing…. Sklar indicated that a determination of the lowest price offered for each of those products to any buyers, domestic and international, would require months of dedicated data entry and investigation to manually pull archived records."DE#551:47-48.

[7] Javat futilely objected to transactions that occurred days before his arrest: "if the Pascal goods that were sold to Mr. Javat were never ultimately resold inside of the

- Galderma ($416,045.10), relying on a chart accompanied by an e-mail from counsel, which differed from an earlier submission by Galderma. Javat noted that the discrepancy reflected "a domestic distributor discount" that had never before been disclosed in the proceedings. DE#551:57-58.

- Steris ($1,155,197.15), "based on the estimate of the difference between their U.S. price and the discounted price they offered as a result of the fraud." DE#551:68.

The district court deferred ruling as to the other vendors seeking restitution: Gojo, which vendor "reserve[d] the right to submit alternate [loss] numbers should it be appropriate," because the submission was "not sufficiently reliable." DE#551:60-64; Convatec, "given both the amount, the late filing of" the claim. DE#551:70; Kraft, DE#551:78; Purdue Pharma, DE#551:83; Bard, DE#551:83; Surgical Specialties, DE#551:84.

The district court filed an amended judgment imposing restitution totaling $7,195,254.56, from which Javat and Soto timely filed an amended notice of appeal, DE#553, 559. The district court set a second restitution hearing for April 2020, which was postponed four times until April 28, 2021, due to delays associated with the pandemic.

---

United States, this crime never reached fruition and, therefore, there can be no restitution with regards to any of those goods." DE#551:54.

Weeks prior to the second restitution hearing, Javat again sought to subpoena the manufacturers for their pricing data, but the court quashed them. DE#713.[8] On the day before the second restitution hearing, the government filed a "Notice Regarding Restitution," DE#716, outlining the additional restitution claims.

At that continued restitution hearing, Javat reasserted his objection to the government's methodology and even proposed an alternative: Javat's gain.

> Our view is that restitution in a criminal case is limited to capturing the cost of goods sold, not lost opportunity; particularly in a case like this one where there is no showing that there was a willing buyer to buy Javat's goods at the prices that the vendors are claiming they wished they had sold the goods to Javat for. So what [we have] done is given you a summary of the markups that Mr. Javat captured by acquiring these goods under the so-called export price, he then sold the goods into the domestic market at a markup. That markup is much lower than the proposed price that the sellers claim they would have liked to have charged Mr . Javat for those same goods. There's been no showing that anybody else in the marketplace would have paid those aspirational prices; and if there had been, of course, a rational seller like Bard would never have sold them at the lower price to Javat. A rational seller like Bard would have sold it at the highest price.

---

[8] The district court ruled that the subpoenas were untimely, even though Javat served the subpoenas on April 15, 2021, two weeks prior to the hearing and within three (3) days after the court *sua sponte* accelerated by four weeks the continued restitution hearing date for April 28, 2021, DE#710, having previously set the hearing for May 21, 2021. DE#707. The subpoenas were issued six (6) business days after undersigned met with Javat at the Federal Detention Center for the first time since the beginning of the pandemic in March 2020, Javat and undersigned having just been vaccinated. The subpoenas were issued in response to a 656-page restitution discovery production provided by the government to undersigned on February 25, 2021—discovery that had been in the government's possession for months but not produced until *after* four scheduled restitution hearings. See DE#714:2-3.

So the very fact that Bard chose to sell it at the export price proves that at that time, at that moment in history, Bard had one option, apparently. Javat was the highest offer that Bard could capture. Had they had another offer higher, naturally they would have accepted the higher offer.

DE#723:43. The district court was not persuaded. DE#723:45.

On April 27, 2021, the day before the continued restitution hearing, the government filed a "Notice Regarding Restitution," DE#716, outlining the additional restitution claims. The court again adopted the government's loss methodology and corresponding loss claims (except for one vendor), over objection, as follows:

- Convatec ($11,896,496.18), relying on a chart calculating the difference between the "US Distributor Base Extended Price" and the "Saif/Safe Traders Extended Invoice Price," with no testimony from the vendor regarding the meaning of those terms. Javat objected because "ConvaTec asserts claims for transactions from 2011 to 2012, which is well outside the period of the indictment… so we'd ask…to exclude those figures from the loss claim." DE#723:50.

- Gojo ($642,566.15), relying on a chart calculating the difference between "Case Price" and "1000 CS Price." Javat argued that Gojo "is a good example why it's unreliable to rely on a list price because GOJO at the March 3rd hearing asked for a figure that was -- ended up being double what they now

feel they're entitled to, because the original claim was based on the list price and the new claim is now based off the distributor discount that GOJO has admitted that it offers." DE#723:50.

- Surgical Specialties ($1,262,094), relying on a chart calculating the difference between "US Distributor Price" and "Uniworld's Price." Javat objected on the basis that Surgical Specialties used multiple, different "US distributor" prices for the same products, highlighting that the prices are "arbitrary and aspirational, and [] not a reliable way to calculate loss." DE#723:60.

- Bard ($2,135,077) – Bard based its losses off the purported difference between what Javat's company paid and "the average contract price" if the goods would have been sold in the US. Javat's first objection to Bard's loss calculation was that Bard claimed a loss of "approximately 1.1 million" and "now claims a loss of 2.135 million." DE#723:39. Javat then objected to the fact that Bard's declaration (which was requested by the court at the March 3, 2020 hearing) contained "no explanation as to what is meant by average contract price," "did not produce any of the numbers that supposedly generate this $3.8 million figure, so there's absolutely no way to confirm if that number is accurate," and was "signed by an employee of BD, which is the company that acquired Bard, and the BD representative did not explain how she is competent to offer an opinion as to Bard's losses." DE#723:40-41.

- Kraft ($4,048,073) – Javat objected to Kraft's loss claim on the basis that Javat was only purchased $400,000 of Kraft products during the conspiracy period, not the roughly $8 million proposed by the government. See DE#720-2 (declaration of warehouse manager Neal Crump). The court sustained Javat's objection only with reference to "losses" that Kraft incurred after Mr. Javat was arrested and in custody. DE#723:91.

- Campbell's ($1,841,682.40) – Javat objected to Campbell's loss claim on the basis that Javat never made any misrepresentations to Campbell's because Javat bought Campbell goods from an "international subsidiar[y]" of Campbell's. DE#723:48. Javat further objected that Campbell's calculated loss off its list price, despite the fact that Cambpell's attorney acknowledged at an earlier hearing that Campbell's has "various prices and discounts that Campbell provides to distributors." DE#723:49.

The district court also overruled Javat's objection to inclusion of those goods purchased from Bard, Gojo and Surgical Specialties that remained in the Javat company warehouse upon his arrest, which were never resold or diverted into the U.S. market. See DE#723:69; DE#720-2 (declaration of warehouse manager Neal

Crump). In the end, the district court increased the restitution award to $29 million. DE#718.[9]

## The District Court Overrules Objections to Forfeiture

The Superseding Indictment sought forfeiture "pursuant to Title 18, United States Code, Section 982(a)(2)(A), and the procedures set forth in Title 21, United States Code, Section 853, made applicable by Title 18, United States Code, Section 982(b)(1)." DE#145:12. The Superseding Indictment did not affirmatively seek a so-called forfeiture money judgment.

Just days before sentencing, the government filed a motion for preliminary order of forfeiture seeking a forfeiture money judgment in the amount of $26.3 million, which the district court initially granted without awaiting a response from the defendants. DE#448, 451. On Javat's oral motion at sentencing on December 16, 2019, the district court vacated the Preliminary Order of Forfeiture to allow for a response, which Javat timely filed; Javat challenged, *inter alia*, the statutory basis for forfeiture, given that the Superseding Indictment did not seek a money judgment and alleged forfeiture under 18 U.S.C. § 982(a)(2)(A), which the government conceded did not apply. See DE#474:2.

---

[9]  Specifically, a $29 million restitution was imposed jointly and severally against Javat and Soto, and $750,000 apportioned separately against Chopra (DE#541), and $7,500 against Armando. DE#542.

At Javat's sentencing, the district court did not order any specific property forfeited or enter a forfeiture money judgment. Neither the initial judgment nor the later amended judgments mention money judgments, forfeiture amounts, or forfeiture statutes; instead, it states: "Forfeiture of the defendant's right, title and interest in certain property is hereby ordered." DE#460:6, 539:6, 718:6.

In its post-sentencing Motion for Preliminary Order of Forfeiture, the government sought the entry of a Preliminary Order of Forfeiture pursuant to 18 U.S.C. §981, a different forfeiture statute than alleged in the indictment, in the amount of $26,272,279.45, based on QuickBooks files from the hard drive of co-defendant Sipprell's computer. DE#516. The district court found:

> Per the Defendant's own records, summarized at Motion, ECF No.[516] Exhibit A, the total of all sales for the period March 2014 through October 2017 was $62,772,601.28. Per the Defendant's own records, the total "Cost of Goods Sold" during that same time frame was $36,500,321.83. Defendant's net income from the diversion scheme during the wire fraud conspiracy period, was $26,272,279.45. The $26,272,279.45 would not have been obtained by the Defendant "but for" his wire fraud conspiracy. The $26,272,279.45 constitutes proceeds traceable to the offense of conviction, which sum may be sought as a forfeiture money judgment pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure.

DE#536:3.

To collect on the forfeiture money judgment, the government later moved the district court to forfeit untainted property purportedly owned by Javat. DE#579. Javat's objection, DE#588, was overruled, DE#641, the district court ordered

25

forfeiture of certain real property, DE#643, Javat appealed, and this Court affirmed. 11th Cir. No. 20-13310 (decided Mar. 9, 2022).

For his part, Soto stipulated to entry of a forfeiture money judgment of $100,000, reserving the right to revisit it if his convictions are vacated. DE#500:141.

## STANDARD OF REVIEW

This Court reviews the sufficiency of the evidence to support a conviction is reviewed *de novo.* The record is viewed in the light most favorable to the verdict, drawing all reasonable inferences and resolving all questions of credibility in favor of the government. *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003). A conviction is affirmed only where "if a reasonable juror could conclude that the evidence establishes guilt beyond a reasonable doubt." *Id.* The legality of an order of restitution is reviewed *de novo. Id.* at 1275. The district court's interpretation of relevant federal criminal statutes and rules is reviewed *de novo. United States v. Krawczak,* 331 F.3d 1302, 1305 (11th Cir. 2003)

## SUMMARY OF THE ARGUMENT

Fundamental errors denied Soto his right to a fair trial, and multiple sentencing errors occurred. Appellants have divided and adopted issues to aid the appellate process, and Soto further by reference Byram Moneck Javat's Summary of Argument as to Issues I, II and IV. As to the issues raised herein, Soto states:

1.     The district court abused its discretion in excluding the testimony of Soto's expert witness on the following topics relevant to Soto's state of mind at the time of the offenses, before Soto declined to testify:  (a) FDA-regulated product requirements, (b) how the gray/secondary market works, (c) the fact that the gray/secondary market is a large in the United States, and (d) whether simply engaging in or facilitating the importation of gray/secondary market merchandise would be a "red flag" that the transaction emanated from a scheme to defraud or deceive the seller/manufacturer.  U.S. manufactured gray or secondary markets for the type of goods in the matter are not illegal under the common law.  Without this testimony, Soto was denied his right to a complete defense in violation of the Fifth and Sixth Amendments, U.S. Const., as the testimony was (a) relevant to Soto's state of mind regarding one or more the elements of the charged offenses, (b) had substantial impact on the credibility of an important government witness, and/or (c) tended to place the prosecution's story in a significantly different light.

2.     The district court abused its discretion in admitting irrelevant, highly prejudicial and speculative "other crimes, wrongs or acts" hearsay evidence consisting of email communications with customers unrelated to this matter, without sufficient foundation and proof that the acts were similar to the offenses charged and that the transactions involved the gray market diversion of goods.  The emails show that Soto performed services as a freight forwarder, inspecting a shipment for

expired or damaged goods, repacking the goods per the customer's delivery notes, removing labels and tracking devices of the customer's supplier to avoid the supplier or the delivery customer from circumventing Soto's customer's sources and clientele. Moreover, the emails do not show that Soto's prior acts involved product diversion or that material misstatements of fact were made to the manufacturer. As a result, the "similar fact" evidence the jury received failed to satisfy Rule 404(b)'s three prong test, were replete with hearsay statements, and resulted in highly irrelevant and prejudicial evidence being admitted at trial.

3. The evidence was insufficient to convict Soto of all counts of the indictment. As to Counts I and III, the evidence failed to show that Soto engaged in a "scheme to defraud" as opposed to a scheme to deceive, lie or trick. The manufacturers received what they bargained for: full payment for the goods purchased. In addition, the evidence failed to show that Soto had knowledge of the fraudulent statements Javat and others made to entice manufacturers or distributors to offer deeply discounted prices. The evidence failed to show that Soto agreed to perform an illegal act as to all counts charged. With regard to sufficiency, Soto has adopted Javat's arguments that apply to Soto as to the charges in Counts 3 through 7 of the indictment.

4. The cumulative sentencing errors in this matter escalated Soto's exposure from a possible non-incarcerative sentencing exposure to 6 years

incarceration. In addition to the sentencing errors raised in Arguments 1 and 2 of Javat's brief, the district court erred in denying Soto's request for a minor role reduction as Soto was not involved in all the transactions and performed certain tasks, only received a flat fee, and thus, had no proprietary interest in the charged activity. When a defendant does not have a proprietary interest in the offenses charged, the fact that the defendant performs "an essential or indispensable role" does not disqualify him for a minor role reduction.

5. The district court further improperly enhanced Soto because he holds a Customs' broker's license. An applicant only needs to be at least 21 years old, of good moral character and pass a brokers exam. Unlike the examples of professions provided in the Sentencing Guidelines, no college degree or course is required.

**ARGUMENT**

**I.**

**THE DISTRICT COURT DENIED SOTO THE RIGHT TO PRESENT A COMPLETE DEFENSE IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS BY EXCLUDING EXPERT TESTIMONY THAT WAS: (1) RELEVANT TO SOTO'S STATE OF MIND REGARDING ONE OR MORE ELEMENTS OF THE CHARGED OFFENSES, (2) HAD A SUBSTANTIAL IMPACT ON THE CREDIBILITY OF AN IMPORTANT GOVERNMENT WITNESS, AND/OR (3) TENDED TO PLACE THE PROSECUTION'S STORY IN A SIGNFICIANTLY DIFFERENT LIGHT.**

In determining whether the district court erred in excluding testimony by an expert witness, this Circuit will reverse a conviction where there is a clear abuse of discretion. *United States v. Lankford*, 955 F.2d 1545, 1550 (11th Cir. 1992),[10] *citing United States v. Rodriguez,* 917 F.2d 1286 at 1289, n. 6 (11th Cir. 1990). However,

---

[10] *Lankford* is a criminal tax case discussed, *infra*.

"where the element of willfulness is critical to the defense," as it is in this matter, "the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent." *Id.* at 1545 *citing United States v. Garber,* 607 F.2d 92, 99 (5th Cir.1979) (en banc).

The Government elicited testimony from its sole cooperating witness, Emanuel Daskos, regarding his opinion as to whether there was any conceivable, legitimate reason to export and reimport goods. Tr. 8-21-2019, p. 200. The Government did not seek or request Mr. Daskos to be qualified as an expert -- yet elicited from Daskos the fact that he had "25 years" experience in the industry importing and exporting goods, and that in his opinion, there is not any legitimate reason to reimport goods. Tr. 8-21-2019 p. 200-201. That testimony, together with the similar act evidence admitted[11] concerning Soto's alleged prior involvement with brokering and facilitating the re-importation of gray market goods, was for no other purpose but to infer that by engaging in gray market imports and product diversion, Soto must have known that his co-defendants were engaged in the charged offenses and that by serving as the broker for the transactions, he willfully participated in the substantive offenses and joined the charged conspiracies.

Gray or secondary markets for the types of products involved in this matter are not illegal under common law, U.S. Customs laws or Florida State laws, but the

---

[11] The improper admission of the similar act evidence is addressed in Argument II.

retail signage is regulated in some states, such as California. See *Impression Prods v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523 (2017) (patent-protected goods may be freely sold after the first authorized sale); 19 C.F.R. §§ 133.2(3), 133.23; 64 Fed. Reg. 9058. See also, *Legal Review of Gray Market Goods*, https://www.rrlaw.com/grey-market-goods and Cal Civ Code Div. 3, Pt. 4, Title 1.7, Ch. 4.[12] See also, *Grey Market Goods and modern Int'l Commerce: A Question of Free Trade*, <u>Fordham Int'l Law Journal</u>, Vol. 10, Issue 2, Article 6; *Grey Market Litigation in the United States District Courts,* <u>N. Carolina Journal of Int'l Law</u>, Vol. 11, No. 2, Article 9, Spring 1986.

Moreover, U.S. Customs regulations only prohibit <u>*foreign*</u> made gray market goods that are physically and materially different from goods intended for sale in the United States *if* the trademark owner is able to state with particularity and show with competent evidence the following proof:

(1) differences in specific composition (including chemical composition);

(2)  differences in formulation, product construction, structure, or composite product components;

(3)  differences in performance and/or operational characteristics;

(4) differences resulting from legal or regulatory requirements, certification, etc.;

---

[12] California statutes do not prohibit the sale of grey market products but do require disclosures to the consumer. *See*, Cal Civ Code § 1797.81.

(5) differences in other distinguishing and explicitly defined factors that would likely result in consumer deception or confusion as proscribed under applicable law.

See 19 C.F.R. 133.2(e); 64 Fed. Reg. 9058, pp. 4-6.[13]

In response to the Government's mid-trial motion to exclude Soto's expert witnesses, (DE: 351) Soto proffered that Mr. England's expert testimony would address the following topics:

(a) FDA-regulated product requirements,

(b) how the gray/secondary market works,

(c) the fact that the gray/secondary market is at large in the United States, and

(d) whether simply engaging in or facilitating the importation of gray/secondary market merchandise would be a "red flag" that the transaction emanated from a scheme to defraud or deceive the seller/manufacturer.

Tr. 8-21-2019, p.p. 240-241, 245.

Soto's trial counsel reminded the trial court that <u>no</u> evidence showed "that Mr. Soto ever made a fraudulent statement to any manufacturer." *Id.* at 24-41. Counsel also proffered that the expert would address the Government's claims and witness testimony stating that there was a health and safety hazard to the American public. Soto's counsel explained, the "secondary or grey market, in this kind of FDA-

---

[13] Even where the manufacturer satisfies the rigorous standard for excluding foreign manufactured gray market products, the product can be sold in the United States if a label is placed on the product identifying that the product was not authorized by the U.S. trademark holder and is physically and materially different from the authorized product. 19 C.F.R. 133.23(b).

regulated product, is huge and is not a health and safety hazard to the American public." *Id.*

Despite the testimony of Mr. Daskos opining that there was no legitimate purpose for engaging in the gray or secondary market, the District Court excluded Mr. England's testimony immediately before the defendant's case in chief, before Soto decided whether he should testify. Tr-8-23-2019, p. 32. This evidence was a crucial foundation for Soto's testimony and for the jury to weigh his *mens rea* for the offenses charged.

"A criminal defendant's right to present witnesses in his own defense during a criminal trial lies at the core of the fifth and fourteenth amendment guarantees of due process." *United States v. Ramos*, 933 F.2d 968, 974 (11th Cir. 1991) (per curiam). In *United States v. Hurn*, 368 F.3d 1359 (11th Cir. 2004), this Court articulated four circumstances where exclusion of evidence may violate a defendant's constitutional rights:

> First, a defendant must generally be permitted to introduce evidence directly pertaining to any of the actual elements of the charged offense or an affirmative defense. Second, a defendant must generally be permitted to introduce evidence pertaining to collateral matters that, through a reasonable chain of inferences, could make the existence of one or more of the elements of the charged offense or an affirmative defense more or less certain. Third, a defendant generally has the right to introduce evidence that is not itself tied to any of the elements of a crime or affirmative defense,

but that could have a substantial impact on the credibility of an important government witness. Finally, a defendant must generally be permitted to introduce evidence that, while not directly or indirectly relevant to any of the elements of the charged events, nevertheless tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently.

368 F.3d at 1363 (footnote omitted).

The District Court's ruling that *all*[14] of the proffered testimony from Mr. England was excluded did not address the second through fourth *Hurn* criteria. The trial court reasoned that "Mr. England's proposed testimony regarding customs laws and/or regulations is not relevant and would likely cause jury confusion. Mr. Soto's compliance with customs or FDA requirements and the supposed legality of the dealings in the grey market are not part of the Government's case." The court further asserted that "these laws and regulations are not in issue in this case" and "Mr. England's testimony regarding compliance with particular laws or regulations is akin to impermissible good acts evidence…." Tr-08-22-2019, pp. 251-252.

Based upon the trial court's findings, it is clear that the court misunderstood the impact of Mr. Daskos' opinion testimony, the similar act evidence and the Government witnesses' assertions that gray market products are harmful to U.S. consumers – all collateral matters under *Hurn's* second prong that the Government

---

[14] For the purposes of this appeal, Soto is not asserting that the testimony regarding victim negligence was improperly struck. *Id.* at 252-253.

admitted to infer that Soto knowingly engaged in the charged offenses. The court also misunderstood that even if a particular rule of evidence would normally bar the admission of certain evidence, there may sometimes be compelling reasons to grant an exception to evidentiary rules. See *Hurn,* at 1363 n.2 ("[T]he fact that a particular rule of evidence requires the exclusion of certain evidence is not dispositive, as particular applications of a generally valid rule may unconstitutionally deny a defendant his rights under the Compulsory Process or Due Process Clauses."), cited with approval in *United States v. Ruan*, 966 F.3d 1101, 1154 (11th Cir. 2020).

A defendant has "the right to introduce evidence . . . that makes the existence or non-existence of some collateral matter somewhat more or less likely, where that collateral matter bears a sufficiently close relationship to an element of the offense." *Hurn,* 368 F.3d at 1364. Although the chain of inferences cannot be "too long, dubious, or attenuated," *id.* at 1366, the right applies with special force "where the government attempts to use [the] collateral matter as the basis for securing a conviction," *id.* at 1365. Here, the Government unquestionably used collateral matters regarding the legitimacy of engaging in gray/secondary market goods, similar act evidence, and inflammatory testimony regarding the harm of those products upon consumers, to secure Soto's conviction.

*Hurn* cited *United States v. Sheffield,* 992 F.2d 1164 (11th Cir. 1993) as an example where right to introduce evidence that is not directly relevant to an element

of the offense, but that makes the existence or non-existence of some collateral matter somewhat more or less likely that bears a sufficiently close relationship to an element of the offense. *Id.* at 1364. In *Sheffield,* the defendant was an Air Force employee convicted of embezzling U.S. Government property because he ordered his subordinates to produce fishing lures for his personal use. He attempted to demonstrate that this was part of a legitimate, authorized custom on the base of making retirement presents for high-ranking civilian and military officials. The district court excluded all evidence concerning the existence of such a custom.

*Sheffield* noted that, like the proffered expert testimony in this matter, the evidence proving that such a custom existed was not directly relevant to any of the elements of embezzlement charges. Nevertheless, the existence of the custom was a collateral matter that was itself relevant to the *mens rea* element of the offense. That is, if the defendant was acting pursuant to an established, authorized custom, then he was not intentionally doing anything wrong. *Id.* at 1170 ("Evidence of the gift-making custom was relevant to [the defendant's] state of mind when he ordered the production of fishing lure molds."). Consequently, exclusion of the evidence violated the defendant's rights. *Id.*

*Hurn* also examined the Court's ruling in *United States v. Lankford*, 955 F.2d 1545 (11th Cir. 1992), in which the defendant was convicted of filing false tax returns. The Eleventh Circuit reversed the conviction because, like here, the court

excluded, *inter alia*, a defense expert.  With regard to the expert testimony, the

Eleventh Circuit held:

> "the district court had prevented a defense expert from
> testifying that the defendant's belief in the legality of his
> acts was reasonable. To be convicted of filing false tax
> returns, the government had to prove that the defendant
> acted "willfully;" that is, that he knew he was breaking the
> law. *Id.* at 1550. We recognized, however, that it would be
> difficult if not impossible for a defendant to introduce
> direct evidence specifically about his mental state.
> Consequently, he had to focus on providing circumstantial
> evidence concerning collateral matters, such as the
> reasonableness of his beliefs, from which the jury could
> infer what his mental state was.  The more untenable his
> belief that he was acting legally, the less likely he actually
> held it. *Id.* at 1550-51.  Because proof demonstrating the
> "reasonableness" of the defendant's beliefs was therefore
> indirectly relevant to an actual element of the offense
> ("willfulness") through a short chain of inferential
> reasoning, the defendant had the constitutional right to
> introduce it. *Id.* at 1551 ("By disallowing expert testimony
> on the gift/income issue, the trial court deprived [the
> defendant] of evidence showing that his asserted state of
> mind was reasonable. Accordingly, we hold that the
> exclusion of expert testimony on this issue was error.").

*Hurn*, 368 F.3d at 1365.

The evidence proffered here likewise was relevant to the *mens rea* element of

the offenses charged because it showed that a broker's knowledge that he/she was

handling gray market goods was not a "red flag" that they were obtained through a

scheme to defraud or fraudulently obtained as charged in the indictment. It further was relevant under *Hurns'* third and fourth criteria, because it had a substantial impact the credibility of the Government witnesses' testimony and opinions and/or tends to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently than the story the Government painted.

The exclusion of Soto's expert testimony was not harmless because the Government's direct evidence against Soto was weak. No direct evidence showed that Soto was ever involved in or was aware of the false statements made to entice the manufacturers to offer significantly lower prices. The Government's theory rested entirely on the circumstantial and "similar fact" evidence – evidence that Soto sought to confront with expert testimony showing that it was reasonable to believe that gray market distribution was legal. Stated differently, the mere fact that goods are diverted or re-routed from their export destination, does not mean that fraudulent statements were made to the manufacturer to obtain significantly lower prices than otherwise would have been offered.

The same analysis applies to Counts 5, 6 and 7 where Soto is charged with conspiracy and two related substantive offenses charging that he knowingly and willfully obtained pre-retail medical products through fraud or deception. Because the Government had no direct evidence that Soto participated in or received copies

of the communications with manufacturers laced with false information devised to entice the manufactures to sell their products for lower prices than what otherwise was available, the Government's case relied upon inferences drawn from the inaccurate testimony and opinions that gray market transactions are rare and make no economic sense absent fraudulent representations that cause manufacturers to part with their goods at prices that otherwise would not have been offered. Soto should have been allowed to present the expert's testimony on these critical issues.

As a result, the error in excluding Soto's expert testimony was not harmless and his convictions should be reversed and remanded for a new trial.

## II.

**THE DISTRICT COURT ABUSED ITS DISCRETION ADMITTING IRRELEVANT, PREJUDICIAL AND SPECULATIVE "OTHER CRIMES, WRONGS OR ACTS" HEARSAY EVIDENCE WITHOUT SUFFICIENT FOUNDATION AND PROOF THAT THE ACT WAS SIMILAR TO THE OFFENSES CHARGED, AND THAT THE TRANSACTION INVOLVED THE GRAY MARKET DIVERSION OF GOODS.**

Rule 404(b) allows admission of other crimes evidence if it is (1) relevant to a material issue, (2) established by a preponderance of the evidence, (3) more probative than prejudicial, (4) and similar in kind and close in time to the events at issue. Fed. R. Evid. 404(b). Prior to trial, Soto filed a motion to exclude 404(b) evidence consisting of email communications between Soto and individuals unrelated to offenses charged "who allegedly fraudulently diverted FDA-regulated products." DE 299. The prosecution claimed that the emails "demonstrate that Soto knowingly assisted in the fraudulent diversion of products" with other individuals. *Id.* Trial counsel's motion and objections at trial asserted that the "email communications are irrelevant and otherwise are impermissible propensity or character evidence" and even if relevant or admissible, were "unfairly prejudicial or confusing to the jury" in violation of Rule 403. *Id.* Counsel noted that the e-mail communications "do not prove that the unrelated transaction[s] were part of a fraudulent scheme." *Id*. at 3. In addition, trial counsel objected on hearsay grounds. Tr-8-22-2019, pp. 235.

An examination of the email communications shows that they are highly irrelevant to show that Soto facilitated misrepresentations to suppliers or manufacturers, were irrelevant to show either that Soto facilitated misrepresentations to obtain lower pricing or divert export only foreign manufactured products for distribution in the United States. Rather, the emails show that the client requested

Soto to perform the services of a freight forwarder.  The industry distinguishes

freight brokers and forwarders as follows:

> "Freight forwarders perform some similar services to freight brokers in that they arrange the transportation of a shipper's cargo by contracting with third-party carriers to ship freight. Like freight brokers, freight forwarders usually do not own carrier assets (such as trucks or trains) used to transport freight. However, freight forwarders also take an active role in the preparation and shipment of a shipper's cargo in ways that freight brokers do not.

> Freight forwarders often perform a wide range of services for their clients. These services can include packaging services, warehousing, consolidating shipments, and preparing customs paperwork. Freight forwarders ship under their own bills of lading (called house bills of lading or HBLs). Freight forwarders also often own their own fleet of containers that they use to prepare cargo for shipment."

See, https://www.suretybondsdirect.com/educate/differences-between-freight-brokers-and-freight-forwarders#:~:text=Freight%20Broker%20vs.&text=A%20freight%20forwarder%20arranges%20transportation,freight%20within%20their%20home%20country.

In the 2015 and 2017 emails, the customer requested Soto to perform freight

forwarding services: inspect and identify damaged and expired goods, repack the

goods per the customers delivery notes, and remove of labels and tracking devices

of their supplier – a prudent, common-sense measure to avoid the next vendor or the

supplier from circumventing Soto's customer sources and clientele to purchase/sell

the product directly.  See. Govt. Ex. U32-U34.

Moreover, the emails do not show that Soto engaged, as the prosecution claimed, in product diversion. For instance, the 2017 emails entered as Govt. Ex. U34 the customer explicitly instructs Soto to do the following "[a]fter checking the goods: … please ship the goods to Austria, to our clients or they pick up the goods. You will get an advice for this." See Govt. Ex. 34 at p. 2, email dated June 6, 2017.

In the 2015 emails, the packing list attached to the shipping box did not match the contents of the box. The packing list is for Farrell valve pressure relief bags assembled in Mexico and the shipping box contained sealed cases 3M Medipore H Soft Cloth Surgical Tape manufactured in the United States. These emails do not describe the contents of the shipping box. The 3M boxes are not labeled "Export Only" or "Not for Sale in the United States." See Govt. Ex. U33, p. 8. As a result, one cannot infer from these facts alone that the 3M Medipore tape was a gray market product. It is more likely that the Farrell mastercases were repacked with 3M Medipore tape. See Gov. Ex. U33 at DE: 386-5.

As a result, the services the customer requested Soto to perform in 2015 and 2017 were the normal services of a freight forwarder and broker. The goods were inspected for damage, supplier labels were removed to prevent circumvention, and the product was repacked to ship to the client's customers in Austria and other customers in the United States.

When determining whether the district court abused its discretion by admitting evidence of a defendant's prior bad acts under Rule 404(b), this Circuit employs a three-part test:

> "First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act. Third, the evidence must possess probative value that is not substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403."

*United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc).

The prosecution's "404(b)" evidence failed every prong of the test. The evidence was highly irrelevant, there was insufficient proof that Soto engaged the acts the prosecution claimed (misrepresentations to the manufacturer or in product diversion), and any probative value the emails had was substantially outweighed by its undue prejudice. This evidence was inflammatory and permitted the jury, without the benefit of Mr. England's expert testimony, to speculate that Soto committed a prior bad act. As a result, the evidence was inadmissible as 404(b) evidence and excludable under Fed. R. Evid. 403.

Furthermore, the three exhibits are replete with hearsay statements that were improperly admitted as co-conspirator hearsay. No evidence demonstrated that Soto and his customer were engaged in a scheme to defraud in violation of 18 U.S.C.

§1343.  See Argument III below. As a result, the admission of the emails was an abuse of discretion and warrants reversal and remand for a new trial.

## III.

## THERE WAS INSUFFICIENT EVIDENCE THAT SOTO HAD KNOWLEDGE OF AND INTENTIONALLY AGREED TO PARTICIPATE IN A SCHEME TO DEFRAUD TO OBTAIN GOODS AT SUBSTANTIALLY LOWER PRICES.

### A. The Evidence Failed to Prove a "Scheme to Defraud"

Deception or trickery to obtain a product, is insufficient to wire or mail fraud. As this Court recognized in *U.S. v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) the wire-fraud statute, 18 U.S.C. § 1343 did not enact as federal law the Ninth Commandment given to Moses on Sinai.[15] *Id.* at 1307. "Congress could have made criminal any "scheme" *simpliciter*, but chose not to do so."  *Id.* at 1313.  Title 18 U.S.C. § 1343 forbids only schemes to defraud, as opposed to a scheme to engage in other wicked things, e.g., schemes to lie, trick, or otherwise deceive.   The

---

[15] See Exodus 20:16 ("Thou shalt not bear false witness against thy neighbor.") (KJV). *Id.* at 1307, n. 1.  The issue raised in *Takhalov* was the district court's failure to provide a theory of defense instruction regarding the type of deception they engaged in was not a crime.  *Id.* at 1317.

difference between schemes to defraud and schemes to deceive is that "deceiving does not always involve harming another person; defrauding does." *Id.* at 1307.

*Takhalov*, therefore, examined the difference in meaning between defrauding and deceiving, explaining:

> [T]o defraud, one must intend to use deception to cause some injury; but one can deceive without intending to harm at all. *See Black's* at 492 (defining the word "deception" as "[t]he act of deliberately causing someone to believe that something is true when the actor knows it to be false"); *Webster's* at 585 (defining the word "deception" as "the act of deceiving, cheating, hoodwinking, misleading, or deluding"). Thus, deceiving is a necessary condition of defrauding but not a sufficient one. Put another way, one who defrauds always deceives, but one can deceive without defrauding.

> For this reason, the law in the Eleventh Circuit makes clear that a defendant "schemes to defraud" only if he schemes to "depriv[e] [someone] of something of value by trick, deceit, chicane, or overreaching." *Bradley,* 644 F.3d at 1240. But if a defendant does not intend to harm the victim—"to obtain, by deceptive means, something to which [the defendant] is not entitled"—then he has not intended to defraud the victim. *Id.*

> From that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to deceive, but not one to *defraud*.

1312-1313.

*Takhalov* provides multiple examples contrasting schemes to *deceive* against schemes to *defraud.* In each, the Court noted that in the scheme to deceive, the alleged victim was enticed or motivated to buy, sell or trade something based upon a false story or lie, but did indeed receive what they bargained for – money, merchandise or a service. The fact that the "victim" would have not entered the transaction but for the lie is not relevant. The reason was simple: The victim received what they bargained for. As a result, the Court concluded that such evidence would be insufficient to prove a scheme to defraud.

The Court then contrasted the same false story or lie with facts that resulted in the victim being defrauded: lack of payment or payment with counterfeit funds, non-receipt of the merchandise or receipt of fake merchandise, and non-receipt of the service paid for. In such instances, the evidence was sufficient to prove a scheme to defraud because the victims did not receive what they bargained for.

This Court then applied its reasoning to the *Takhalov* defendants' scheme to entice and lure victims to visit the defendants' bars and night clubs and purchase alcoholic beverages at inflated prices. The undisputed facts showed that the defendants hired "Bar Girls" or "B-girls" – to pose as tourists, locate visiting businessmen, and lure them into the defendant's bars and nightclubs. The B-girls never revealed that they worked for the defendants.

The *Takhalov* defendants disputed the Government's claims that once inside the bar, the employees would pour vodka in the men's beer to get them drunker, misrepresent the prices of the drinks, the menus, cover up prices, and forge the men's signatures on credit-card receipts. *Id.* at 1310. The defendants asserted that they were shocked and had no knowledge that fraud was on-going in the nightclubs and bars (i.e., the lying about prices, the forging of signatures). They testified that they were merely investors and were not involved in the day-to-day workings of the clubs. The defendants asserted that none of these allegedly swindled men were truly victims: they knowingly entered the clubs, bought bottles of liquor, and drank them with their female companions.

This Court agreed with the defendants' view, "these men got what they paid for—nothing more, nothing less." *Id.* at 1310-1311. As the defendants argued, "just because they used promoters to persuade men to come to their establishments does not constitute fraud with regard to wire fraud or conspiracy to commit the frauds charged." *Id.* at 1310.

In this matter, Counts 1 through 4 charged the defendants[16] with conspiracy to commit wire fraud and three substantive wire fraud counts in violation of § 1343 through a sales pitch "scheme" that encouraged manufacturers and distributors to sell goods to Javat's companies at "deeply discounted prices." Like the facts alleged

---

[16] Soto was not charged in Count 2.

in *Takhalov*, the enticement involved deception and trickery.  However, the victims received the price for the merchandise they charged.  Just because one or more of the alleged conspirators used deception or trickery to entice the sellers to offer deeply discounted prices, does not constitute a "scheme to defraud."  Accordingly, the evidence failed to prove a conspiracy to defraud or the substantive wire fraud charges against each of the defendants.

**B. The evidence failed to show that Soto had knowledge of the fraudulent statements made to entice manufacturers or distributors to offer deeply discounted prices.**

The evidence at trial did not show that Soto heard or received a copy of the sales pitch that Javat or his companies (hereinafter "Javat") made to obtain products at lower prices.   Nor did the evidence show that Soto was aware of (a) the price Javat paid for the goods, (b) the list or normal selling prices for the goods, or (c) that Javat represented that the goods would be resold to the U.S. military in Afghanistan.

The evidence only showed that Soto, as the broker of the imported goods, had knowledge that the goods were diverted from their shipping destination and imported into the United States as gray market products.  No evidence showed that the manufacturers were not paid or were paid less than the price they agreed upon. See *Takhalov* discussion*, supra*.

However, the evidence did show that Soto agreed to perform acts that are not illegal by serving as the broker or freight forwarder of the gray market goods.  An

agreement to commit an unlawful act is the essence of conspiracy law. While the prosecution need not show that the agreement in a charged conspiracy was explicit and the agreement can be inferred from the facts and circumstances of the case, the prosecution must show that Soto agreed to perform an *illega*l act. See *Iannelli v. United States*, 420 U.S. 770, 777 (1975), *United States v. Michel,* 588 F.2d 986, 994 (5th Cir.), *cert. denied*, 444 U.S. 825 (1979); *United States v. Gordon*, 580 F.2d 827, 834 (5th Cir.), *cert. denied*, 439 U.S. 1051 (1978).

As outlined in the first argument in this brief, U.S. Customs laws do not prohibit the importation and sale of domestically produced gray market goods. Customs regulations only prohibit the importation of foreign made goods where the manufacturer or trademark holder satisfies a stringent test. See 19 C.F.R. 133.2(e), 64 Fed. Reg. 9058. Thus, engaging in broker or freight forwarding services involving gray market products is not a crime or a red flag that a crime is occurring.

Soto had no information that the charged gray market transactions were any different than any other legal gray market transactions he observed or performed services for. Accordingly, such conduct cannot serve as a basis to infer that Luis Soto joined the conspiracies charged in the indictment to defraud manufacturers, conspired to engage in theft of pre-retail medical products or had sufficient knowledge to be found guilty of the substantive charges that are the objects of the conspiracies charged in Counts 1 and 3 through 7 of the indictment and cannot serve

as a predicate act to support a conspiracy charge.  Therefore, even if it was charged in the indictment, Soto's agreement to act as a freight forwarder of gray market products is not a crime, and, therefore, is not a conspiracy.

## IV.

## THE DISTRICT COURT ERRED IN DENYING SOTO'S REQUEST FOR A MINOR ROLE REDUCTION.

At sentencing, the trial court denied Soto's request for a reduction for mitigating role. Sent. Tr:12-16-2019, pp.64-68, DE#445. This Court reviews such denials for clear error. *United States v. Bernal-Benitez,* 594 F.3d 1303, 1320 (11th Cir. 2002).  A preponderance of the evidence must show that the defendant's role was minor or minimal. *United States v. Cruickshank,* 837 F.3d 1182,1192 (11th Cir. 2016).

A two-point minor role reduction is warranted where a defendant is "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id. §3B1.2, comment (n.5).* A defendant's role must be measured "against the relevant conduct for which he has been held accountable" in his base offense level, and against "other discernable participants in the relevant conduct." *United States v. Rodriguez De Varon,* 175 F.3d 930,940-41,44-45 (11th Cir.1999)(en banc)." A defendant is not disqualified from receiving a reduction if he

is paid to perform certain tasks that are "an essential or indispensable role in the criminal activity," but he "does not have a propriety interest" in the offenses. See U.S.S.G. §3B1.2, App. Note 3(C).

Soto had no propriety interest in the offense other than his normal fixed fees. No evidence showed that Soto charged higher fees for some individuals, such as Javat, and lower fees for others that do not reimport goods. Sent.Tr:12-16-2019 pp. 67.

Moreover, Soto had no knowledge that Javat obtained the goods for less money based upon a deceptive sales pitch and never received any of Javat's communications sent to manufacturers. Soto had no decision-making capacity. When compared to the culpability of other defendants, Soto's role, while an important piece, was minor. Sent. Tr:12-16-2019, pp.64-68. As a result, the sentencing court erred in denying a minor role reduction.

## V.

## THE DISTRICT COURT ERRED IN DENYING SOTO'S OBJECTION TO SPECIAL SKILL ENHANCEMENT.

The sentencing court denied Soto's objection to a two-level enhancement for special skill. A "special skill" is a "skill not possessed by members of the general public and usually requiring substantial education, training or licensing." *U.S.S.G.*

*§3B1.3. cmt. (n. 4).* No reported case has addressed whether a customs broker is a special skill. The examples provided in the Application Notes are "pilots, lawyers, doctors, accountants, chemists and demolition experts." *Id.*

Soto's education, training or license as a customs broker does not approximate the degree of education, training or licensure required for any of these examples contained in the Application Notes. Customs brokers take an exam to get a customs brokers license. There is no special degree or training required. To become a customs broker, you must simply pass the broker exam, submit an application and must be 21 years old, possess good moral character, and not be a federal employee. No degree or training is required. See, https://www.cbp.gov/trade/programs-administration/customs-brokers/  becoming-customs-broker.   Accordingly, the sentencing court erred in imposing a two-point enhancement for special skills.

## CONCLUSION

This Court should reverse the conviction of Luis Soto, or in the alternative, reverse and remand for a new trial or resentencing.

Dated:        March 17, 2022.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(g)**

Counsel for Appellants/Defendants hereby submits its Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements pursuant to F.R.A.P. 32(a), and certify:

1. This brief complies with the type-volume limitation of F.R.A.P. 32(a)(7)(B) because this brief contains 11,852 words, excluding the parts of the brief exempted by F.R.A.P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of F.R.A.P. 32(a)(5) and the type style requirements of F.R.A.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font, Times New Roman.

By: */s/ Rhonda A. Anderson*
Rhonda A. Anderson
Fla. Bar No. 708038
RHONDA A. ANDERSON, P.A.
2655 LeJeune Road, Suite 540
Coral Gables, Florida 33134
Tel:      305-567-3004
Fax:     305-476-9837
Email:    randersonlaw@gmail.com

*Attorney for Appellant, Luis Soto*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 17, 2022, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system. I also hereby certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Rhonda A. Anderson*
Rhonda A. Anderson
RHONDA A. ANDERSON, P.A.