# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,
    *Appellee,*

    v.                        **Appeal Nos. 19-15168, 20-11137**

BYRAMJI MONECK JAVAT, et al.,
    *Appellants.*
_____/

CALH HOLDING CORP. and
PENNCO, LLC,
    *Third-Party Petitioners-Appellants,*

    v.                        **Appeal No. 21-13593**

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee.*

_____

### *On Appeal from the United States District Court*
### *for the Southern District of Florida*

_____

## PRINCIPAL BRIEF OF APPELLANT
## BYRAMJI MONECK JAVAT

_____

Richard C. Klugh, Esq.         Howard Srebnick, Esq.
**Law Office of Richard C. Klugh**   Alyssa Silvaggi, Esq.
                            **BLACK SREBNICK**
Terrance G. Reed, Esq.       201 S. Biscayne Blvd, Suite 1300
**Lankford & Reed**           Miami, Florida 33131
                            (305) 371-6421

                            *Counsel for Appellant*

**CERTIFICATE OF INTERESTED PERSONS**
**AND CORPORATE DISCLOSURE STATEMENT**

***United States v. Byramji Moneck Javat, et al.,***
Case Nos. 19-15168-H, 20-11137-H, 21-13593-H

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, counsel for Appellant, Byramji Moneck Javat, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities who may have an interest in the outcome of this case:

Abbott Laboratories

Adams, John

Amicorp Trustees (Delaware), Inc.

Anderson, Rhonda A.

Armando, William

Bayer Corporation (BAYRY)

Beaton, Marcos

Becerra, Robert J.

Becerra Law, P.A.

Becton Dickinson and Company

Binhak, Stephen James

Black Srebnick

**United States v. Byramji Moneck Javat, et al.,**
Case Nos. 19-15168-H, 20-11137-H, 21-13593-H

Braun Medical, Inc.

Brown, Kristine M.

Calh Holding Corp

Calh Trust

Calloway, Mark T.

Campbell Soup Company (CPB)

Chopra, Sunil

Citibank (C)

Daskos, Emanuel George

Dray, Simon Patrick

Edelstein, David M.

Fajardo Orshan, Ariana

Fougere, Joshua

Garber, Hon. Barry L.

Geiger, Brett

Grande, Carlos Daniel

Greenberg, Benjamin G.

Harris, Robert Charles

Hendrix, David Stockton

Hoernlein, Michael R.

Javat, Byramji Moneck

Kehoe, Gregory William

Klugh, Richard

Kruppa, Andrew

Kubica, P. Jan

Lehr, Alison Whitney

Ludlow, David

Matzkin, Daniel

McAliley, Hon. Chris M.

Middlebrooks, Hon. Donald M.

Noto, Kenneth

O'Sullivan, Hon. John J.

Pace, Christopher R.J.

Pennco, LLC

Pennco Trust

Proton Healthcare, Ltd.

Rabin, Samuel J. Jr.

Rhonda A. Anderson, P.A.

**United States v. Byramji Moneck Javat, et al.,**
Case Nos. 19-15168-H, 20-11137-H, 21-13593-H

Rosen, Adrienne E.

Schoeppl, Carl, Jr.

Schoeppl Law

Shipley, John

Silvaggi, Alyssa

Simonton, Hon. Andrea M.

Smachetti, Emily M.

Sombuntham, Nalina

Soto, Luis Alberto

Srebnick, Howard

TD Ameritrade, Inc.

The Edelstein Firm

The Law Office of Stephen James Binhak

Torres, Hon. Edwin G.

Truist Bank (TFC)

Turken, David Samuel

Ursini, Louis Mario III

Waxman, Benjamin

WH Legal

***United States v. Byramji Moneck Javat, et al.,***
Case Nos. 19-15168-H, 20-11137-H, 21-13593-H

Respectfully submitted,

**BLACK SREBNICK**
201 South Biscayne Boulevard, Suite 1300
Miami, FL  33131
Telephone: (305) 371-6421
Email: HSrebnick@RoyBlack.com

By: */s/Howard Srebnick*
   **HOWARD SREBNICK, ESQ**.
   Florida Bar No. 919063

## STATEMENT REQUESTING ORAL ARGUMENT

Appellant respectfully requests that the Court grant oral argument in this case. The procedural history of this case is lengthy and complex and the case raises issues of first impression in this Court. Oral argument will serve the interests of judicial economy and justice.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ...................................................C-1

STATEMENT REGARDING ORAL ARGUMENT .............................................. i

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ..................................................................................v

STATEMENT OF ADOPTION OF CO-APPELLANT'S BRIEF .......................xv

STATEMENT OF JURISDICTION ....................................................................xv

STATEMENT OF THE ISSUES ...........................................................................1

STATEMENT OF THE CASE ...............................................................................1

COURSE OF PROCEEDINGS AND RELEVANT FACTS..................................3

STANDARDS OF REVIEW ................................................................................12

SUMMARY OF THE ARGUMENT ...................................................................13

ARGUMENT .......................................................................................................16

    I.    THE DISTRICT COURT'S SENTENCING GUIDELINE
        ERRORS—OVERSTATEMENT OF LOSS AND NUMBER
        OF VICTIMS AND IMPOSITION OF INAPPLICABLE
        ENHANCEMENTS UNDER U.S.S.G. § 2B1.1—COMPEL
        REVERSAL ...................................................................................16
        A.    Erroneous loss calculation……………………………….16

        B.    Erroneous 4-level enhancement under U.S.S.G. §
            2B1.1(b)(8)(B) for theft of pre-retail medical products
            under 18 U.S.C. § 670............................................................26

C.     Erroneous 2-level enhancement under U.S.S.G. § 2B1.1(b)(9)(A) for Misrepresenting Government/Nonprofit Status ................................................29

D.     Erroneous 2-level enhancement for ten victims (U.S.S.G. § 2B1.1(b)(2)(A)) ....................................................30

II.     THE RESTITUTION JUDGMENT SHOULD BE VACATED........32

A.     Procedural Errors Regarding Restitution ..................................32

B.     Direct Losses Have Not Been Proven.......................................36

C.     Expectation Damages Are Unavailable In Restitution .............40

D.     Expectation Damages Were Not Proven Here .........................42

III.     MULTIPLE FORFEITURE ERRORS WARRANT REVERSAL ...................................................................................44

A. There is No Forfeiture Judgment and the Government failed to appeal ......................................................................................45

B. Under the Indictment, no forfeiture is authorized.........................47

C. Tracing Under § 981 Was Not Proven .........................................51

D. A Money Judgment would be Improper.......................................52

E. Substitute Asset Forfeiture is Unavailable....................................54

IV.     THE DEFENDANT'S CONVICTION MUST BE VACATED BECAUSE THE FRAUD STATUTES DO NOT ENCOMPASS HIS ALLEGED OR ADMITTED CONDUCT ................................55

CONCLUSION ..................................................................................58

CERTIFICATE OF COMPLIANCE......................................................59

CERTIFICATE OF SERVICE ............................................................59

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Allison v. Vintage Sports Plaques*,
    136 F.3d 1443 (11th Cir. 1998) ................................................................55

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ................................................................39

*Class v. United States*,
    138 S.Ct. 798 (2018) ................................................................55

*Commonwealth v. Hinds*,
    101 Mass. 209 (1869) ................................................................55

*Edgenet, Inc. v. GS1 AISBL*,
    742 F. Supp.2d 997 (E.D. Wis. 2010) ........................................................56

*Hemi Group, LLC v. City of New York*,
    550 US. 1 (2010) ................................................................39

*Honeycutt v. United States*,
    137 S. Ct. 1626 (2017) ................................................................*passim*

*Impression Products, Inc. v. Lexmark Int'l*,
    137 S.Ct. 1523 (2017) ................................................................55

*In re Doe*,
    264 Fed. Appx. 260 (4th Cir. 2007) ........................................................38

*In re General Motors LLC Ignition Switch Litigation*,
    407 F.Supp.3d 212 (S.D.N.Y. 2019) ........................................................42

*Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*,
    61 F.3d 1250 (7th Cir 1995) ................................................................56

*Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*,
    940 F.2d 397 (9th Cir. 1991) ................................................................56

**CASES**                                                     **PAGE(S)**

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
  18 How. 272, 15 L.Ed. 372 (1856) ...........................................27

*Paroline v. United States*,
  572 U.S. 434 (2014) ..................................................37

*Russell v. United States*,
  369 U.S. 749 (1962) ..................................................49

*Straus v. Victor Talking Machine Co.*,
  243 U.S. 490 (1917) ..................................................55

*Transunion LLC v. Ramirez*,
  141 S.Ct. 2190 (2021) ...........................................39, 56

*United States v. $125,938.62*,
  537 F.3d 1287 (11th Cir. 2008) ..................................53

*United States v. Adebara*,
  2021 WL 3633475, *4 (N.D. Okla 8,17, 2021) .........................34

*United States v. Ali*,
  620 F.3d 1062 (9th Cir. 2010) ..................................22

*United States v. Allen*,
  983 F.3d 463 (10th Cir. 2020) ..................................36

*United States v. Annabi*,
  746 F.3d 83 (2d Cir. 2014) .....................................48

*United States v. Annamalai*,
  933 F.3d 1216 (11th Cir. 2019) ...........................30

*United States v. Boccagna*,
  450 F.3d 107 (2d Cir. 2006) ...........................40, 43

**CASES**                                                         **PAGE(S)**

*United States v. Browne,*
    505 F.3d 1229 (11th Cir. 2007) ...............................................12

*United States v, Bruchhausen,*
    977 F.2d 464 (9th Cir 1992) .......................................................55

*United States v. Cabrera,*
    172 F.3d 1287 (11th Cir. 1999) ................................................35

*United States v Canela,*
    2019 WL 2543503 (M.D. Tenn. June 20, 2019) .........................46

*United States v. Cavallo,*
    790 F.3d 1202 (11th Cir. 2015) ................................................35

*United States v. Cingari,*
    952 F.3d 1301 (11th Cir. 2020) ................................................49

*United States v. Conner,*
    752 F.2d 566 (11th Cir. 1985) ..................................................52

*United States v. Corbett,*
    921 F.3d 1032 (11th Cir. 2019) ................................................31

*United States v. Cutter,*
    313 F.3d 1 (1st Cir. 2002) ........................................................17

*United States v. Dabbs,*
    134 F.3d 1071 (11th Cir. 1998) ................................................18

*United States v. Daddona,*
    34 F.3d 163 (3d Cir. 1994) .......................................................19

*United States v. Ferdman,*
    779 F.3d 1129 (10th Cir. 2015) ..........................................*passim*

**CASES**                                                                  **PAGE(S)**

*United States v. Ford*,
784 F.3d 1386 (11th Cir. 2015) ...............................................................18

*United States v. Freeman*,
741 F.3d 426 (4th Cir. 2014) ....................................................................38

*United States v. Galvez*,
108 F.Supp.2d 1369 (S.D. Fl. 2000) ....................................................5, 19

*United States v. Geovanni*,
2022 WL 291761, *10 (11th Cir. Feb. 1, 2022) ........................................22

*United States v. Gilbert*,
244 F.3d 888 (11th Cir. 2001) ............................................................49, 50

*United States v. Goldstein*,
989 F.3d 1178 (11th Cir. 2021) ................................................................51

*United States v. Harvey*,
20 F. 4th 71 (1st Cir. 2021) ......................................................................46

*United States v. Hasson*,
333 F.3d 1264 (11th Cir. 2003) ................................................................12

*United States v. Hill*,
564 F.2d 1179 (5th Cir. 1977) ..................................................................55

*United States v. Huff*,
609 F.3d 1240 (11th Cir. 2010) ................................................................34

*United States v. Janosko*,
642 F.3d 40 (1st Cir. 2011 ........................................................................38

*United States v. Kim*,
988 F.3d 803 (5th Cir. 2021) ....................................................................36

*United States v. Krawczak*,
331 F.3d 1302 (11th Cir. 2003) ................................................................12

**CASES**                                                                     **PAGE(S)**

*United States v. Liss*,
　　265 F.3d 1220 (11th Cir. 2001) ..........................................................17, 24

*United States v. LNU*,
　　16 F.3d 1168 (11th Cir. 1994) ...................................................................19

*United States v. Marlatt*,
　　24 F.3d 1005 (7th Cir. 1994) .....................................................................19

*United States v. Martin*,
　　803 F.3d at 581 (11th Cir. 2015).................................................... 12, 35, 36

*United States v. Mason*,
　　722 F.3d 691 (5th Cir. 2013) .....................................................................36

*United States v. Medina*,
　　485 F.3d 1291 (11th Cir. 2007) .................................................................18

*United States v. Mendez*,
　　737 Fed.Appx. 935 (11th Cir. 2018) .........................................................18

*United States v. Mullins*,
　　971 F.2d 1138 (4th Cir. 1992) ...................................................................36

*United States v. Omar*,
　　24 F.3d 1356 (11th Cir. 1994) ...................................................................19

*United States v. Orton*,
　　73 F.3d 331 (11th Cir. 1996) .....................................................................22

*United States v. Owen*,
　　858 F.2d 1514 (11th Cir. 1988) .................................................................12

*United State v. Pease*,
　　331 F.3d 809 (11th Cir. 2003) .......................................................44, 45, 46

**CASES**                                                                 **PAGE(S)**

*United States v. Petrie*,
  502 U.S. 1280 (11th Cir. 2002) .................................................................45

*United States v. Robertson*,
  493 F.3d 1322 (11th Cir. 2007) ...............................................................17

*United States v. Robinson*,
  137 Fed. Appx. 273 (11th Cir. 2005) ......................................................46

*United States v. Rothenberg*,
  610 F.3d 621 (11th Cir. 2010) .................................................................12

*United States v. Sedillo*,
  2020 WL 5369070 (D.N.M. Sept. 8, 2020) .............................................34

*United States v. Sharma*,
  703 F.3d 803 (5th Cir. 2012) ...................................................................36

*United States v. Shugart*,
  176 F.3d 1373 (11th Cir. 1999) ...............................................................43

*United States v. Steele*,
  897 F.3d 606 (4th Cir. 2018) ...........................................................36, 43

*United States v. Stein*,
  846 F.3d 1135 (11th Cir. 2017) .......................................................21, 35

*United States v. Takhalov*,
  827 F.3d 1307 (11th Cir. 2016) .......................................................55, 57

*United States v. Thomas*,
  62 F.3d 1332 (11th Cir. 1995) .................................................................19

*United States v. Thuna,*
  382 F. Supp.3d 166 (D.PR. 2019) ..........................................................38

**CASES**                                                           **PAGE(S)**

*United States v. Turley*,
    352 U.S. 407 (1957) ....................................................................28

*United States v. Waddell*,
    840 Fed. Appx. 421 (11th Cir. 2020) .........................................31

*United States v. Waked Hatum*,
    969 F.3d 1156 (11th Cir. 2020) ..................................................52

 *United States v. Wall*,
    285 Fed. Appx. 675 (11th Cir. 2008)  ...........................47, 50, 51

*United States v. Weinstein*,
    762 F.2d 1522, *opinion modified on denial of reh'g*,
    778 F.2d 673 (11th Cir. 1985) .......................................................1

*United States v. Wilson*,
    993 F.2d 214 (11th Cir. 1993) .....................................................19

*United States v. Zhu*,
    2012 WL 359734, *5 (D. N.J. 2012) ..........................................21

*Whalen v. United States*,
    455 U.S. 684 (1980) ....................................................................54

*Wooden v. United States*,
    142 S. Ct. 1063 (2022) ................................................................27

**UNITED STATES CONSTITUTION**

U.S. Const., Amedts. 5, 14.................................................................27

**STATUTES AND RULES**

18 U.S.C. § 670 ...................................................................*passim*

18 U.S.C. § 670(a)(1) .........................................................................26

**STATUTES AND RULES**                    **PAGE(S)**

18 U.S.C. § 670(e)(6) .........................................................29

18 U.S.C. § 981 ...........................................................*passim*

18 U.S.C. § 981(a)(1)(C) ........................................*passim*

18 U.S.C § 982 ...................................................49, 51

18 U.S.C. § 982(a)(1) .........................................................49

18 U.S.C. § 982(a)(1)(C) .................................................49

18 U.S.C. § 982(a)(2)(A) ...............................11, 44, 47

18 U.S.C. § 982(a)(2)(B) .................................................47

18 U.S.C. § 983(a)(3)(C) .................................................50

18 U.S.C. § 3663A(a)(2) ................................................35

18 U.S.C. § 3664.................................................32, 33

18 U.S.C. § 3664(a) ........................................................34

18 U.S.C. § 3664(e) ........................................................35

18 U.S.C. § 3742(b) ........................................................46

21 U.S.C. § 853(p) ............................15, 45, 53, 54

21 U.S.C. § 853(p)(1) ....................................................55

21 U.S.C. § 853(p)(1)(A)-(E) ....................................55

21 U.S.C. § 853(p)(2) ....................................................54

**STATUTES AND RULES**                                                    **PAGE(S)**

28 U.S.C. § 2461(c) ...................................................................................50

28 U.S.C. § 2641 .......................................................................................51

28 U.S.C. § 2641(c) ..................................................................................47

31 U.S.C. § 5332(b)(4) ............................................................................53

Fed. R. Crim. P. 32.2 ..........................................................................44, 51

Fed. R. Crim. P. 32.2(a) ..................................................................48, 51, 53

Fed. R. Crim. P. 32.2(b) ........................................................................15

Fed. R. Crim. P. 32.2(b)(1)(A) ..............................................................48

Fed. R. Crim. P. 32.2(b)(2)(C) ..............................................................46

Fed. R. Crim. P. 32.2(b)(4)(B) .........................................................44, 45

Fed. R. Crim. P. 32(c)(1)(B) ....................................................................9

Fed. R. Crim. P. 32(d)(2)(D) ....................................................................9

Fed. R. Crim. P. 32(e)(2) ..........................................................................9

Fed. R. Crim. P. 36 ..................................................................................46

**U.S. SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1 .............................................................................*passim*

U.S.S.G. § 2B1.1(b)(2)(A) ................................................................7, 30

U.S.S.G. §2B1.1(b)(8)(B) .............................................................7, 14, 26

U.S.S.G. §2B1.1(b)(9)(A) .............................................................7, 14, 29

**OTHER AUTHORITIES** **PAGE(S)**

Black's Law Dictionary (11th ed. 2019) ........................................................42, 43

N. Chapman & M. McConnell, *Due Process as Separation of Powers*,
    121 Yale L. J. 1672 (2012) ........................................................................27

Rule 32.2 2000 Advisory Committee Notes.........................................................51

## STATEMENT OF ADOPTION OF CO-APPELLANT'S BRIEF

Appellant respectfully adopts the following components of the Initial Brief of Co-Appellant Luis Soto: (a) Soto's statement of the case; and (b) Soto's argument and argument summary as to Issue III(A), concerning the insufficiency of the Government theory of a scheme to defraud.

## STATEMENT OF JURISDICTION

The United States District Court had subject matter jurisdiction over this case pursuant to 18 U.S.C. § 3231 because the United States was prosecuting Mr. Javat under the laws of the United States.

Pursuant to 28 U.S.C. §1291, this Court has jurisdiction over the District Court's final judgment orders in Mr. Javat's criminal case, including the final judgment entered on May 4, 2021 (DE #718), from which Mr. Javat timely appealed on May 15, 2021 (DE#727)

## STATEMENT OF THE ISSUES

1.      Did the district court reversibly err in imposing sentencing guideline enhancements, resulting in overstating the amount of loss and the number of victims and applying unwarranted enhancements for a theft offense and for acting as a governmental entity?

2.      Did the district court commit substantive and procedural errors in imposing restitution where no actual losses were shown?

3.      Did the district court commit substantive and procedural error that compel vacating the forfeiture penalty?

4.      Should the defendant's conviction be vacated because the federal fraud statutes do not encompass his alleged or admitted conduct?

## STATEMENT OF THE CASE

This case involves price discrimination and gray market arbitrage, sometimes referred to as product "diversion," whereby "[m]anufacturers maintain a bifurcated pricing structure. One price is quoted for [product] sold to domestic wholesalers for resale in the United States. A much lower price is quoted for sales to exporters." *United States v. Weinstein*, 762 F.2d 1522, 1527, *opinion modified on denial of reh'g*, 778 F.2d 673 (11th Cir. 1985). "Occasionally, however, exporters … may purchase a surplus of … products and later seek to resell that surplus in the domestic market." *Id.* "This is the diversion market." *Id.* ("Diversion,

whether boon or bane to the … industry, is not contended to be illegal as a matter of federal law.").

In the instant case, appellant Byramji Javat, through his wholesale companies, purchased authentic products from manufacturers (vendors) and resold those goods to domestic U.S. distributors, despite false assurances that the products were purchased "for export only" (some characterized as "pre-retail medical products," like aspirin, but none of which were prescription drugs). The government contended that Javat and his co-conspirators, including customs broker Luis Soto, "defrauded" numerous vendors into selling their products at "deeply discounted prices" by falsely representing that Javat would export and resell the products in the Middle East (including to the U.S. military in Afghanistan). DE#113. As alleged in the Superseding Indictment, Javat was "looking to obtain the Victim Companies' products at discounted prices ***not generally*** *offered to distributors and wholesalers in the United States* in order to sell such products to their US-based customers at a significant profit. DE#145:5 (emphasis added). Even so, the vendors also profited from selling the products to Javat—albeit at prices lower than some vendors aspired to obtain from domestic distributors.

The principal dispute in this sentencing appeal is the measure of "loss" sustained by vendors as a result of the diversion. Appellants Javat and Soto maintain that because the government presented no evidence of economic injury to

any vendor, the district court erred in finding a $36.5 million loss and thus increasing the sentencing guidelines range by 22 levels; the district court also erred in imposing other upward adjustments (ten or more victims, theft of pre-retail medical goods, and misrepresentation that the defendant was acting on behalf of a charitable or a government agency), ordering $29 million in restitution and imposing a $26 million forfeiture money judgment as to Javat.

<u>Course of Proceedings and Relevant Facts[1]</u>

Javat and Soto were charged in a seven-count Superseding Indictment with, *inter alia*, conspiracy to commit wire fraud in connection with the purchase and resale of "FDA regulated consumer goods."[2] DE#145:4. The alleged fraud theory was that Javat misrepresented to the manufacturers that he was purchasing the goods for export and thus was able to purchase the goods "at discounted prices *not generally* offered to distributors and wholesalers in the United States." DE#145:5 (emphasis added). Javat then re-sold the goods into the U.S. domestic market.

The defendants challenged the government's prosecution theory, arguing that deception to induce a transaction is insufficient, economic harm is necessary, and here the vendors had no property right to control the ultimate resale destination

---

[1] To minimize repetition, counsel for Javat and Soto collaborated on a more complete rendition of the Course of Proceedings and Relevant Facts, contained in Soto's brief, which counsel suggest the Court may wish to read first. Here Javat presents an abbreviated recitation.

of the goods at issue. DE#91, 92, 119, 163, 164, 165, 170, 188.  The district court rejected these challenges, concluding that the defendants "caused those companies to lose money in the form of potential revenue and profit." DE#197:4.

Javat twice sought leave to subpoena the manufacturers for relevant pricing data, including the lowest prices actually charged by the manufacturers to U.S. distributors. DE#179:3 (emphasis added). Ultimately, the government successfully moved the court to quash Javat's subpoenas, *see* DE#236, 295, 324, arguing, among other things, that "the sentencing hearing is the time for [Javat] to seek information that may bear upon his loss for Guideline purposes." DE#274:13.

Having unsuccessfully challenged the Superseding Indictment's theory of prosecution, Javat pled guilty to Count 1 charging wire fraud conspiracy in exchange for the government dismissing the remaining counts. DE#339; DE#418:3. At the plea, the Court notified Javat that he "could be subject to forfeiture of some assets." DE#418:12.

In anticipation of sentencing, Javat moved, *again*, for leave to subpoena relevant manufacturer pricing data for sentencing loss purposes. DE#423. The Court denied the motion. DE#431.

---

[2] None of the goods were prescription medications.

**The District Court Overrules Objections to the Presentence Investigation Report**

Defendants timely objected to the government's proposed loss calculation contained in the PSR, which by then characterized as alleged victims more than 40 vendors. *See* DE#439:17(¶47). The number one factor driving the sentencing guidelines computation—and ultimate sentence—was the loss calculation. No manufacturer loss evidence or testimony was provided; instead, the PSR relied on the government's methodology of estimating "the amount of the discount/purchase price obtained [by Javat] based on the fraud." DE#439:14(¶39); *accord* DE#420:23 ("the difference between [the manufacturer/vendor's] U.S. list price and the prices that the manufacturers offered Javat."). Thus, the government relied upon its extrapolation from QuickBooks records seized from co-defendant Sipprell, showing that Javat's companies purchased approximately $36.5 million worth of products. Applying the government's methodology, the district court ultimately found that Javat "received an average discount of 50% because of their fraudulent representations," (i.e., Javat should have paid $73 million for those products but for the misrepresentations), so the loss attributable to Javat was $36.5 million, DE#459:7, resulting in a 22-level upward adjustment under U.S.S.G. § 2B1.1. DE#500:35.

Javat proposed a methodology that would compute losses based on the "reasonable replacement cost of the goods obtained (or sought to be obtained) by

theft. DE#500:24-25 (citing *United States v. Galvez*, 108 F. Supp. 2d 1369, 1372, 1374 (S.D. Fla. 2000) (Jordan, J.). Because Javat paid the vendors an amount sufficient to cover, and was typically greater than, the cost of goods sold (i.e., the replacement cost) in each transaction, Javat argued both before and at sentencing that loss was zero: "Loss, ordinarily, is not loss of interest, loss of opportunities or loss of consequential damages. The guidelines contemplate loss to be out-of-pocket loss." DE#500:22 (Sentencing Transcript); *see also* DE#436:1-2 (Javat's Reply Memorandum) ("Loss, under the sentencing guidelines, does not include consequential damages.").

In support of Javat's loss computation, at sentencing Javat presented the unrebutted expert opinion of H. Stephen Grace, Jr., Ph.D. (Economics), who reviewed the record of the case, including the Soto trial. In general, he observed:

    A. sellers obtained profits from sales to Mr. Javat, even factoring in overhead and other costs;

    B. no evidence of another buyer willing to pay the list price at the time or in the volume transacted by Mr. Javat; thus, the record does not show that a seller's declining of the transactions with Mr. Javat would have resulted in higher profits (notwithstanding the higher profit margin that the government relies on in its sentencing filings);

    C. sales to Mr. Javat that were diverted to the domestic secondary market likely created additional profits;

D. with one notable exception, it likely was the overstock of goods, additional capacity or other factors which created opportunities for sellers to engage in sales beyond the point of saturation in the domestic market at formal or other non-discounted domestic prices. The seller-companies would have no economic reason to institute an export price structure unless they had greater production capacity or stocked goods [sic] than needed for the domestic market (at formal domestic pricing levels).

DE#466-1 (admitted at the Sentencing Hearing, DE#500:29-32). Javat also introduced a summary exhibit, a PowerPoint presentation of "excerpts from the [Soto] trial regarding testimony of witnesses saying they have different price structures and comparing it to, for example, pretrial disclosures by the government witnesses about price structure, that the list price is not always the actual price." DE#466-2 (admitted at the Sentencing Hearing, DE#500:32-34). Soto adopted Javat's objections. DE#500:57-58.

In addition to overruling Javat's objection to the **22**-level enhancement for loss, the district court also overruled objections to a **2**-level enhancement under § 2B1.1(b)(2)(A)(i),(ii) for ten or more victims, DE#439:19(¶55), DE#550:44; a **4**-level enhancement under § 2B1.1(b)(8)(B) because the offense involved conduct described in 18 U.S.C. § 670 and defendant was in the "supply chain for the pre-retail medical product," DE#439:19(¶56), DE#500:53; and a **2**-level enhancement under § 2B1.1(b)(9)(A) because the offense involved the misrepresentation that the

defendant was acting on behalf of a charitable or a government agency, DE#439:19(¶57), DE#500:54. In the final analysis, the district court overruled Javat's objections to enhancements totaling **30** levels and arrived at a Total Offense Level of 41, with a corresponding guideline range of 324-405 months incarceration. Had the district court sustained Javat's objections, Javat would have faced a Total Offense Level of 11 and a corresponding guideline range of 8-14 months incarceration. If the district court had only sustained Javat's objection to loss, the Total Offense Level would have been (41 - 22 =) 19, with a corresponding guideline range of 30-37 months incarceration.

Ultimately, the district court varied downward and imposed a sentence of 120-months incarceration upon Javat, DE#500:114, and 72-months incarceration upon Soto, DE#500:138, finding that

> [t]he loss amount here is substantial, but it also somewhat misrepresents the harm caused by the Defendants' conduct in the sense that the victims were in fact compensated for the goods sold to the Defendants. Although the victims were unmistakably defrauded, *they chose to sell their products at the discounted price. Presumably, under their individual circumstances even the discounted prices made economic sense.* Other factors such as volume, preferential customers, payment terms, or abundance of supply may have motivated the victim companies to sell their products at discount, even had Defendants not intervened and defrauded the companies.

DE#459:10-11 (emphasis added). Javat timely filed a notice of appeal from the written judgment. *See* DE#475.

**The District Court Overrules Objections to Restitution**

Following imposition of the sentence of incarceration, the district court set a restitution hearing for March 3, 2020. In the days leading up to it, the government confirmed its methodology for computing restitution: "the difference between what Javat and his cohorts actually paid these victims and what these victims *would have charged Javat* for the products if he had told the truth (*i.e.*, the domestic distributor price)." DE#523:2. On February 25, 2020, the government filed a notice identifying as vendor-victims the same five vendors discussed at the Soto trial, plus four others. By February 28, 2020, the number was twelve, at which point Javat unsuccessfully moved to strike the newly disclosed victim claims, or in the alternative to continue the hearing, complaining that the government's late disclosure circumvented Fed. R. Crim. P. 32(c)(1)(B), (d)(2)(D), and (e)(2). DE#526:3. *See* DE#526, 527.

At the March 3, 2020 hearing, the government presented no live witnesses, relying instead on the records submitted by the vendors reflecting purported discounts from their list prices. Javat reiterated his objection that there was

> no evidence that but for these transactions the seller had a willing buyer at a higher price at the time it sold the goods to Mr. Javat. Our understanding is that these sellers, for the most part, I think all of them, there was no limit of supply. There was excess capacity and so there was no lost opportunity for the seller when it chose to sell it at the export price rather than a different buyer at the domestic price.

DE#551:7. In response, the district court recalled "the evidence at trial showed that at least several of these victims would never have sold the products at the price they sold …so I reject that general principle you have." *Id.*

Relying on the self-serving summary charts presented by the vendor-victims and having quashed defense subpoenas seeking the underlying pricing data, the district court adopted the government's loss methodology and the corresponding extrapolated loss figures. The district court filed an amended judgment imposing restitution totaling $7,195,254.56, from which Javat timely filed an amended notice of appeal, DE#553.

Weeks prior to the second restitution hearing, Javat again sought to subpoena the manufacturers for their pricing data, but the court quashed them. DE#713. On the day before the second restitution hearing, the government filed a "Notice Regarding Restitution," DE#716, outlining the additional restitution claims.

At that continued restitution hearing, Javat reasserted his objection to the government's methodology and even proposed an alternative: Javat's gain.

> Our view is that restitution in a criminal case is limited to capturing the cost of goods sold, not lost opportunity; particularly in a case like this one where there is no showing that there was a willing buyer to buy Javat's goods at the prices that the vendors are claiming they wished they had sold the goods to Javat for. So what [we have] done is given you a summary of the markups that Mr. Javat captured by acquiring these goods under the so-called export price, he then sold the goods into the domestic market at a markup. That markup is much

> lower than the proposed price that the sellers claim they would have liked to have charged Mr[.] Javat for those same goods. There's been no showing that anybody else in the marketplace would have paid those aspirational prices; and if there had been, of course, a rational seller like Bard would never have sold them at the lower price to Javat. A rational seller like Bard would have sold it at the highest price.

DE#723:43. The district court was not persuaded. DE#723:45.

On the day before the second restitution hearing, the government filed a "Notice Regarding Restitution," DE#716, outlining the additional restitution claims. The court again adopted the government's loss methodology and corresponding loss claims (except for one vendor), over objection. In the end, the district court increased the restitution award to $29 million. DE#718.

### The District Court Overrules Objections to Forfeiture

The Superseding Indictment sought forfeiture "pursuant to Title 18, United States Code, Section 982(a)(2)(A)." DE#145:12. The Superseding Indictment did not affirmatively seek a so-called forfeiture money judgment.

At Javat's sentencing, the district court did not order any specific property forfeited or enter a forfeiture money judgment. Neither the initial judgment nor the later amended judgments mention money judgments, forfeiture amounts, or forfeiture statutes; instead, it states: "Forfeiture of the defendant's right, title and interest in certain property is hereby ordered." DE#460:6, 539:6, 718:6.

Post-sentencing, the government successfully sought the entry of a Preliminary Order of Forfeiture under a different forfeiture statute, 18 U.S.C. § 981, in the amount of $26,272,279.45, DE#516, 536:3, and later moved the district court to forfeit untainted property purportedly owned by Javat. DE#579. Javat's objection, DE#588, was overruled, DE#641, the district court ordered forfeiture of certain real property, DE#643, Javat appealed, and this Court affirmed. 11th Cir. No. 20-13310 (decided Mar. 9, 2022).

## Standards of Review

For sentencing and forfeiture claims, this Court reviews factual findings for clear error and legal questions *de novo*. *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010); *United States v. Browne*, 505 F.3d 1229, 1278 (11th Cir. 2007). This Court reviews *de novo* the legality of an order of restitution. *See United States v. Hasson*, 333 F.3d 1264, 1275 (11th Cir. 2003). Whether a person or entity was a victim of a fraud offense is reviewed *de novo*. *See United States v. Martin*, 803 F.3d 581, 598 (11th Cir. 2015). The district court's interpretation of relevant federal criminal statutes and rules is reviewed *de novo*. *United States v. Krawczak*, 331 F.3d 1302, 1305 (11th Cir. 2003). The validity of a guilty plea to a non-existent crime is reviewed *de novo*. *See United States v. Owen*, 858 F.2d 1514, 1516 (11th Cir. 1988).

## Summary of the Argument

1.     The district court erred in its imposition of sentencing guideline enhancements. The errors elevated the guideline sentencing minimum from less than three years to nearly twenty-five years based primarily on speculation regarding whether vendors who *profited* from dealing with the defendant could have made more money from other buyers, even though there was no evidence that such other buyers existed. Notwithstanding the government's theory that the vendors were misled regarding the defendant's intention to resell goods in a domestic, rather than foreign, market, there was no evidence that the vendors suffered any *economic harm*. Importantly, the district court made express findings that vendors had multiple reasons to sell at a discount, independent of any fraud. The sentencing guidelines do not provide for loss enhancement in this context. The district court's procedural errors in the loss calculation include barring the defense from obtaining relevant pricing information as to the vendors in order to bolster the showing of net profitability of sales to the defendant.

For similar reasons, the district court erred in finding that there were more than ten victim vendor companies, where even as to the handful of companies the government identified as claiming lost potential profits, the government failed to show victim status within the meaning of the loss and intended-loss requirements of the guidelines.   The district court also erred in imposing inapplicable guideline

enhancements under U.S.S.G. § 2B1.1(b)(8)(B) (for violation of 18 U.S.C. § 670 by an employee of a supply chain company victim) and under U.S.S.G. § 2B1.1(b)(9)(A) (for impersonation of a charitable or governmental entity), because the defendant did not violate § 670 or the trust of any employer and neither stole from within the supply chain nor claimed to be anything other than a for-profit reseller. Regarding § 670, the district court erred in concluding that § 2B1.1(b)(8) applies to price fraud cases where—as the Indictment clearly alleged—any fraud was in the *pricing* of goods, not their physical *acquisition*. Nor, under § 2B1.1(b)(8)(B), was the defendant an employee of a victim supply chain company and thus he did not violate the trust of such a company—the focus of that guideline. Likewise, the relevant guideline for charity impersonation is inapplicable where the defendant purported to be what he was: a for-profit reseller of goods. His misstatement about customers in foreign markets did not change that. The district court exceeded the scope of its interpretive authority when it effectively re-wrote the guideline to reach for-profit defendants who claim to sell to foreign governmental entities.

2. The restitution judgments should be vacated for failure to comply with basic procedural requirements. The government circumvented the probation office and blocked the defendant's access to alleged victims' relevant data by refusing and then moving to quash defendant's discovery efforts. In addition, the restitution

calculations are invalid for three independent reasons. First, restitution awards are limited to out-of-pocket actual losses—of which none were shown. Second, restitution awards premised on calculations of expectation damages are legally impermissible. Third, even if expectation damages could be awarded, none were established here because no relevant product sales occurred, and the product manufacturers did not establish any fair market value above the sale price for hypothetical sales. Indeed, largely because the defense's access to all relevant pricing data was barred, and the companies simply offered their profit wish lists using undisclosed, calculation methodologies, there was no showing of loss.

3.     The forfeiture judgment is also invalid for procedural and substantive reasons. First, the district court prejudicially permitted amendment of the Indictment after the guilty plea and contrary to the plea agreement. The district court also violated multiple requirements of Fed. R. Crim. P 32.2(b), failed to require tracing of proceeds (including where there were no fraud "proceeds" shown and no showing of any amount going to the defendant), and improperly imposed substitute asset forfeiture under 21 U.S.C § 853(p). The district court methodology for determining a forfeiture amount vastly overstated any determinable fraud proceeds, where no evidence was offered as to whether any of the defendant's revenue constituted fraud proceeds.

4.     The defendant's conviction should be vacated based on the jurisdictionally defective theory on which the Indictment and his guilty plea were premised. Fraud law does not reach bargaining-position misstatements absent intended economic harm.  Although the defendant assumed the bargaining position of a foreign distributor to convince vendors to offer him prices not *generally* available to domestic customers, any possibility of harm was purely speculative and was never supported in the plea's factual basis or any allegation of the Indictment.

## ARGUMENT AND CITATIONS OF AUTHORITY

### ISSUE I

**THE DISTRICT COURT'S SENTENCING GUIDELINE ERRORS—OVERSTATEMENT OF LOSS AND NUMBER OF VICTIMS AND IMPOSITION OF INAPPLICABLE ENHANCEMENTS UNDER U.S.S.G. § 2B1.1—COMPEL REVERSAL.[3]**

**A.     Erroneous loss calculation.**

The district court committed clear procedural errors that warrant resentencing. Despite formally accepting the government's loss calculation, the district court did not apply any viable loss methodology to reach its loss findings and ultimately rejected the foundational premises of the government's loss theory, while accounting for that disagreement only by imposing a downward variance.

---

[3] Co-appellant Luis Soto adopts Issues I, II, and IV of this brief.

*See* DE#459:7–9. A court cannot enhance a sentence by relying upon a government methodology it finds to be "unreasonable." The district court adopted the government's loss calculation even though the methodology unreasonably overestimated losses. At the same time, the district court erroneously failed to address the defense expert's methodology, despite ultimately reaching similar criticisms of the government' overestimations.

Where, as here, the loss is disputed, a court cannot simply agree with the government's loss claim, but rather is "required to make factual findings sufficient to support the government's claim that the amount of fraud loss attributed to [defendant] was that which was contained in the PSI." *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001). Factual causation of loss, for sentencing purposes, requires proof of reliance ("but for" causation) and also legal (i.e., direct) causation. *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) ("'[T]he government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally).'") (quoting *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002)).

The district court first erred in accepting the government's theory that lost potential profits could constitute loss under U.S.S.G. § 2B1.1. Under section

2B1.1, actual loss means an out-of-pocket economic harm, rather than consequential damages such as a lost opportunity for greater financial gain. Because the manufacturers in this case valued the products at a level below the prices they charged to Javat, and because they received their full asking price, they suffered no out-of-pocket loss within the meaning of the loss guidelines.

A guideline analogy to fraud in a residential mortgage loan application is relevant. If the loan applicant falsely claims an intention to reside in the home, that misstatement fraudulently induces a loan; but if the mortgage company is fully repaid the principal balance, there is no loss under the guidelines, even if the lender could have received a greater return on its money in the absence of the fraud. *See United States v. Mendez*, 737 Fed.Appx. 935, 944 (11th Cir. 2018) ("interest shall not be factored into a loss amount calculation").

The government bore the burden of establishing the loss amount by the preponderance of the evidence. *See United States v. Dabbs*, 134 F.3d 1071, 1081 (11th Cir. 1998). A district court cannot "speculate about the existence of facts and must base its estimate on reliable and specific evidence." *United States v. Ford*, 784 F.3d 1386, 1396 (11th Cir. 2015); *see also United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) (loss must be proven "with reliable and specific evidence").

Significantly, under the sentencing guidelines, loss does not include consequential damages. This Court "has found that the Sentencing Commission's intention to exclude consequential damages from the loss calculation is so clear that such damages may not generally be taken into account even in justifying a departure." *United States v. Thomas*, 62 F.3d 1332, 1346 (11th Cir. 1995) (citing *United States v. LNU*, 16 F.3d 1168, 1170 (11th Cir. 1994), *modified*, *United States v. Omar*, 24 F.3d 1356 (11th Cir. 1994)). The exclusion of consequential damages in loss calculation is expressly set forth in the guidelines and serves the important function of avoiding sentencing disparity. *See United States v. Wilson*, 993 F.2d 214, 217 (11th Cir. 1993); *United States v. Daddona*, 34 F.3d 163, 171–72 (3d Cir. 1994); *United States v. Marlatt*, 24 F.3d 1005, 1007 (7th Cir. 1994); *see also* U.S.S.G. § 2B1.1, comment. (n.3(D)(i)) ("Loss shall not include the following: (i) Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."); § 2B1.1, comment. (n.3(E)(i)) (credits against loss includes money paid or returned to the victim).

The federal sentencing guidelines and application notes for fraud or theft loss—whether calculated under an actual-harm or intended-harm theory—look to the "reasonable replacement cost" of the goods obtained (or sought to be obtained) by theft or destruction. *See*, *e.g.*, *United States v. Galvez*, 108 F. Supp. 2d 1369, 1372, 1374 (S.D. Fla. 2000) (Jordan, J.) (where the product the defendant "helped

steal was packaged in wholesale lots and owned by a wholesale dealer at the time of the offense," court found that "the victim's reasonable replacement cost may be used as a loss figure"). Thus, if an offender breaks into a warehouse and steals pre-retail medical products, the actual loss is the replacement value of the goods taken. Notably, if the roles were reversed, and the sellers had defrauded the buyers (i.e., fraudulently failed to deliver the goods as promised), loss would undoubtedly be the amount of money the buyer paid for the undelivered goods—without regard to *any potential profit* the buyers could have made had they later resold the goods.[4]

First, when calculating loss of goods in a theft from a manufacturer at the wholesale level, the loss amount is capped at the actual value of the goods, not including any markup for resale. *See Id*. A loss in such a theft case is the value of the goods minus the amount paid—the "reasonable replacement cost to the victim"—the equivalent of an insurance loss analysis. *See* U.S.S.G. § 2B1.1, comment. (n.2) ("Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may

---

[4] The premise of the government's prosecution is that all products obtained from sellers were stolen within the meaning of 18 U.S.C. § 670. As explained below, the defendants disputed the applicability of § 670 for guideline purposes, but it was nevertheless the theory on which the government proceeded. Under that theory, when a defendant buys five apples and pays a price that the seller has previously obtained for selling four apples (even if the supply of any additional high-price customers has already been exhausted), all five apples are deemed stolen.

measure loss in some other way, such as reasonable replacement cost to the victim."). The government never advanced a replacement cost figure in this case as to any seller, but any reasonable estimate of the total cost of the goods is substantially below the asserted loss figure, where sellers sold the goods for a profit.

Second, U.S.S.G. § 2B1.1, comment. (n.3(E)), provides that in calculating such a loss amount, a credit must be given for amounts received by the victim in exchange, which in this case equals the price paid. *See United States v. Zhu*, 2012 WL 359734, *5 (D. N.J. 2012), and cases cited therein. A presumptive absence of loss is unsurprising where the sellers concede making profits (in some cases, essential profits) and where the sophisticated, rational sellers could have sold their products to another buyer for a higher price if the demand *at that price level* existed.

Because potential lost *profits* due to fraudulently induced investment decisions are not added into the guideline loss calculation, the defrauded victim's actual out-of-pocket loss is the measure used (and the use of which avoids disparity). In *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017), this Court explained the need for proof of out-of-pocket (net) losses that would not have occurred but for the fraudulent actions of the defendant.

In *Stein*, this Court vacated the sentence after identifying two reversible errors in the district court's loss calculation where the government speculated using a limited number of victim impact statements to extrapolate an elevated loss calculation: first, the use of a small subset of potential victims was "too limited to support a finding" of detrimental reliance "on the fraudulent information" by all such victims, *id.* at 1154; and second, "[t]he district court failed to consider" whether "factors independent" of the false statements–such as the overall market at issue, including buying and selling by other parties—affected the financial picture painted by the government at sentencing. *Id.* at 1155–56; *see id.* at 1153 ("government must show that the [victims] relied on [defendant's] fraudulent information to satisfy the 'but for' causation requirement under U.S.S.G. § 2B1.1").

In *Stein*, this Court concluded that the victim-impact statements on which the government proceeded was not enough to support an "inference" that the defendant's "fraudulent information" caused the entirety of the loss asserted. *Id.* at 1154. *See also United States v. Orton*, 73 F.3d 331, 335 (11th Cir. 1996) (where "detailed information" is available to the government, it cannot simply avoid

review and analysis of that information in favor of speculation on an enhanced loss amount).[5]

The government rested its loss methodology on *United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010), which dealt with a unique copyrighted-material market in a near-monopolistic industry, Microsoft's licensed operating system products which were essential to running personal computers. In *Ali*, Microsoft's market control of its non-fungible licensed software, which was essential for most personal computers, meant that diversion of its donated products into the commercial market necessarily caused a loss: there was a self-evident impact on Microsoft's revenue. Even if *Ali* were correct in carving out an exception to the rule of excluding consequential damages, the *Ali* exception would be inapplicable to Javat, where there was no showing of loss of revenue to the manufacturers in this case. Unlike the unique Microsoft-licensed operating software in *Ali*, sellers of fungible goods (as in this case) operate exclusively in markets that are sensitive to price resistance and competition. As a result, diversion resales may *or may not* capture any of the manufacturer's full-price U.S. market because of the fungible nature of the product and the existence of other effectively competing

---

[5] The guesstimates about loss were predicated upon government counsel's purported re-calculations from QuickBooks entries by an alleged but untried co-defendant (Sipprell). *United States v. Geovanni*, No. 19-11044, 2022 WL 291761, at *10 (11th Cir. Feb 1, 2022) ("the government offered only its spreadsheet to establish the loss amount—not witnesses, documents, or anything else").

manufacturers (including those who already serve a lower-price market). And unlike *Ali*, in the case of additional for-profit sales (at prices set not for charity, but for export to maximize overall profits to the manufacturer), it is unsurprising that gray market sales result in a net gain to the seller.

The district court erred in speculating, and making no finding, that any product purchased in this case by the defendant would have been purchased by another customer at a higher price, much less the markup that the government unilaterally proposed for them, but for the sale to the defendant. The failure to make adequate loss findings requires reversal. *Liss*, 265 F.3d at 121.

Further, the procedures employed to arrive at a $36.5 million sentencing loss on sales that were all profitable for the vendors were unfairly tilted to reach an unreasonable calculation. First, the government and the district court precluded the defense's access to the actual vendor pricing data relevant to the issue in dispute, the marginal domestic pricing rates for the vendors, to evaluate whether it was even economically realistic to imagine that the vendors could find additional customers other than the defendant and prices higher than those paid by the defendant. The government's resulting reliance on the wholly speculative theory that the vendors necessarily could have found additional customers willing to pay those prices because some pricing had been set at a higher level for some undefined number of sales to other customers failed as a matter of economic logic

and as to the reality of the companies' sales. Despite the fact that the vendors did not ever find such additional high-price customers in the real world and never suggested, even by proffer, that they could have found even one additional customer to pay the price asserted hypothetically by the government, the government maintained that the guidelines permitted such contrary-to-fact adverse speculation if it increased the defendant's sentence. Little wonder that the district court, in its ultimate sentencing decision, acknowledged the speculative nature of the government's loss thesis.

Before adopting these government-sponsored vendor numbers, the district court quashed defense subpoenas seeking vendor transactional and pricing records and communications with the government, sought under a protective order. DE#423, 431, 714. This limited the record to vendor self-serving pricing declarations (that did not claim anything other than that if the defendant had chosen to pay higher prices, the vendors would have had additional profits) and disparate loss methodologies that were not explained, were not self-explanatory, nor subject to a common pricing methodology.

The government thereby created a record consisting of no more than the companies' individual projections of lost profits from hypothetical sales (i.e., not based even on actual projections of the companies) at preferred prices to unidentified (and presumably non-existent) parties. Not only was a reliable

evidentiary foundation lacking (i.e., no loss witness, document, expert), the derivative government methodology (calculating loss upon nonexistent sales from assumed discounts) was unreliable. The unreliability of this methodology is revealed by the contrast between the government-sponsored loss calculation of $36.5 million and its admission that, as of the sentencing, it only had vendor pricing information that could support a $5 million loss. DE#420:29 n.10.

The loss enhancement increased the defendant's sentence by 22 levels. Eliminating just this enhancement would reduce the Total Offense Level to 19 (i.e., 41 minus 22), with a corresponding guideline range of 30–37 months incarceration (which Javat has already served). The overstatement of loss, and its dramatic raising of the guideline score, compels resentencing.

**B.    Erroneous 4-Level Enhancement under U.S.S.G. § 2B1.1(b)(8)(B) for Theft of Pre-retail Medical Products under 18 U.S.C. § 670.**

The district court enhanced Mr. Javat's sentence two levels because "the offense involved conduct described in 18 U.S.C. § 670" and two additional levels because Javat "was employed by, or was an agent of, an organization in the supply chain for the pre-retail medical product[s]," for a total of four levels under U.S.S.G. § 2B1.1(b)(8)(B).

But Javat did not plead guilty under 18 U.S.C. § 670(a)(1), titled "Theft of Pre-retail Medical Products," which applies where a defendant "embezzles, steals, or by fraud or deception obtains, or knowingly and unlawfully takes, carries away,

or conceals a pre-retail medical product." The purchased goods in this case were not *stolen* by fraud or otherwise. Any fraud in negotiating better prices for the goods did not constitute fraud in the taking possession of the goods and thus was not theft.

Acquisition of the goods was on negotiated terms with which the defendant complied. The theft statute cannot be read to extend to ambiguous circumstances of price negotiation. Extending, as no court previously has, the theft concept of § 670 to price negotiation fraud, would distort the theft premise of the statute and its common law understanding. *See Wooden v. United States*, 142 S. Ct. 1063, 1082 (2022) (Gorsuch, J., concurring) ("Under the Fifth and Fourteenth Amendments, neither the federal government nor the States may deprive individuals of 'life, liberty, or property, without due process of law.' U.S. Const., Amdts. 5, 14. Generally, that guarantee requires governments seeking to take a person's freedom or possessions to adhere to 'those settled usages and modes of proceeding' found in the common law. *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 277, 15 L.Ed. 372 (1856); N. Chapman & M. McConnell, *Due Process as Separation of Powers*, 121 Yale L. J. 1672, 1774–1775 (2012).").

Despite obtaining the defendant's guilty plea to the Indictment's charge of fraud under the theory that the *property* of which the victims were defrauded was the additional profit that the victims could have made by negotiating a higher

price—i.e., pricing fraud—the government argued at sentencing that the property of which the sellers were defrauded was not the additional profit, but the whole of the goods that they sold to the defendant. The district court ruled that, while some of the statute's terms are narrow, the term "fraud" expands its scope to any transaction involving allegations of fraud. DE#500:51. However, applying the canon of *noscitur a sociis*, § 670 is directed at the *theft* of medical supplies, that is, obtaining them without authority—not misstatements of downstream distribution. Here, the vendors voluntarily parted with their products for valuable and sufficient financial consideration, making a theft enhancement inapplicable.

Where a seller earns a profit when it receives the contracted-for valuable consideration for its goods, the resulting transfer of possession of the goods to the buyer does not constitute a theft of the goods, even if price negotiations prior to executing the transactions were affected by the buyer's misrepresentations; the purchased goods are not thereby stolen. For the products to be obtained by fraud within the meaning of § 670, more is required than merely using deception to obtain a lower price (e.g., pretending to resell goods in foreign markets). *Cf. United States v. Turley*, 352 U.S. 407, 416 (1957) (theft shown where "automobile is purchased with a worthless check"). Whereas the "deeply discounted prices" for the products may have been obtained by fraud, (PSI ¶¶ 8, 16 18, 26, 41), the products themselves were not. As used in the theft statute, the term "obtains"

requires a proximate connection between the physical act of acquisition and the fraudulent misrepresentation, rather than pre-acquisition fraud in price negotiation as alleged in this case.

Second, Javat was neither an employee nor agent of a ripped-off supply chain company, so the guideline meant to address abuse of trust by agents of the victim companies should not have applied. The defendant did not violate any duty of trust (the focus of the guideline), and when he acquired the goods, they were outside the relevant supply chain. "Supply chain" is statutorily defined as "manufacturers" and those acting on their behalf, such as an "own-labeled" or a "private-label" distributor." 18 U.S.C. § 670(e)(6). Javat was not an employee or agent of any of the identified vendors; Javat's purchasing companies were *buyers*, not agents of the vendors.

## C.    Erroneous 2-Level Enhancement under U.S.S.G. § 2B1.1(b)(9)(A) for Misrepresenting Government/Nonprofit Status

The district court erroneously increased Javat's sentence by two levels for misrepresenting himself as a charity. This enhancement applies when the defendant claimed to be acting selflessly—i.e., "on behalf of" and not at arms-length with—a charitable or similar entity and does not apply where the defendant reveals that he is acting out of his own self-interest in personal gain. It is not applicable to a for-profit company claiming to bid on business with a governmental agency while admitting to seek a profit in the purchase of goods, and particularly so where the

selling entity also admits that it was making a profit. The defendant made it clear to any and all sellers that he was an independent wholesaler and distributor for profit and was not part of any government. The assertion that he claimed that he *intended* to resell to a quasi-governmental Afghan agency or even the U.S. military did not amount to a representation that Javat operated any form of nonprofit concern at all. The reference to a foreign entity was clearly part of the plan to explain why the defendant needed to bid low, but the real focus of the low prices was the foreign sales contemplated by the vendor. The vendors knew they were dealing with a for-profit company with a foreign downstream customer, not a charity sale. Thus, on its face, the guideline enhancement is inapplicable.

**D.     Sentencing Non-Loss Issue 3: Two Levels for Ten Victims or Mass Marketing (U.S.S.G. § 2B1.1(b)(2)(A)).**

At sentencing, the government admitted that it only had pricing information from seven vendors. DE#420:29 n.10. Of those, the government claimed that it had only established loss from five vendors at the Soto trial. *Id.* at 9 n.4. Nonetheless, without evidence from the prosecution, the district court upheld a loss calculation from the government that assumed every sale involving dozens of vendors was fraudulent by extrapolating the pricing data from a handful of vendors, of which only five were the subject of the Soto trial. DE#420:9. This is speculation, not a valid basis of extrapolation. Loss calculations based upon extrapolations, as the government sought to use in this case, must be grounded in evidence of actual

losses, not speculation. *United States v. Annamalai*, 939 F.3d 1216, 1238 (11th Cir. 2019) (vacating sentencing loss calculation where agent testimony simply inferred fraud loss in 467 files from evidence relating to 87); *United States v. Waddell*, 840 Fed. Appx. 421 (11th Cir. 2020) (evidence of only 8 out of 87 alleged victims insufficient to establish loss). Here, there was no witness testimony—lay, expert, or agent—that every transaction was fraudulent. QuickBooks entries by a deceased unconvicted co-defendant were not evidence of fraud loss, much less a reliable means of extrapolating fraud loss to all transactions.

To the contrary, the defendant introduced unrebutted expert evidence that the vendors suffered no financial losses. DE#466-1 (admitted at the Sentencing Hearing, DE#500:29-32). The lack of any reliable contrary government evidence requires a corresponding refusal to impose the enhancement for more than 10 victims.

The number-of-victims enhancement requires proof of actual loss by an identified victim. *United States v. Corbett*, 921 F.3d 1032, 1038 (11th Cir. 2019). No such evidence was presented at sentencing, and indeed the district court found that the transactions were motivated by numerous vendor-specific factors other than fraud. The enhancement should be reversed.

# ISSUE II

## The Restitution Judgment Should Be Vacated.

The restitution judgment should be vacated for procedural and substantive errors. The district court failed to comply with the notice and investigation requirements of 18 U.S.C. § 3664 in the presentence report stage of the case, with the probation office never having had the opportunity to examine or verify any restitution claim. Further, the government presented no proof of actual direct loss; the alleged proof of expectation losses is not recoverable in restitution; and in any event, the lack of evidence of fair market value or replacement value above the amounts paid by the defendant is fatal to the judgment.

## A.     Procedural Errors Regarding Restitution.

The errors attending the sentencing actual loss calculation methodology (recognized as "unreasonable" by the district court) apply equally to the restitution loss methodology because they are the same estimates (guesses) of profits based upon sales not made or even proven likely. Procedurally, the government failed to follow any of the procedures required for the calculation and imposition of a restitution loss, and then obtained court orders quashing defendant's efforts to subpoena relevant pricing information from the manufacturers. *See* DE#248 & 274 (quashed at DE#295 & 324); DE#423 (quashed at DE#431).

Specifically, 18 U.S.C. § 3664 requires restitution information to be collected by the U.S. Probation Office, where it can be evaluated, and objected to, by defense counsel. The government completely circumvented this process by undertaking its own information collection efforts directly with the drug manufacturers, shielding its victim communications, and then presenting the companies' conclusions within days of the two restitution hearings. DE#439:17 (¶ 47) (probation office notice that it has not contacted victims). By this means, the defense was completely shut out of the restitution calculation process, depriving it of a meaningful opportunity to test or compare the disparate loss calculation methodologies.

This error was then compounded by the district court's refusal to grant the defense a continuance to investigate and address the manufacturer-derived restitution information. When the defense then subpoenaed relevant documents directly from the manufacturers, the government moved to quash the subpoenas, which the district court erroneously granted.

The net result was the government's complete circumvention of the statutorily required procedures for adjudicating restitution awards, with the effective elimination of the Probation Office, and derivatively the defendant, as a participant in the process. The result is what one would expect from such a one-sided process—the government presented the self-serving estimates of the drug

manufacturers as to the hypothetical sales they would have liked to see, without a shred of corroboration.

Each manufacturer provided its own preferred price from which it calculated an alleged, but not proven, lost profit. There was no common pricing formula among the victims. Some of the manufacturers did not even participate in sales during the relevant time frame.

Critically, none of the manufacturers (or the government) presented a single piece of evidence as to the fair market value of the hypothetical sales they were claiming as losses. The price at which an existing buyer is willing to pay for the item is an essential component necessary to calculate fair market value. No evidence was presented by the manufacturers, or the government, identifying the existence of a single willing buyer, much less the price at which they would be willing to buy.

Further, the quashing of the defendant's subpoenas denied him his right to compulsory process, and otherwise was an abuse of discretion.

That is not how the process is supposed to work. *See United States v. Sedillo*, 2020 WL 5369070, *13, No. CR 17-1371 JB, (D.N.M. Sept. 8, 2020) (Browning, J.) (§ 3664(a) requires probation office to collect information for restitution calculations). None of this happened, and this Court should therefore vacate the restitution judgment for procedural error.

As to restitution, this Court has consistently held that restitution awards "must be based on the amount of loss *actually* caused by the defendant's conduct," and "[t]he government bears the burden of proving the amount of the loss." *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010) (internal citation omitted; emphasis in original). The government must prove both proximate and but for causation of actual loss. *Id.*; 18 U.S.C. § 3663A(a)(2).[6] "In most cases, the amount of actual loss under the guidelines will be the same as the restitution figure." *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017). "Restitution is not to provide a windfall for crime victims." *Martin*, 803 F.3d at 594 (citations and internal quotation marks omitted); *United States v. Cavallo*, 790 F.3d 1202,1238 (11th Cir. 2015) (failure to credit victim economic benefits is an impermissible windfall).

Under the Restitution Act, 18 U.S.C. § 3664(e) "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). "[T]he government bears the burden of supporting its loss calculation with 'reliable and specific evidence.'" *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999). Speculation is forbidden. *Stein*, 846 F.3d at 1154. Critically, a "victim's

---

[6] *United States v. Adebara*, 2021 WL 3633475, *4 (N.D. Okla. Aug. 17, 2021) ("And the harm would have occurred regardless of defendants' conduct, such that the offense of conviction cannot constitute the 'but for' cause of the harm.").

unsupported loss estimate [is] insufficient, on its own, to substantiate a restitution amount." *United States v. Steele*, 897 F.3d 606, 613 (4th Cir. 2018) (citing *United States v. Mullins*, 971 F.2d 1138, 1147 (4th Cir. 1992)). That is the only record here.

"[E]xcessive restitution awards cannot be excused by harmless error; every dollar must be supported by record evidence.'" *United States v. Kim*, 988 F.3d 803, 811 (5th Cir. 2021) (quoting *United States v. Sharma*, 703 F.3d 803, 823 (5th Cir. 2012)). Restitution is limited to the offense of conviction and its temporal scope; here, the Count One conspiracy. *United States v. Allen*, 983 F.3d 463, 472 (10th Cir. 2020); *United States v. Mason*, 722 F.3d 691, 694 (5th Cir. 2013).

## B.     Direct Losses Have Not Been Proven

First, restitution loss is limited to direct, "actual" losses, which is traditionally limited to out-of-pocket losses. *United States v. Martin*, 803 F.3d 581, 595 (11th Cir. 2015) (citing *Howard*, 784 F.3d at 750–51 (vacating restitution)). DE#500:22 (defense objection that guideline sentencing loss limited to out-of-pocket loss), 89 (same). That is, the "amount of restitution owed to each victim must be based on the amount of loss actually caused by the defendant's conduct." *Martin*, 803 F.3d at 595.

Here, there was no evidence that any of the sales allegedly at issue resulted in any actual loss to the "victim" manufacturers. For example, there was no

showing that a company lost any sales, domestic or foreign, as a result of the offense; quite the contrary. They profited from the sales to Javat. DE#466-1. Similarly, there was no showing that the companies incurred any new or different expenses as a result of the offense. There is simply no evidence of out-of-pocket losses. Accordingly, the restitution awards should be vacated for lack of any evidence of out-of-pocket damages actually incurred by the alleged victims.

Similarly, the subsequent sales—the reselling by Javat—did not cause any out-of-pocket losses to the manufacturers. There was no evidence offered that these sales were, or could have been, made by the alleged vendor victims directly at their preferred prices. The vendors may have apprehended a disadvantage by having to confront price competition. But that is not an actual out-of-pocket loss. That is the marketplace working as it should despite efforts by vendors to force U.S. consumers to pay more for the products than their foreign counterparts do.

The lack of any actual loss is also made clear by application of restitution's causation limitations—requiring factual and proximate causation. *Paroline v. United States*, 572 U.S. 434, 446 (2014). The vendors' losses are based upon unproven expectations arising from hypothetical purchases by unidentified buyers at the highest vendor list price. These transactions simply did not occur, and therefore could not have caused an actual loss. Any such contingent injury is too attenuated to qualify as a directly caused injury.

In *United States v. Thuna,* 382 F. Supp. 3d 166 (D.P.R. 2019), for example, a defendant pled guilty to causing mislabeled products to be delivered and introduced into interstate commerce. *Id.* at 169. Eli Lilly and Company ("Lilly") requested the Court to recognize Lilly as a victim because Thuna "caused misbranded Lilly pharmaceuticals to be introduced into interstate commerce" and to award restitution as part of sentencing. *Id.* As here, Lilly did not itself engage in retail sales, but rather sold to wholesalers who then resold to customers. *Id.* at 171. Nonetheless, Lilly's restitution theory was that "'each unit of Lilly product that Defendant illegally diverted into the legitimate supply chain displaced a corresponding wholesale sale of Lilly's legitimate product to which Lilly was entitled.'" *Id.* (quoting Lilly's brief). The *Thuna* opinion rejected this claim because:

> Lilly's alleged harm is not 'directly' caused by any element of Thuna's offense. That Thuna intentionally introduced misbranded drugs into interstate commerce does not necessitate the displacement of Lilly's products.

*Id.*

Specifically, *Thuna* held that the alleged loss "is too attenuated for restitution." *Id.* at 172 (citing *United States v. Janosko*, 642 F.3d 40, 42 (1st Cir. 2011), *United States v. Freeman*, 741 F.3d 426, 438 (4th Cir. 2014), and *In re Doe*, 264 Fed. Appx. 260 (4th Cir. 2007)). The same conclusion applies here.

There was no claim or evidence that any of the manufacturers lost a single sale. Defendant's expert provided the only evidence on this point and concluded that there was no record support for such a finding. DE#466-1. Any such loss would be too attenuated for restitution, especially when supported only by aspirations. *United States v. Ferdman*, 779 F.3d 1129, 1139 (10th Cir. 2015) (government must present some evidence of lost sales; mere victim expectation claims legally insufficient) (citing cases).

Here, the companies hypothecated that they might have found resellers other than Javat who could have, and would have, bought their goods at their preferred higher domestic price for potential resale to others. Pegging loss upon the independent, contingent actions of third and fourth parties does not satisfy the directness requirement of proximate cause. *Hemi Group, LLC v. City of New York*, 559 US. 1, 15 (2010) ("The City's theory of liability rests on the independent actions of third and even fourth parties."). Indeed, the Supreme Court has recently held that claims of "injury" based upon future events fall outside the Article III jurisdiction of courts. *Transunion v. Ramirez*, 141 S.Ct. 2190, 2211 (2021) (risk of future harm is not concrete injury, "at least unless the exposure to the risk of future harm itself causes *separate* concrete harm") (emphasis in original). Here, no separate concrete harm to the vendors was proven based upon future events.

Ultimately, neither the vendors nor the government produced any evidence of such a willing buyer or potential reseller. This does not satisfy the directness requirement of proximate cause. *See, e.g., Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) (describing directness requirement of proximate causation). The alleged victims (manufacturers with a profit) did not suffer, and the government failed to prove, any out-of-pocket losses.

## C.     Expectation Damages Are Unavailable in Restitution

The government pursued a theory of expectation damages as restitution losses—the recovery of manufacturers' expected damages (i.e., recovery of their artificially high list prices). But that is not available under the restitution statutes, nor under restitution precedent. "'Criminal restitution. . . is not concerned with a victim's disappointed expectations but only with [its] actual losses.'" *Ferdman*, 779 F.3d at 1139 (10th Cir. 2015) (quoting *United States v. Boccagna*, 450 F.3d 107, 119 (2d Cir. 2006)).

The manufacturers' expectations of potential drug profits from their highest list price are simply not an "actual loss" for restitution purposes. *Id.* "[T]he government must present more than a claim that but for a defendant's theft, the victim may have made additional sales." *Ferdman*, 779 F.3d at 1139.

This result should apply especially to these manufacturers because an essential component of expectation damages for product sales is establishing a fair

market value for the product sold. This was not even attempted here; the government and vendors successfully opposed all price discovery. There was no effort by the government or the alleged victims to establish a fair market value for any of the products at issue. *Ferdman*, 779 F.3d at 1141 (holding abuse of discretion "standard will not countenance a finding of lost sales based on a victim's unverified claim ... .").

In *Ferdman*, the Tenth Circuit rejected vendor loss claims like those made by the government here—victim Sprint alleged lost future sales from stolen cell phones using fictitious purchasers. 779 F.3d at 1130. The district court calculated restitution in the amount of Sprint's retail unsubsidized price for the stolen inventory. *Id*. at 1131. The Tenth Circuit reversed this "rubber stamp" of the victim's alleged losses. *Id*. at 1133, 1139–40, and rejected loss claims based upon possible future sales of the phones at potentially profitable retail prices "absent proof of the same." *Id*. at 1138.

Here, apart from the government's blocking any vendor price or sale discovery, the vendors offered self-serving estimates of their anticipated profits from sales they did not secure, even after they were actually paid for their products at fully profitable prices they accepted for their own reasons. As in *Ferdman*, the government adduced no evidence, including from the vendors, of any replacement value for the allegedly diverted products (they were sold over cost); no evidence of

future vendor sales generally or at their preferred prices; and no evidence of the vendor's actual costs. Instead, the government accounted only for the aspirational profits of the vendors at their preferred pricing.

## D. Expectation Damages Were Not Proven Here

Even in circumstances where expectation damages are proper, they must be established by reliable means, which necessarily includes consideration not only of what a plaintiff expects, but also what the market will reasonably bear.  Here, there was no evidence adduced that the victim companies had prospects for, or could obtain, sales in the domestic or foreign markets at their preferred prices.  For example, no evidence was adduced that, instead of a sale to defendant, the vendors could have sold their drugs into the domestic market and at what price.

Fair market value is defined as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." Black's Law Dictionary (11th ed. 2019). *See In re General Motors LLC Ignition Switch Litigation*, 407 F. Supp. 3d 212, 224 n.7 (S.D.N.Y. 2019) (citing cases). Both sides of this equation are essential—a willing seller's price, *and* a willing buyer's price—the equivalent of the market forces of supply and demand. *Id*. A damages methodology that just considers the desired price of the seller is not evidence of

fair market value whatsoever. *Id.* (rejecting methodology relying upon seller's valuation but failing to account for product demand).

Here, the government adduced anecdotal evidence of what the drug manufacturers would have preferred to be paid (a preferred sales price) for sales that did not occur, without any evidence as to what a willing buyer would pay, or even that there was a willing buyer. That is a complete failure of proof on the issue of fair market value. *In re General Motors LLC Ignition Switch Litigation*, 407 F. Supp. 3d at 224–25. As the defense expert observed, if there had been a willing buyer ready and able to pay a higher price for the transaction, (rational) vendors would have sold to that willing buyer rather than to Javat. DE#466-1.There was no effort by the government, the vendors, or the district court to otherwise determine the fair market value of the goods. *Goldman*, 925 F.3d at 1223 ("'value' means the 'actual value, or fair market value, of the item") (quoting *United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999) (quoting Black's Law Dictionary); *accord Steele*, 897 F.3d at 611 (quoting *Boccagna*, 450 F.3d at 109 ("[F]air market value will generally provide the best measure to ensure restitution in the 'full amount' of the victim's loss."). Establishing fair market valuations is anathema to a price discrimination scheme intended to avoid competition while inflating prices.

Accordingly, even if expectation damages were a proper measure of restitution, they were not proven here because neither the government nor the

manufacturers established a fair market value ignoring entirely the impact upon price of having to secure a willing buyer.

## ISSUE III

## MULTIPLE FORFEITURE ERRORS WARRANT REVERSAL.

The forfeiture penalties in this case should be vacated for procedural and substantive error. Because the district court failed to include any forfeiture money judgment in any of the three judgments (DE#460, 539, 718), there is no valid forfeiture judgment as required by Fed. R. Crim. P 32.2(b)(4)(B) and hence any imposition of a forfeiture penalty is barred. *United State v. Pease*, 331 F.3d 809, 813 (11th Cir. 2003) (forfeiture must be in judgment).

Second, it is undisputed that there is no forfeiture liability under the forfeiture statute under which the grand jury indicted and to which defendant pled—18 U.S.C. § 982(a)(2)(A).

Third, the post-sentencing effort of the district court to amend the Indictment to allege § 981 forfeiture violates Fed. R. Crim. P. 32.2 and is also not contained in any judgment.

If the district court could unilaterally change the applicable forfeiture statute to § 981, it requires tracing, which the district court found was not undertaken by the government, precluding forfeiture. The government claimed tracing is unnecessary for a money judgment, but money judgments are not statutorily

authorized; and even if valid, they cannot be used to repeal § 981's express statutory tracing requirements. Finally, without a valid forfeiture judgment as to specific property or a statutorily authorized money judgment, there is no legal basis for substitute asset forfeiture under 21 U.S.C. § 853(p), especially without a finding that the property is owned by, and dissipated by, the defendant.

A.     **There is no forfeiture judgment and the government failed to appeal.**

The Javat judgments do not mention § 981, money judgments, forfeiture amounts, or forfeiture statutes. DE#460, 539, 718. The initial judgment stated: "Forfeiture of the defendant's right, title and interest in certain property is hereby ordered." DE#460. No forfeiture was ordered at sentencing, however. There followed additional hearings addressing forfeiture and restitution, but the judgment never changed, and the district court never adopted a preliminary or other order of forfeiture in the judgment. DE#539, 718. No amount, money judgment, or certain property is identified. The district court erred in failing to include a forfeiture determination in its judgments, as required by Fed. R. Crim. P. 32.2(b)(4)(B), which requires that forfeiture must "be made part of the sentence and be included in the judgment."

This Court has held that inclusion of a forfeiture determination in a judgment is a precondition if "forfeiture to the United States is to come to fruition." *Pease*, 331 F.3d at 813; *United States v. Petrie*, 502 U.S. 1280, 1284

(11th Cir. 2002). A final judgment also needs to include reference to any preliminary order of forfeiture. *United States v. Robinson*, 137 Fed. Appx. 273, 276 (11th Cir. 2005) (citing *Pease*, 331 F.3d at 816).

The Javat judgments fail to identify: any property, including any money judgment or judgment amount; any preliminary order of forfeiture; or any applicable forfeiture statute—either the statute found by the grand jury, or the different statute later invoked by the judge to enter a preliminary order of forfeiture.[7] DE#498, 536.

In *United States v Canela*, 2019 WL 2543503 (M.D. Tenn. June 20, 2019), a district court, following this Court's reasoning in *Pease*, held that a judgment's failure to include a preliminary forfeiture order or to mention a money judgment or amount was fatal to a forfeiture claim, and is not curable as a clerical error under Fed. R. Crim. P. 36. *Canela* followed *Pease* by holding a judgment's failure to include a forfeiture determination is an error that the government must seek to cure by way of appeal, failing which there is no forfeiture. *Id*. at *9. Here, there is no government appeal from any Javat judgment. *See Pease*, 331 F.3d at 811 (government fails to appeal lack of written forfeiture judgment under 18 U.S.C. § 3742(b)); *United States v. Harvey*, 20 F.4th 71, 77 (1st Cir. 2021) (upon

---

[7] The District Court purported to retroactively make its forfeiture judgment a general order under Fed.R.Crim.P. 32.2(b)(2)(C), DE#498, at 4, but nonetheless failed to enter any forfeiture judgment, including as described under that rule.

sentencing, no jurisdiction to alter final judgment). Given the absence of a money judgment forfeiture order in any judgment or amended judgment as to the defendant, imposition of forfeiture penalties must be reversed.

## B.    Under the Indictment, No Forfeiture is Authorized.

The original and Superseding Indictments alleged criminal forfeiture under 18 U.S.C. § 982(a)(2)(A), which authorizes the forfeiture of fraud proceeds "affecting a financial institution." DE#1:11; 145:12. *United States v. Wall*, 285 Fed. Appx. 675, 684 (11th Cir. 2008) (government conceded that § 982(a)(2)(A) applies only to fraud affecting a financial institution). Neither Indictment alleges any claim for civil forfeiture generally, 28 U.S.C. § 2641(c), or wire fraud civil forfeiture specifically, 18 U.S.C. § 981(a)(1)(C). Likewise, the Javat plea was to Count One of the Superseding Indictment, which did not contain any allegation of civil forfeiture under 18 U.S.C. § 981(a)(1)(C) or any money judgment, but rather purported to identify "properties" subject to criminal forfeiture under § 982(a)(2)(A), including the contents of bank accounts and proceeds of $21 million. DE#145:12.

Just a few days before sentencing, long after Javat's guilty plea, the government argued that the Indictment's invocation of 18 U.S.C. § 982(a)(2)(B) was error, and it preferred to prosecute a proceeds forfeiture claim under § 981(a)(1)(C). Over defense objection, DE#474, 521, the district court purported to

order forfeiture under the unpled civil forfeiture provisions of § 981(a)(1)(C). DE#498. The district court acknowledged that the Superseding Indictment "failed to identify the correct statutory basis for forfeiture," DE#641:2, and was "never formally amended" by the government. DE#498. It ruled "there was no formal requirement for the government to amend the Superseding Indictment," DE#498:7, thereby removing the grand jury from the forfeiture process. This was error.

Rule 32.2(a) of the Rules of Criminal Procedure forbids entry of a forfeiture judgment "unless the indictment . . . contains notice to the defendant that the government will seek the forfeiture of property *in accordance with the applicable statute." Id.* (emphasis added). The emphasized language is repeated in Rule 32.2(b)(1)(A), which specifies that a court must, upon accepting a guilty plea for which "criminal forfeiture is sought," "determine *what property is subject to forfeiture under the applicable statute." Id.* (emphasis added). The Rule is incompatible with any suggestion that courts have authority to make forfeiture charging decisions, or to amend those of grand juries.

The district court refused to enforce this Rule, concluding that if an indictment forfeiture allegation is "mistaken," it is up to the court to find a better forfeiture charge. The district court attempted to distinguish the contrary Second Circuit case enforcing the indictment requirements of Rule 32.2(a), *United States v. Annabi*, 746 F.3d 83 (2d Cir. 2014), on the ground that here, notice of the

Indictment's legal error was previously provided by the government to another defendant (Daskos) in a brief footnote, which the district court concluded was sufficient to dispel prejudice from the erroneous notice provided by the two "mistaken" Indictments and defendant's entry of a plea to them. DE#536.

But *Annabi* reversed because the new forfeiture provision was "harsher' than that pled in the indictment. 746 F.3d at 84. This is also the case here, because the substitution of § 981 for § 982 not only broadened the general forfeiture exposure (from non-existent financial institution fraud proceeds to traceable proceeds of alleged vendor fraud) but, under this Court's precedent at least, expanded forfeiture beyond property personally acquired by Defendant to that obtained by others (i.e., codefendants and coconspirators). Under § 982(a)(1), a defendant is only liable for property he personally obtains ("proceeds the person obtained"). *Accord Honeycutt v. United States*, 137 S. Ct. 1626, 1632 (2017); *compare United States v. Cingari*, 952 F.3d 1301, 1305–06 (11th Cir. 2020) (*Honeycutt* inapplicable to § 981 under plain error).[8]

Both the Criminal Rules and the statutory incorporation of civil forfeiture consistently identify indictments as the necessary procedure for making forfeiture charges and mandate their use. 28 U.S.C § 2461(c) ("the Government may include

---

[8] By abandoning the Indictment's forfeiture charge under § 982(a)(1)(C), the government was also relieved of its forfeiture burden of proving the fraud offense "affect[ed] a financial institution." *Id*.

notice of the forfeiture in the indictment or information *pursuant to the Federal Rules of Criminal Procedure*") (emphasis added); 18 U.S.C. § 983(a)(3)(C) ("the Government may include a forfeiture allegation in a criminal indictment").

The district court erred by purporting to amend the forfeiture authority cited in the Indictment returned by the grand jury. *Russell v. United States*, 369 U.S. 749, 771 (1962) ("an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form."). This Court has held that a court may *not* amend a grand jury forfeiture allegation to correct alleged mistakes. *United States v. Gilbert*, 244 F.3d 888, 923 n.5 (11th Cir. 2001). In *Gilbert*, a trial court changed the forfeitable property as alleged in an indictment (a casino) to justify forfeiture of unpled property (a joint venture). This Court held a court cannot correct "a grand jury's mistakes on its own initiative. Rather, the court could only order forfeiture of that interest or property named in the indictment, to wit: the Bell Gardens Bicycle Club." *Id*.[9]

The district court's reliance upon this Court's unpublished pre-*Honeycutt* opinion in *United States v. Wall*, 285 Fed. Appx. 675 (11th Cir. 2008), was misplaced. *Wall* addressed an indictment error in citing § 982, concluding that,

"absent prejudice," a scrivener's error is not a basis for reversal. *Id*. at 684. The unpublished *Wall* opinion failed to address the language of Criminal Rule 32.2, and 28 U.S.C.§ 2641 requiring indictment pleading. In any event, abundant procedural and substantive prejudice exist here. *Wall* addressed an indictment's failure to plead § 981 at a time when it was practically indistinguishable in scope with § 982 forfeitures. This ended in 2017. *See, e.g., Honeycutt*, 137 S. Ct. at 1631 n.1. Indeed, this Court has since "expressed doubt" that *Honeycutt's* criminal forfeiture limitations apply equally to § 981, including when incorporated in a criminal case. *United States v. Goldstein*, 989 F.3d 1178, 1203 n.8 (11th Cir. 2021).

## C.     Tracing Under § 981 Was Not Proven.

Even if the district court's amendment of the Indictment was proper, it was never proven. Subsection 981(a)(1)(C) authorizes the forfeiture of proceeds *traceable* to the offense (wire fraud). *Id*. ("constitutes or is derived from proceeds traceable to a violation"). As the district court found no such tracing was undertaken by the prosecution, *i.e.*, no effort was undertaken to track the flow of monies from vendors, much less to track any resulting flow of proceeds.

---

[9] *Gilbert* addressed former Rule7(c)(2) that required the extent of forfeitable property be included in the indictment. This Rule was replaced by Rule 32.2(a), derived from former Rule 7(c)(2). Rule 32.2 2000 Advisory Committee Notes (subdivision a). The current iteration of that Rule requires that the indictment specify the "*applicable statute"* subjecting a defendant's property to forfeiture.

At a March 19, 2021 hearing, the district court correctly found that the government's forfeiture calculation methodology (netting company costs against income) did not constitute tracing: "Because the numbers that you [the government] have is not a proceeds to Javat number." DE#551:115. The prosecution agreed, explaining that was why it was seeking a money judgment pursuant to the "cases where the government cannot directly trace all the assets because they have been otherwise disposed of or are unaccounted for." DE#551:133. For example, several of the companies were owned by defendant Sipprell, but no effort was undertaken to trace monies from these companies to Javat. Accordingly, it is undisputed that the tracing requirement of § 981(a)(1)(C) has not been satisfied.

## D.     A Money Judgment Would Be Improper.

No money judgment is sought in any Indictment, nor one identified in any Javat judgment. If this is insufficient to preclude the creation of one now, the defendant disputes whether forfeiture money judgments are statutorily authorized at all, making them unlawful, although he recognizes that this Court has upheld them in certain circumstances. *See, e.g., United States v. Waked Hatum*, 969 F.3d 1156, 1163 (11th Cir. 2020).

---

Fed. R. Crim. P. 32.2(a) & (b).

Money judgments are not statutorily authorized,[10] but are mentioned in Rule 32.2(a) as an alternative to the specific forfeiture, a practice accepted by some courts, even though not endorsed by the Ruler's Committee. 2000 Adv. Cmtee Notes Rule 32 ("The Committee takes no position on the correctness of those rulings."). As explained above, from indictment through plea and then judgment, there was no money judgment sought or obtained. But any such judgment would be error here.

This Court first recognized money judgments for forfeitures that lack a tracing requirement, which is not the case with § 981. *See United States v. Conner*, 752 F.2d 566, 576 (11th Cir. 1985) (statute "does not require that the government trace it"). The prosecution below accurately described the objective of forfeiture money judgments as relieving the government of tracing requirements. DE#551:113. The subsequent enactment of substitute assets forfeiture in 21 U.S.C. § 853(p) in 1986 should supersede the availability of judicial forfeiture money judgments because this statute is the exclusive means of forfeiting legitimate property. *Honeycutt*, 137 S. Ct. at 1634.

Regardless, the civil forfeiture proposed here under § 981(a)(1)(C) expressly requires tracing. *Id*. (property which "constitutes or is derived from proceeds

---

[10] Money judgments conflict with the exclusive statutory authority to forfeit legitimate property (§ 853(p); *Honeycutt,* 137 S. Ct. at 1634), and the sole statutory reference to them in 31 U.S.C. § 5332(b)(4).

traceable to a violation"); *United States v. $125,938.62*, 537 F.3d 1287, 1294 (11th Cir. 2008) (failing to connect any individual transaction to the alleged fraud (but for causation) is a failure of tracing). Under these circumstances, a money judgment cannot relieve the government of its statutory burden of proof. *Whalen v. United States*, 455 U.S. 684, 689 & n.4 (1980) (only Congress authorizes criminal punishments).

Finally, the district court imposed dramatically lower express money judgments for other defendants: $100,000 for co-defendant Soto (DE#461, 719); $24,000 for co-defendant Armando (DE#542, 463), and $18,536.40 for co-defendant Daskos (DE#464). The substantial discrepancy between the forfeiture ostensibly confiscating the same generated "proceeds," ($26 million for Javat; $100,000 for Soto), demonstrates that no tracing was attempted or established.

### E. Substitute Asset Forfeiture Is Unavailable.

The district court granted a government motion (DE#579) for substitute asset forfeiture under 21 U.S.C. § 853(p) of two pieces of realty owned by third party entities. DE#643. The district court acknowledged that substitute asset forfeiture was limited to a defendant's property but could find only that "defendant potentially has an interest in the substitute property." DE#641. This was error because: (i) a defendant must own property to suffer its forfeiture (§ 853(p)(2) (forfeiture of "other property of the defendant"), and none was proven; (ii)

substitute asset forfeiture is predicated upon a valid prior forfeiture judgment (§ 853(p)(1)), and there is none here; (iii) without an identified forfeited *res*, a defendant cannot take any "act or omission" to dissipate it under § 853(p)(1); and (iv) assuming a money judgment was impliedly imposed, money judgments are not among the five types of substitute forfeiture listed under § 853(p)(1)(A)–(E), and cannot be dissipated by act of a defendant or otherwise.

## ISSUE IV

### THE DEFENDANT'S CONVICTION MUST BE VACATED BECAUSE THE FRAUD STATUTES DO NOT ENCOMPASS HIS ALLEGED OR ADMITTED CONDUCT.

Defendant adopts the arguments made by co-appellant Luis Soto concerning the denial of the joint motion to dismiss the Indictment based on the inapplicability of the federal fraud statutes to the conduct alleged.[11] The defendant's conviction should be vacated based on the jurisdictionally defective Indictment theory on which his guilty plea was premised. Defendant had moved to dismiss the Indictment based upon the law that mere deception does not establish federal fraud. *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) (fraudulently inducing

---

[11] Although Javat entered a guilty plea to Count 1 of the Indictment, "a guilty plea does not bar an appeal that asserts that the indictment failed to state an offense [or] that the charge is unconstitutional." *United States v. Hill*, 564 F.2d 1179, 1180 (5th Cir. 1977); *see also Class v. United States*, 138 S. Ct. 798, 804 (2018) ("'But if the facts alleged and admitted do not constitute a crime against the laws of the Commonwealth, the defendant is entitled to be discharged.'") (quoting *Commonwealth v. Hinds*, 101 Mass. 209, 210 (1869)).

person to enter transaction he would otherwise have avoided if obtained bargained economic benefits). Defendant contends that the only potential losses of the vendors are opportunities to control future product prices downstream in their distribution chain. That is not a cognizable financial loss under the federal fraud statutes. *United States v, Bruchhausen*, 977 F.2d 464 (9th Cir 1992) (manufacturer right to control destination of products not a property right under federal fraud statute). Indeed, long-established common law doctrine prohibits restraints on the alienation of property as "'obnoxious to the public interest,'" *Impression Products, Inc. v. Lexmark Int'l*, 137 S. Ct. 1523, 1532 (2017) (quoting *Straus v. Victor Talking Machine Co.*, 243 U.S. 490, 491 (1917)), a principle sometimes known as the first-sale doctrine. *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1449 (11th Cir, 1998).

Drug and consumer goods manufacturers do not, and should not, have a legal property interest in controlling the downstream resale prices of their products. Harm to market share is not the type of injury to property that justifies a finding of federal fraud liability. *Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 406 (9th Cir. 1991) ("'Market share' is neither tangible nor intangible property; its loss us far too amorphous a blow to support a claim of mail fraud under the reasoning of *McNally*, 483 U.S. at 356-60 and *Carpenter*, 484 U.S.

at 26") (adopted, *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1258 (7th Cir 1995))).[12]

For the same reason that tricking the vendor about the destination of the products to obtain a discount does not in itself create a fraud loss, the allegations of fraud in this case were insufficient. In *Takhalov*, the patrons paid inflated prices for bar drinks because they were tricked by B-girls into believing that their final destination might be the bedroom, not the poor house:

> From that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to deceive, but not one to defraud.

*Takhalov*, 827 F.3d at 1312–13.

Fraud law does not reach bargaining-position misstatements *absent* intended economic harm. While the defendant, by assuming the bargaining position of a foreign distributor, admitted that he triggered an impulse or excuse for vendors to offer him prices that were not generally available to domestic customers, given the absence of any intended economic harm, or any possibility of harm that was not

---

[12] The risk of potential future harm is generally not a cognizable injury under Article III. *Transunion LLC v. Ramirez*, 141 S. Ct. 2190, 2212 (2021). Competitive injury is also not a proper basis for a federal fraud claim. *Lancaster*, 940 F.2d at 405. (followed, *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1018–19 (E.D. Wis. 2010)).

purely speculative, in the factual basis or in any allegation of the Indictment, the conviction cannot stand.

## Conclusion

For the foregoing reasons, the judgment of the district court should be vacated and the case remanded for further proceedings. In resentencing the defendant, the district court should enter a judgment with no restitution or forfeiture, and without the challenged guideline loss and non-loss enhancements.

## FRAP 32(g) CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 27(d)(2)(A), I hereby certify that the foregoing brief contains 12,758 words, excluding those parts exempted by Fed. R. App. P. 32(f).  It further complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6), as it has been prepared in a proportionally-based typeface using Microsoft Word, Times New Roman 14-point font.

Respectfully submitted,

**BLACK SREBNICK**
201 South Biscayne Boulevard, Suite 1300
Miami, FL  33131 / Tele: (305) 371-6421
Email: HSrebnick@RoyBlack.com

By: */s/Howard Srebnick*
    **HOWARD SREBNICK, ESQ**.
    Florida Bar No. 919063
    *Counsel for Javat*

## CERTIFICATE OF SERVICE

I CERTIFY that on March 17, 2022 this document was electronically filed and that a bound copy was sent, by regular mail, to Daniel Matzkin, Esq., Assistant United States Attorney, U.S. Attorney's Office, 99 N.E. 4th Street, Suite 500, Miami, Florida 33132-2111.

*/s/ Howard Srebnick*
 Howard Srebnick, Esq.