# In the United States Court of Appeals for the Eleventh Circuit

---

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

BYRAMJI MONECK JAVAT and LUIS ALBERTO SOTO,
Defendants-Appellants,

and

PENNCO, LLC, AND CALH HOLDING CORP.,
Third Party Petitioners-Appellants.

---

On Appeal from the United States District Court
for the Southern District of Florida, No. 1:18-cr-20668

---

## BRIEF FOR THE UNITED STATES

---

JUAN ANTONIO GONZALEZ
United States Attorney

LISA TOBIN RUBIO
Chief, Appellate Division

DANIEL MATZKIN
Deputy Chief
Southern District of Florida

KENNETH A. POLITE
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

DAVID M. LIEBERMAN
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 262-6805
david.lieberman@usdoj.gov

# CERTIFICATE OF INTERESTED PERSONS

*United States of America v. Byran Moneck Javat, et al.*
Nos. 19-15168-H, 20-11137-H, 21-13593H

Undersigned counsel for the United States of America hereby certifies that the following is a complete list of persons and entities who have an interest in the outcome of this case. Persons not included in the Certificate of Interested Persons set forth in Appellants' briefs are listed in bold.

Abbott Laboratories

Adams, John

Amicorp Trustees (Delaware)

Anderson, Rhonda Anne

Armando, William

Bayer Corporation (BAYRY)

Beaton, Jr., Marcos

Becerra, Robert John

Becton, Dickinson, and Company

Binhak, Stephen James

Braun Medical, Inc.

Brown, Kristine M.

Calh Holding Corp

Calh Trust

Calloway, Mark T.

Campbell Soup Company (CPB)

Chopra, Sunil

Citibank (C)

Daskos, Emanuel George

Dray, Simon Patrick

Edelstein, David Moss

Fajardo Orshan, Ariana

Fougere, Joshua

Garber, Hon. Barry L.

Geiger, Brett

Grande, Carlos Daniel

Greenberg, Benjamin G.

Harris, Robert Charles

Hendrix, David Stockton

Hoernlein, Michael R.

Javat, Byramji Moneck

Kehoe, Gregory William

Klugh, Richard

Kruppa, Andrew

Kubica, P. Jan

Lehr, Alison Whitney

**Lieberman, David**

Ludlow, David

Matzkin, Daniel

McAliley, Hon. Chris M.

Middlebrooks, Hon. Donald M.

**Miller, Lisa H.**

Noto, Kenneth

O'Sullivan, Hon. John J.

Pace, Christopher R.J.

Pennco, LLC

Pennco Trust

**Polite, Kenneth A.**

Proton Healthcare, Ltd.

Rabin, Jr., Samuel Joseph

**Reed. Terrance G.**

Rosen, Adrienne E.

**Rubio, Lisa Tobin**

Schoeppl, Jr., Carl Francis

Shipley, Jr., John Charlton

Silvaggi, Alyssa

Simonton, Hon. Andrea M.

Sipprell, James

Smachetti, Emily M.

Sombuntham, Nalina

Soto, Luis Alberto

**Stone, Emily R.**

Srebnick, Howard Milton

TD Ameritrade, Inc. (AMTD)

Torres, Hon. Edwin G.

Truist Financial Corp (TFC)

Turken, David Samuel

Ursini, Louis Mario III

Waxman, Benjamin

WH Legal

/s/ David M. Lieberman

## STATEMENT REGARDING ORAL ARGUMENT

These consolidated appeals advance sufficiency, evidentiary, sentencing, and forfeiture/restitution claims. The government believes the facts and legal contentions are adequately discussed in the briefs, and that oral argument would not significantly aid the Court's decisional process. In addition, the Court addressed the facts and legal issues pertaining to the forfeiture claims in its earlier decision. *See United States v. Javat*, No. 20-13310, 2022 WL 703940, at *3 (11th Cir. Mar. 9, 2022).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................C-1

STATEMENT REGARDING ORAL ARGUMENT....................................i

TABLE OF AUTHORITIES ....................................................... ix

JURISDICTIONAL STATEMENT............................................ 1

ISSUES PRESENTED ................................................. 1

STATEMENT OF THE CASE .................................... 3

I.     Procedural History............................................... 3

II.    Statement of Facts ........................................ 4

       A.     U.S. manufacturers sold medical products to Javat's companies at discounted prices for export to Afghanistan................................. 4

              1.  Sklar Instruments ................................. 5

              2.  Andover Healthcare ............................. 7

              3.  Parkell ................................................. 7

              4.  Bayer .................................................. 8

       B.     Javat's companies diverted the products to the U.S. market ......... 9

       C.     Soto aided Javat's scheme ........................................ 11

       D.     Javat's companies resold the products to U.S. distributors at lower prices ...................................................... 13

III.   Course of Proceedings......................................... 13

IV.    Rulings Presented and Standards of Review ....................... 16

SUMMARY OF ARGUMENT ................................................... 17

ARGUMENT ..................................................................... 22

I.    Javat and Soto participated in a scheme to defraud the manufacturers . 22

    A.    Background .............................................................. 22

    B.    Standard of Review................................................... 23

    C.    Discussion............................................................... 24

        1.  The scheme defrauded the manufacturers of money and property by deceiving them to sell heavily discounted products for supposed export ............................................. 24

        2.  *Takhalov* confirms the scheme's fraudulent nature ................. 26

        3.  Javat also cannot demonstrate plain error ............................ 28

II.    Ample evidence supports the jury's finding that Soto knowingly participated in the fraud scheme ........................................ 30

    A.    Background .............................................................. 30

    B.    Standard of Review................................................... 30

    C.    Discussion............................................................... 31

        1.  The proof shows that Soto knowingly aided Javat's scheme to divert products into the U.S. market ..................................... 31

        2.  The proof further shows that Soto knowingly aided Javat's deception of manufacturers and U.S. Customs...................... 34

        3.  Soto's contrary arguments lack merit.................................... 36

III.   The district court appropriately exercised its discretion in admitting three of Soto's emails under Federal Rule of Evidence 404(b) ...................... 37

A.    Background ................................................................ 38

B.    Standard of Review.................................................... 39

C.    Discussion ................................................................. 39

    1.  The emails show Soto's knowledge that his customers
       fraudulently diverted products designated for export ............ 39

    2.  The district court correctly overruled Soto's hearsay
       objection ................................................................. 42

    3.  Any error was harmless ....................................... 43

IV.  The district court appropriately exercised its discretion in excluding
Soto's expert ...................................................................... 43

A.    Background ................................................................ 43

B.    Standard of Review.................................................... 44

C.    Discussion ................................................................. 44

    1.  The proffered testimony was irrelevant................................. 45

    2.  Any error was harmless ....................................... 48

V.   No error occurred at Javat's sentencing............................... 49

A.    Background ................................................................ 49

B.    Standard of Review.................................................... 52

C.    Discussion ................................................................. 52

    1.  The record amply supports the district court's loss-calculation
       approach and findings ....................................... 52

    2.  The record amply supports the victim enhancement.............. 60

3. The record amply supports the enhancement for theft or diversion of pre-retail medical products ................................. 61

4. The record amply supports the enhancement for misrepresenting a government agency ................................... 63

5. Any error was harmless ....................................................... 65

VI.   No error occurred at Soto's sentencing .................................................. 66

A.   Background ................................................................................. 66

B.   Standard of Review ..................................................................... 67

C.   Discussion .................................................................................. 67

1. The record amply supports the district court's denial of a minor-role reduction ............................................................. 67

2. The record amply supports the district court's finding that Soto used a special skill .................................................... 68

3. Any error was harmless ....................................................... 69

VII.  The district court properly calculated restitution ................................. 69

A.   Background ................................................................................. 70

B.   Standard of Review ..................................................................... 73

C.   Discussion .................................................................................. 73

1. No procedural error occurred at the restitution hearing ......... 73

2. No clear error exists in the district court's loss calculation ..... 76

a.   The record amply supports the court's findings ................. 76

b.   Javat's contrary arguments lack merit .............................. 78

VIII. The district court entered valid forfeiture orders against Javat ............. 81

    A.    Background ........................................................................ 82

    B.    Standard of Review.............................................................. 85

    C.    Discussion......................................................................... 85

        1.  The forfeiture orders were validly incorporated into Javat's final judgment .......................................................... 85

        2.  The indictment adequately apprised Javat that the government would seek forfeiture ......................................... 88

        3.  The forfeiture order satisfied 18 U.S.C. § 981(a)(1)(C)........... 92

        4.  The district court permissibly entered a forfeiture-money judgment ......................................................... 95

        5.  This Court already rejected Javat's challenges to the district court's order authorizing substitute-asset forfeiture ............... 95

IX.  The district court properly dismissed Calh's and Pennco's petitions asserting ownership of the properties that the court ordered Javat to forfeit as substitute assets.................................................................. 96

    A.    Background ........................................................................ 97

    B.    Standard of Review............................................................ 103

    C.    Discussion....................................................................... 103

        1.  This Court's prior decision precludes Calh and Pennco's attack on the preliminary forfeiture order ..................................... 103

        2.  The district court properly dismissed Calh's and Pennco's petitions under 21 U.S.C. § 853(n) for lack of standing........ 106

          a.  The court applied the correct legal framework................ 106

  b. No clear error exists in the court's finding that Calh and Pennco are straw owners............................................... 111

CONCLUSION......................................................................... 114

CERTIFICATE OF COMPLIANCE ....................................... 115

CERTIFICATE OF SERVICE ................................................ 115

# TABLE OF AUTHORITIES

<u>Cases</u>

*Advertects, Inc. v. Sawyer Industries, Inc.,* 84 So.2d 21 (Fla. 1955) ................. 110

*Advoc. Health Care Network v. Stapleton*, 137 S. Ct. 1652 (2017) ..................... 63

*Allison v. McGhan Med. Co.*, 184 F.3d 1300 (11th Cir. 1999) ........................ 45

*Borgesano v. United States*, No. 20-11453,
   2021 WL 2879696 (11th Cir. July 9, 2021) .............................................. 86

*Class v. United States*, 138 S. Ct. 798 (2018) ................................................. 29

*Heathcoat v. Potts,* 905 F.2d 367 (11th Cir. 1990) ......................................... 96

*Honeycutt v. United States*, 137 S. Ct. 1626 (2017) ...................... 82, 91, 92, 112

*Medina & Medina Inc. v. Hormel Foods Corp.*, 840 F.3d 26 (1st Cir. 2016) ..... 113

*NLRB v. McClain of Georgia, Inc.,* 138 F.3d 1418 (11th Cir. 1998) ................. 96

*Taylor v. Illinois*, 484 U.S. 400 (1988) ......................................................... 45

*United States v. A Single Fam. Residence & Real Prop. Located at 900 Rio Vista Blvd.*,
   803 F.2d 625 (11th Cir. 1986) ....................................................... 101, 112

*United States v. Ali*, 620 F.3d 1062 (9th Cir. 2010) ................................... 50, 54

*United States v. Angelica*, 951 F.2d 1007 (9th Cir. 1991) ............................... 79

*United States v. Azmat,* 805 F.3d 1018 (11th Cir. 2009) ............................ 16, 30

*United States v. Barner*, 572 F.3d 1239 (11th Cir. 2009) ................................ 65

*United States v. Barton*, 909 F.3d 1323 (11th Cir. 2018) ........................... 16, 44

*United States v. Bennett,* 368 F.3d 1343 (11th Cir. 2004) ................................ 90

*United States v. Cambio Exacto, S.A.*, 166 F.3d 522 (2d Cir. 1999) ................. 107

*United States v. Camejo,* 929 F.2d 610 (11th Cir. 1991) .................................... 48

*United States v. Canela*, No. 3:02-cr-00072,
  2019 WL 2543503 (M.D. Tenn. Jun. 20, 2019) ................................... 87, 88

*United States v. Cano*, 558 Fed. Appx. 936 (11th Cir. 2014) ..................... 86, 87

*United States v. Carrell*, 252 F.3d 1193 (11th Cir. 2001) ........................ 106, 112

*United States v. Cavallo*, 790 F.3d 1202 (11th Cir. 2015) ................................ 54

*United States v. Collins*, 854 F.3d 1324 (11th Cir. 2017) ................................ 70

*United States v. Cone*, 627 F.3d 1356 (11th Cir. 2010) .................................. 104

*United States v. Dahda*, 852 F.3d 1282 (10th Cir. 2017) ................................ 87

*United States v. De La Cruz Suarez*, 601 F.3d 1202 (11th Cir. 2010) ................ 67

*United States v. Duncan,* 400 F.3d 1297 (11th Cir. 2005) ................................ 46

*United States v. Edwards*, 728 F.3d 1286 (11th Cir. 2013) ........................ 17, 73

*United States v. Elbeblawy*, 839 Fed. Appx. 398 (11th Cir. 2021) ................... 92

*United States v. Ellisor*, 522 F.3d 1255 (11th Cir. 2008) ................................. 48

*United States v. Farano*, 749 F.3d 658 (7th Cir. 2014) ................................... 54

*United States v. Farias*, 836 F.3d 1315 (11th Cir. 2016) ................................. 96

*United States v. Ferdman*, 779 F.3d 1129 (10th Cir. 2015) ............................. 81

*United States v. Foster*, 878 F.3d 1297 (11th Cir. 2018) ................................. 37

*United States v. Frady*, 456 U.S. 152 (1982) ................................................. 28

*United States v. Gallant*, 537 F.3d 1202 (10th Cir. 2008) ................................ 80

*United States v. Gilbert*, 244 F.3d 888 (11th Cir. 2001) ................... 107, 108, 109

*United States v. Grimon*, 923 F.3d 1302 (11th Cir. 2019) ................................ 29

*United States v. Harris*, 7 F.4th 1276 (11th Cir. 2021) ................................... 28

*United States v. Javat*, No. 20-13310,
  2022 WL 703940 (11th Cir. Mar. 9, 2022) .........................................passim

*United States v. Kalaycioglu*, 210 Fed. Appx. 825 (11th Cir. 2006) ................. 64

*United States v. Kennedy*, 201 F.3d 1324 (11th Cir. 2000) ........................... 111

*United States v. King,* 73 F.3d 1564 (11th Cir. 1996) ..................................... 46

*United States v. Lively*, 20 F.3d 193 (6th Cir. 1994) ................................... 203

*United States v. Lopez-Vanegas,* 493 F.3d 1305 (11th Cir. 2007) ................16, 23

*United States v. Maddox*, 803 F.3d 1215 (11th Cir. 2015) ..........................17, 52

*United States v. Martí-Lón*, 524 F.3d 295 (1st Cir. 2008) ...........................53, 55

*United States v. Martin*, 803 F.3d 581 (11th Cir. 2015) .............................70, 78

*United States v. Maxwell*, 579 F.3d 1282 (11th Cir. 2009) .........................24, 25

*United States v. Melgen*, 967 F.3d 1250 (11th Cir. 2020) ................................ 50

*United States v. Moreno-Gonzalez*, 662 F.3d 369 (5th Cir. 2011) ..................... 33

*United States v. Neff*, 787 Fed. Appx. 81 (3d Cir. 2019) ................................. 94

*United States v. Olano*, 507 U.S. 725 (1993) ................................................ 85

*United States v. Owen*, 858 F.2d 1514 (11th Cir. 1988) .................................. 28

*United States v. Pease*, 331 F.3d 809 (11th Cir. 2003) ...................................... 87

*United States v. Perez-Tosta*, 36 F.3d 1552 (11th Cir. 1994) ...................... 59, 75

*United States v. Perry*, 14 F.4th 1253 (11th Cir. 2021) ..................................... 41

*United States v. Persaud*, 866 F.3d 371 (6th Cir. 2017) ................................... 34

*United States v. Phaknikone*, 605 F.3d 1099 (11th Cir. 2010) .............. 16, 39, 40

*United States v. Pierre*, 120 F.3d 1153 (11th Cir. 1997) ............................ 29, 30

*United States v. Presendieu*, 880 F.3d 1228 (11th Cir. 2018) ........................... 28

*United States v. Ramirez*, 426 F.3d 1344 (11th Cir. 2005) .............................. 41

*United States v. Rivera*, 780 F.3d 1084 (11th Cir. 2015) ................................. 43

*United States v. Robertson*, 493 F.3d 1322 (11th Cir. 2007) ...................... 75, 79

*United States v. Rodriguez De Varon*,
  175 F.3d 930 (11th Cir. 1999) (en banc) .................................................. 67

*United States v. Rothenberg*, 923 F.3d 1309 (11th Cir. 2019) .......................... 78

*United States v. Shefton*, 548 F.3d 1360 (11th Cir. 2008) ............................. 110

*United States v. Simon*, 12 F.4th 1 (1st Cir. 2021) ........................................ 79

*United States v. Sosa*, 782 F.3d 630 (11th Cir. 2015) ...................................... 85

*United States v. Spirito*, 36 F.4th 191 (4th Cir. 2022) ...................................... 85

*United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017) .............................. 56, 57

*United States v. Sterling*, 685 Fed. Appx. 880 (11th Cir. 2017) ....................... 79

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) .............22, 23, 26, 27

*United States v. Thuna*, 382 F. Supp. 3d 166 (D.P.R. 2019) ......................80, 81

*United States v. Valladares*, 544 F.3d 1257 (11th Cir. 2008) ........................... 74

*United States v. Vandeberg*, 201 F.3d 805 (6th Cir. 2000) ................................ 74

*United States v. Velez*, 586 F.3d 875 (11th Cir. 2009) .................................... 63

*United States v. Viveros*, 298 Fed. Appx. 817 (11th Cir. 2008) ........................ 91

*United States v. Waked Hatum*, 969 F.3d 1156 (11th Cir. 2020) .... 17, 85, 96, 103

*United States v. Wall*, 285 Fed. Appx. 675 (11th Cir. 2008) ........................... 90

*United States v. Weiss*, 467 F.3d 1300 (11th Cir. 2006) ................................ 100

*United States v. White*, 846 F.3d 170 (6th Cir. 2017) ...................................... 54

*United States v. Zorrilla-Echevarria*, 671 F.3d 1 (1st Cir. 2011) ....................... 87

*Via Mat Int'l S. Am. Ltd. v. United States*,
  446 F.3d 1258 (11th Cir. 2006) ........................................100, 106, 107, 110

## Statutes, Rules, and Other Authorities

18 U.S.C. § 670...................................................................................passim

18 U.S.C. § 981...................................................................................passim

18 U.S.C. § 982.................................................................88, 90, 91, 92

18 U.S.C. § 1343 ....................................................................... 1, 3, 16, 89

18 U.S.C. § 1349 ......................................................................3, 28, 29, 30

18 U.S.C. § 1956 ................................................................................... 89

18 U.S.C. § 1961 ................................................................................... 89

18 U.S.C. § 1963 ................................................................. 94

18 U.S.C. § 3231 ................................................................... 1

18 U.S.C. § 3553 ............................................ 19, 20, 52, 66, 69

18 U.S.C. § 3663A ............................................................... 70

18 U.S.C. § 3664 ............................................................ 70, 73

18 U.S.C. § 3742 ................................................................... 1

21 U.S.C. § 853 ............................................................ passim

28 U.S.C. § 1291 ................................................................... 1

Fed. R. Civ. P. 24 ............................................................... 97

Fed. R. Crim. P. 7 ................................................... 20, 89, 90

Fed. R. Crim. P. 11 ........................................................ 28, 30

Fed. R. Crim. P. 17 .............................................................. 59

Fed. R. Crim. P. 32.2 .................................................... passim

Fed. R. Crim. P. 36 .............................................................. 86

Fed. R. Evid. 404 ..................................... 2, 16, 18, 37, 39

Fed. R. Evid. 801 ................................................................ 42

U.S.S.G. § 2B1.1 ......................................................... passim

U.S.S.G. § 3B1.2 ..................................................... 2, 19, 66

U.S.S.G. § 3B1.3 ................................................. 2, 19, 66, 69

## JURISDICTIONAL STATEMENT

Byramji Javat and Luis Alberto Soto appeal their final judgments in this criminal case. The district court (Middlebrooks, J.), which had jurisdiction under 18 U.S.C. § 3231, entered the judgments on December 17, 2019. DE.460; DE.461. Javat and Soto filed timely notices of appeal. DE.475; DE.476. The court later amended the final judgments. DE.718; DE.719. Javat and Soto again filed timely notices of appeal. DE.726; DE.727. Calh Holding Corporation and Pennco, LLC appeal the court's dismissal of their verified petitions under 21 U.S.C. § 853(n). The court entered its dismissal order on August 20, 2021. DE.742. Calh and Pennco filed timely notices of appeal. DE.745; DE.746. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ISSUES PRESENTED

1. Whether defendants' scheme to obtain deeply discounted products from U.S. manufacturers on the promise that the products would be exported to Afghanistan for use by the U.S. military and Afghan clinics constitutes a scheme to defraud under 18 U.S.C. § 1343 (Javat Issue 4; Soto Issue 3).

2. Whether sufficient proof supports the jury's verdict that Soto knowingly participated in a scheme to defraud the manufacturers (Soto Issue 3).

3.      Whether the district court properly exercised its discretion under Federal Rule of Evidence 404(b) in admitting email communications reflecting Soto's knowledge that his customers fraudulently diverted products destined for export into the U.S. market (Soto Issue 2).

4.      Whether the district court properly exercised its discretion in excluding Soto's expert on secondary and gray-market imports (Soto Issue 1).

5.      Whether the district court committed reversible error at sentencing when it calculated (a) the loss associated with Javat's offense conduct under Guidelines § 2B1.1(b)(1); and (b) applied enhancements under Guidelines §§ 2B1.1(b)(2)(A), 2B1.1(b)(8)(B), and 2B1.1(b)(9)(A) because his offense conduct involved at least 10 victims, the theft of pre-retail medical products, and a misrepresentation that Javat was acting on a government agency's behalf (Javat Issue 1).

6.      Whether the district court committed reversible error at sentencing when it denied Soto's request for a minor-role reduction under Guidelines § 3B1.2, and applied a special-skill enhancement under Guidelines § 3B1.3 (Soto Issues 4 & 5).

7.      Whether the district court committed reversible error in calculating Javat's restitution (Javat Issue 2).

8.     Whether the district court committed reversible error in entering a forfeiture judgment against Javat and ordering his forfeiture of two properties as substitute assets (Javat Issue 3).

9.     Whether the district court clearly erred in finding that Calh and Pennco lacked standing to file petitions asserting ownership of the properties ordered forfeited as Javat's substitute assets (Calh/Pennco Issues 1 & 2).

## STATEMENT OF THE CASE

### I.     Procedural History.

Javat pleaded guilty to wire-fraud conspiracy, in violation of 18 U.S.C. § 1349.  DE.718:1.  A jury convicted Soto of wire-fraud conspiracy, in violation of 18 U.S.C. § 1349; two counts of wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to obtain pre-retail medical products by fraud or deception, in violation of 18 U.S.C. § 670(a)(6); and two counts of obtaining pre-retail medical products by fraud or deception, in violation of 18 U.S.C. § 670(a)(1).  DE.719:1. The district court sentenced Javat and Soto to 120-month and 72-month prison terms, respectively.  DE.718:2; DE.719:2.  The court also entered a $26-million forfeiture-money judgment against Javat and further ordered him to forfeit ownership of two properties.   DE.536; DE.744.  Finally, the court ordered Javat and Soto to pay $29 million in restitution.  DE.718:5; DE.719:5.  In a separate

ancillary proceeding, the court dismissed petitions filed by Calh and Pennco asserting third-party ownership of the two forfeited properties.  DE.742.

## II.    Statement of Facts.

Between 2014 and 2017, Javat and his co-conspirators convinced U.S. manufacturers to sell medical devices and other products to Javat's companies at deep discount.  The pitch: they would export the products to Afghanistan for use by the U.S. military and Afghan clinics.  Javat's companies, however, never exported the products.  Instead, they surreptitiously resold the products to U.S. wholesalers at a significant profit.  Soto, a customs broker, facilitated Javat's diversion of these products into the U.S. market.

### A.    U.S. manufacturers sold medical products to Javat's companies at discounted prices for export to Afghanistan.

Javat operated several front companies—Uniworld, Proton Contracting, and Saif Traders—that purchased products from manufacturers and resold them.  DE.397:34, 43.  The companies negotiated these deals based on the manufacturer's list price, standard selling price, and cost.  DE.397:44-45.  Javat approved each purchase agreement.  DE.397:46.

Starting in 2014, Javat's companies approached manufacturers and advertised an opportunity to provide supplies to the U.S. military and Afghan government.  DE.397:49.  Uniworld, for instance, advertised itself as "one of

the largest equipment, medical, surgical and dental supplier[s]/distributor[s] to the US Army/Allied Forces." DE.397:50. It touted agreements to supply equipment, disposables, and medicines to the U.S. Army and Afghanistan Reconstruction and Development Services.[1] DE.397:51. Proton Contracting and Saif Traders made similar claims. DE.397:52-53, 56-57. These solicitations invited the manufacturer to "share [its] best economical prices to proceed." DE.397:53. Javat's companies would then tender an offer to supply the products, the Afghan agency would review it, and, if approved, the manufacturer would supply the products to Javat's companies for export to Afghanistan. DE.395:24.

Soto's trial focused on four manufacturers that sold discounted products to Javat's companies for export.

### 1. Sklar Instruments.

Sklar Instruments, a Pennsylvania company, manufactures surgical instruments and sterile surgical products. DE.395:6-7. Domestic sales comprise 95% of its business. DE.395:125.

---

[1] Javat described this agency as "the purchasing arm of the Afghan National Army and police hospital" under the funding and supervision of the U.S. government and Army. DE.396:22-23. At trial, the district court took judicial notice that this Afghan agency ceased operations in 2014. DE.395:179.

In 2014, Uniworld approached Sklar about distributing its products to Afghanistan. DE.395:18-21. It requested quotations for the sale of medical supplies to Afghan Reconstruction and Development Services. DE.395:23. The companies initially failed to reach agreement. DE.395:38, 41. Sklar had, for instance, offered to sell boxes of 100 surgical blades at $21.45 each—far higher than the $8.49 price Uniworld wanted. DE.395:32.

Javat then contacted Sklar about a second opportunity to "win some business … to supply the 67th Afghan National Army and Police Hospital." DE.395:45-46. Javat asked Sklar "to support us with the very best price" and noted his upcoming meeting with an Afghan senior adviser. DE.395:46-47. Sklar offered significant discounts, DE.395:48-50, that were "lower than any other export deal that [Sklar had] done." DE.395:137. Uniworld accepted— the first of seven purchase orders with Sklar. DE.395:51.

Between 2014 and 2017, Sklar sold nearly $765,000 worth of its medical products to Uniworld and provided discounts totaling $508,000.[2] DE.395:145. Sklar offered the discounts with the goal of supporting the U.S. military and Afghan hospitals. DE.395:137. Absent Uniworld's representations about

---

[2] $765,000 reflects the standard wholesale price that a U.S. distributor would have paid Sklar for these same products. DE.395:145.

supplying the products to Afghanistan, Sklar would not have offered the discounts. *Ibid.*

## 2. Andover.

Andover Healthcare, a New England company, manufactures pressure-sensitive bandages primarily for U.S. sale. DE.395:170-171, 173.

In 2015, another Javat company—Saif Traders—approached Andover about distributing its bandages in Afghanistan to the U.S. miliary and Afghan development projects. DE.395:175-178. Viewing this as an opportunity "to help the US military," Andover agreed to sell its bandages at a 60% discount— a price that the company "never" previously offered. DE.395:182. It completed two purchase orders with Saif Traders. DE.395:190. Andover would have not agreed to these discounts absent the representation that its bandages would be supplied to the U.S. military in Afghanistan. DE.395:196.

## 3. Parkell.

Parkell, a Long Island company, manufactures dental fillings, composites, desensitizers, cement, and sealants. DE.395:201. It sells these products to distributors and dentists; 80-90% of its business is domestic. DE.395:203.

In 2015, Uniworld contacted Parkell about supplying its dental products to Afghanistan for U.S. troops. DE.395:204. Uniworld requested a large discount. DE.395:207. As Javat's request, Parkell authorized Uniworld to act

on its behalf in Afghanistan, provided samples of its products, and confirmed a large discount.  DE.395:211; DE.396:8-9; *see id*. at 55 ("[T]he total price for the 40 units [of one product] for Uniworld was $440, whereas the total price for a US dealer would be $840").  Parkell also acceded to external inspections of its shipments and placed U.S. packaging on its products—demands that Uniworld insisted upon.  DE.396:12-14, 24, 34.

Parkell completed five purchase orders for Uniworld.  DE.396:44.  Had it offered the same discounts to U.S. customers, Parkell "would be out of business" because the price "would not cover [the company's] costs."[3]  DE.396:65-66.

### 4.  Bayer.

Bayer Pharmaceuticals manufactures and distributes nonprescription medications like Aspirin and Aleve.  DE.396:205.  It has multiple manufacturing sites that export these drugs around the globe.  DE.396:207-208.

In 2016, another Javat company—Proton Contracting—approached Bayer about supplying Aspirin and Aleve to Afghanistan Reconstruction and Development Services for distribution to the U.S. military.  DE.396:212-213.  These medicines had to carry U.S. packaging.  DE.396:214.  Bayer accepted the

---

[3] When selling its products domestically, Parkell pays all regulatory, marketing, and storage costs.  DE.396:61.

deal, manufactured the drugs at its Pennsylvania plant, and provided them to Proton for shipment to Afghanistan. DE.396:215, 219-220.

Bayer made two shipments to Proton and charged approximately $158,000 each. DE.396:226-229. These charges reflected significant discounts compared to the fixed prices that Bayer charged its U.S. customers.

| Product | Fixed U.S. price | Proton discount price |
|---|---|---|
| Aleve caplets 24-pack | $3.45 | $1.13 |
| Aleve tablets 24-pack | $3.45 | $1.18 |
| Aleve tablets 100-pack | $9.72 | $2.83 |
| Aspirin tablets 100-pack | $2.05 | $0.82 |

DE:396:228-229; DE.397:12-13.

## B. Javat's companies diverted the products to the U.S. market.

The products never made it to Afghanistan. Javat-affiliated entities redirected them into the U.S. market.

Manufacturers use freight-forwarding companies to transport goods to their final destinations. DE.395:54-55. Javat's companies insisted that the manufacturers hire ITL. DE.395:55. Upon pickup, ITL would "move the product to the final destination," "[w]hich was Afghanistan," often by way of a Dubai port. DE.395:57-58; *see* DE.397:86 (Uniworld to ITL: "You must advise Benchmark/Sklar that these samples are being forwarded by yourselves to

Dubai."); DE.397:136-137 (Saif Traders to ITL: "In case if anything asked by Andover, please inform them that the shipment will be going to Jebel Ali and then to Kabul.").

That did not occur. ITL instead transported the products to a Calhoun, Georgia warehouse operated by International Medical Distributors, DE.397:86, 99, 129, 136, 200-201—another Javat-controlled company.[4] DE.396:78-79; DE.397:23. The products often carried manufacturer labels stating that they were for export or overseas sale. DE.396:95-96; *see also* DE.395:194 ("US export only" labels on Andover products). Workers removed those labels and markings. DE.396:97-98, 113; *see id.* at 108 (email to Javat about removing Parkell stickers).

The manufacturers had no knowledge that their products had been diverted. According to Sklar's president, Uniworld "gave extricating detail as to where [the product] was going," "named the hospital … they were sending it to," and provided "copies of letterhead … from government agencies." DE.395:160-161; *see also* DE.396:48 (Uniworld email to Parkell: "All products are shipped to ARDS warehouse, Kabul"); DE.397:166 (assurances to Bayer).

---

[4] This is a "blind pickup" where the recipient "keep[s] the manufacturer in the dark on where the goods are going." DE.396:156.

Sklar occasionally requested documents confirming export. DE.395:58, 70. Uniworld provided bills of lading showing shipment of the products to Dubai and delivery to Afghanistan.[5] DE.395:61-62, 73-74, 75-76. Internal emails show that the documents were false. *See* DE.397:86 ("Should [Sklar] require any documentary proof of export, then ITL should be able to generate a dummy house [bill of lading]."); DE.397:89 ("How about providing [Sklar] a dummy house airway bill … a house airway bill cannot be easily tracked."); DE.397:92 ("Unless [the Sklar sales director] is an ex from the freight forwarding industry, chances are good that she will swallow this story.").

## C. Soto aided Javat's scheme.

In 2016, Sklar sought documents confirming export of its products to Afghanistan. DE.397:106-107. Sklar cited the possibility of a Department of Homeland Security audit. DE.395:86; DE.397:108. Upon receiving this request, Javat's companies stopped sending Sklar's products directly to the Georgia warehouse. They instead arranged to ship the products to Dubai and then to Miami. *See* DE.397:109 ("[P]lease arrange to pick up these goods and deliver directly to Uniworld in Dubai. Under no circumstances are the goods to be delivered to our facility in Calhoun."); DE.397:110 ("We will need to ship

---

[5] The freight forwarder prepares a bill of lading showing "where [the products are] coming from, where it's shipping to and the commodity that will be on the shipment, either air or ocean." DE.395:75-76.

to Dubai to stay compliant."). That itinerary, in turn, generated the needed export documents. DE.397:108.

But Javat needed to get the products back into the United States. Enter Soto: a customs broker in Miami and owner of AFS Freight. Javat hired Soto to file the proper documentation with U.S. Customs and the U.S. Food and Drug Administration (FDA) when products were imported into the country. DE.396:88-90. Soto charged double the rate of other brokers and preferred the Port of Miami for his services. DE.396:90, 144.

In this instance, Javat's company (Uniworld) notified Soto that it shipped Sklar products from Dubai to Miami. DE.397:111-112. Uniworld further stated that the products came from "our supplier Sklar Instruments" that originated in "USA." DE.397:111; DE.384-21:3. Soto, however, drafted a letter to U.S. Customs stating that this shipment contained overstocked products from an overseas supplier. DE.397:117-118. Soto later transmitted an invoice for his customs work: receiving the Sklar products in Miami and shipping them off to another Javat company (International Medical). DE.397:121.

Soto provided similar assistance when Javat exported, and then imported, products obtained from other manufacturers. DE.397:140-143 (Andover); DE.397:146-150 (Parkell); DE.397:172-179 (Bayer). On one occasion, Soto also

stored the Bayer products at his warehouse for distribution to a U.S. wholesaler. DE.397:173-174.

## D. Javat's companies resold the products to U.S. distributors at lower prices.

The last step involved domestic resale of the medical products. Javat's companies advertised and sold their inventory to U.S. distributors at prices lower than those offered by the manufacturers. DE.396:112-113, 169-173; *see* DE.397:80-81 (Sklar products to Mammoth Medical and Palm Tree Group); DE.397:113-115 (Sklar products to Q-Med); DE.397:124-126 (Andover products to Gemstar, Henry Schein, and Q-Med); DE.397:152 (Parkell products to Henry Schein); DE.397:173-174 (Bayer products to Quality King).

In the meantime, the manufacturers developed concerns. The FDA contacted Sklar about the nature of its sales to Uniworld. DE.395:96-97. Andover grew "suspicious" when "some of [its] main distributors were not ordering their normal ordering patterns." DE.395:192. Parkell asked for pictures of its dental products in Afghanistan. DE.396:46-47.

## III. Course of Proceedings.

The government charged Javat, Soto, and four other individuals in connection with this scheme.[6] DE.145.

---

[6] Three co-defendants pleaded guilty; a fourth died.

Javat pleaded guilty to wire-fraud conspiracy. At his plea hearing, the government proffered that "Javat, through his Uniworld Group buying companies, contacted various victim companies under the false pretense of being a large supplier of medical, surgical and food products to the United States military stationed abroad, specifically in the middle east." DE.418:15. The government further proffered that "Javat and his co-conspirators made false and fraudulent representations to the victim companies in order to induce the victim companies to offer him special discount pricing, including … that Javat sought to purchase the victim companies' products specifically for distribution and use abroad … to … the US military." *Ibid.* Finally, the government proffered that Javat and his co-conspirators had "the products diverted directly to a location within the United States and provid[ed] the victim companies with fraudulent shipping documentation reflecting that the product had been exported." *Id*. at 16. They then sold the products to "United States based wholesalers and distributors … at significant profit." *Ibid*. Javat admitted this conduct. *Id*. at 17. The government, in turn, agreed to drop the other charges. *Id*. at 9-10.

Soto proceeded to trial. Sklar, Parkell, Andover, and Bayer representatives testified about their dealings and communications with Javat's companies. Emanual Daskos—a U.S. wholesaler and cooperating co-defendant—testified about his work with International Medical in Georgia.

Daskos confirmed that Javat had purchased products directly from the manufacturers, DE.396:86-87, 104; that the manufacturers had labeled them for export, *id*. at 95-96, 114; and that he (Daskos) helped removed those labels, *id*. at 97, 107-108. Daskos also testified that Soto cleared Javat's products through the Port of Miami, and that Javat then sold the products to U.S. distributors at lower prices than the manufacturers. *Id*. at 144, 169-173. Finally, the government introduced emails involving Javat, Soto, and other co-conspirators. They showed that Javat's scheme reached other products. *See* DE.397:180-204 (Demet's Candy); *id*. at 221-228 (Storck Candy, Campbell Soups, Equal Sweetener). The jury convicted Soto on all counts. DE.398:162-163.

At sentencing, the district court applied several Sentencing Guidelines enhancements over defense objection. It imposed 120-month and 72-month prison terms on Javat and Soto, respectively. DE.519:114, 138.

The district court entered a preliminary forfeiture order and $26-million forfeiture-money judgment against Javat. DE.536. It also entered an order requiring Javat to forfeit ownership of a Washington, D.C. condominium and the Calhoun, Georgia warehouse as substitute assets satisfying the money judgment. DE.744. This Court affirmed. *See United States v. Javat*, No. 20-13310, 2022 WL 703940 (11th Cir. Mar. 9, 2022). Lastly, the district court ordered Javat and Soto to pay $29 million in restitution. DE.718:5; DE.719:5.

15

In an ancillary proceeding, the district court dismissed petitions filed by Calh and Pennco asserting ownership of the two forfeited properties. DE.742.

## IV. Rulings Presented and Standards of Review.

Javat and Soto contend that their scheme to obtain products from U.S. manufacturers at discounted prices on the promise that they would be exported to Afghanistan does not constitute fraud under 18 U.S.C. § 1343. Whether a criminal statute reaches particular conduct is an issue of law subject to de novo review. *See United States v. Lopez-Vanegas,* 493 F.3d 1305, 1311 (11th Cir. 2007). Soto also challenges the evidence showing his knowledge of the scheme. This Court conducts a de novo review of sufficiency claims. *See United States v. Azmat,* 805 F.3d 1018, 1035 (11th Cir. 2009).

Soto contends that the district court erred at trial in admitting several email messages under Federal Rule of Evidence 404(b) and in excluding his expert on secondary and gray-market imports. This Court reviews those rulings for abuse of discretion. *See United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018); *United States v. Phaknikone*, 605 F.3d 1099, 1107 (11th Cir. 2010).

Javat and Soto challenge the district court's rulings on various Sentencing Guidelines enhancements. This Court reviews de novo the court's interpretation and application of the Guidelines and reviews for clear error its

underlying factual findings. *See United States v. Maddox*, 803 F.3d 1215, 1220 (11th Cir. 2015).

Javat challenges the district court's restitution award. This Court conducts a de novo review of the restitution order's legality and examines any underlying factual findings for clear error. *See United States v. Edwards*, 728 F.3d 1286, 1291 (11th Cir. 2013).

Javat and the third parties—Calh and Pennco—raise multiple challenges to the district court's forfeiture orders. This Court conducts a de novo review of the court's legal rulings and examines related factual findings for clear error. *See United States v. Waked Hatum*, 969 F.3d 1156, 1161-1162 (11th Cir. 2020).

## SUMMARY OF ARGUMENT

1. Javat's scheme is punishable under the wire-fraud statute. Had Javat and his companies identified themselves as U.S. distributors, they would have paid the manufacturer's domestic list price. They instead promised to export the products to Afghanistan for use by the U.S. military and Afghan clinics and convinced the manufacturers to offer aggressive product discounts to support those causes. Javat's representations were lies and they implicated the nature of his bargain with the manufacturers. That is fraud.

2. Ample evidence supports the jury's finding that Soto knowingly participated in Javat's scheme. Soto knew that Javat's companies obtained

products directly from U.S. manufacturers, shipped the products abroad, and then shipped the products back to the United States via Miami, where Soto cleared them through U.S. Customs for twice the fee as other customs brokers. The jury could reasonably infer that Javat would not have left this crucial step to an unwitting customs broker. Rather, as characterized in an internal email, Soto was Javat's logistics partner. Lest any doubt remain, the trial documented instances where Soto directly aided efforts to disguise Javat's scheme from both the manufacturers and U.S. Customs.

3.      The district court appropriately exercised its discretion in admitting three of Soto's emails under Federal Rule of Evidence 404(b). The emails reveal Soto's knowledge that his customer had obtained goods from a U.S. manufacturer for export and then diverted them into the domestic market for resale. That, in turn, undermined Soto's defense that he innocently provided customs-broker services and lacked knowledge of what his customers had promised the manufacturers. The district court's limiting instruction also reduced the risk of any unfair prejudice.

4.      The district court appropriately exercised its discretion in excluding testimony from Soto's proffered expert about U.S. customs laws and FDA regulations governing the secondary or grey market—where exported goods are reimported into the United States for resale. Soto was on trial for wire fraud and

obtaining pre-retail medical products by fraud or deception. The court correctly recognized that Soto's compliance with U.S. customs laws and FDA regulations did not bear on whether he knowingly participated in Javat's fraud scheme.

5. No error occurred at Javat's sentencing. As multiple courts have done in fraudulent-discount cases, the district court here appropriately measured the loss amount under Guidelines § 2B1.1(b)(1) by identifying the difference between the discounted price that Javat's companies paid for the products and the list price they would have paid but for the fraudulent representations. The record also supports the court's findings that Javat's scheme victimized at least 10 manufacturers, obtained pre-retail medical products by fraud or deception, and involved a misrepresentation that Javat acted on a government agency's behalf. The court thus appropriately applied the enhancements in Guidelines §§ 2B1.1(b)(2)(A), 2B1.1(b)(8)(B), and 2B1.1(b)(9)(A). Finally, any error was harmless given the court's rejection of Javat's guidelines range as unreasonable and imposition of a significantly lower term under 18 U.S.C. § 3553(a).

6. No error occurred at Soto's sentencing. The record amply supports the district court's decision to deny Soto's request for a minor-role reduction under Guidelines § 3B1.2 given Soto's significant role in aiding Javat's scheme. The record likewise supports the court's enhancement under Guidelines § 3B1.3 because Soto used a special skill—his customs-broker license and expertise—to

aid Javat's scheme. Finally, any error was harmless given the court's rejection of Soto's guidelines range as unreasonable and imposition of a significantly lower term under 18 U.S.C. § 3553(a).

7. Javat has shown no error in the district court's entry of the $29-million restitution judgment. The court properly exercised its discretion in resolving Javat's procedural objections. And its restitution calculation—a factual finding regarding the manufacturers' actual losses—easily passes clear-error review. Referencing the products that Javat fraudulently obtained, the court permissibly found that the manufacturers could have instead sold them on the U.S. market. The court also permissibly found that each manufacturer's list price reflected a reasonable estimate of what the manufacturer would have collected. The difference between list price and Javat's discount on each product accordingly represents the manufacturer's loss.

8. The district court entered valid forfeiture orders. First, the court followed Federal Rule of Criminal Procedure 32.2(b)(4)(B) when it informed Javat at sentencing that it would enter a forfeiture order and referenced forfeiture in the final judgment. Second, the superseding indictment notified Javat that the government would seek to forfeit his fraud proceeds. Although the indictment listed the wrong statutory citation, Federal Rule of Criminal Procedure 7(c)(2) specifies that this typographical error does not constitute

grounds for reversal. Third, the district court permissibly found, based on Javat's accounting records, that his companies collected over $26 million in revenue from the fraud scheme. Because that revenue "constitutes or is derived from proceeds traceable to" Javat's scheme, 18 U.S.C. § 981(a)(1)(C), this money is subject to forfeiture. Fourth, this Court's decisions authorized the district court's entry of a forfeiture-money judgment. Fifth, the law-of-the-case doctrine prohibits Javat's attempt to relitigate the district court's order directing forfeiture of his ownership interests in two properties as substitute assets.

9. The district court properly dismissed third-party petitions from Calh and Pennco asserting ownership of the properties that the court ordered Javat to forfeit. Although Calh and Pennco were listed as record title owners of the properties, the court found (after a hearing) that they were instead straw owners who acted on Javat's behalf. And because straw owners do not suffer injury when their property is forfeited, the court dismissed Calh's and Pennco's petitions for lack of standing. That ruling reflects a proper application of this Court's case law and a well-supported appraisal of the record.

# ARGUMENT

## I.    Javat and Soto participated in a scheme to defraud the manufacturers.

Javat (Br. 55-58) and Soto (Br. 45-49) assert that their conduct is not punishable as wire fraud because they did not intend economic harm to the manufacturers.[7]  This claim fails.

### A.    Background.

Javat, Soto, and other defendants sought pretrial dismissal of the indictment on the ground that it failed to allege a scheme to defraud.  DE.170:5. The district court disagreed, noting that the government alleged that "Defendants lied about the destination of the products for the express purpose of receiving a discounted price on those products from the Victim Companies" and that "the prices offered to Defendants would not have been available had the Victim Companies known that Defendants intended to sell the products within the United States."  *Id*. at 6-7.  Because of these misrepresentations, the court explained, "the Victim Companies lost potential revenue on the lower-priced sale of those products to Defendants."  *Id*. at 7.

The district court rejected the defendants' reliance on *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), which explained that "one must intend

---

[7] Soto has not raised a similar challenge with respect to his 18 U.S.C. § 670 convictions.

to use deception to cause some injury" in order "to *defraud*" the victim. *Id.* at 1312. "[I]f a defendant does not intend to harm the victim—to obtain, by deceptive means, something to which the defendant is not entitled—then he has not intended to defraud the victim." *Id.* at 1313 (internal quotation marks, alteration, and citation omitted). Addressing the allegation here, the district court held that "[t]his is … a scheme to defraud as *Takhalov* defines it" because "the misrepresentations that Defendants are alleged to have made directly affected the price at which they were able to buy th[e] goods." DE.170:7.

Javat subsequently entered a guilty plea. He agreed that "the victim companies sold their products to Javat at deeply discounted prices" "[b]ased on [his] false and fraudulent representations," and that the companies "would not have otherwise offered [these discounts] but for the false and fraudulent representations." DE.418:15. The jury convicted Soto. In doing so, the jury found that Soto participated in "a[] plan or course of action intended to deceive or cheat someone out of money or property by using false or fraudulent pretenses, representations or promises." DE.398:98 (wire-fraud instructions).

## B. Standard of Review.

This Court reviews de novo whether a criminal statute proscribes a defendant's conduct. *Lopez-Vanegas,* 493 F.3d at 1311.

23

## C.   Discussion.

As a result of deception, Javat's companies obtained discounted products from the manufacturers to which they were not entitled.  That is fraud.

> **1.   The scheme defrauded the manufacturers of money and property by deceiving them to sell heavily discounted products for supposed export.**

A scheme to defraud occurs where the defendant makes "a material misrepresentation … calculated to deceive another out of money or property." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009).  That is precisely what occurred here.

The manufacturers sold their products to U.S. distributors at standard list prices.  DE.395:141-142, 149, 181, DE.396:52-54; DE.397:10-11.  Had Javat's companies identified themselves as such, they would have paid those prices.  Javat's companies instead promised to export the products to Afghanistan for use by the U.S. military and Afghan clinics and urged the manufacturers to offer aggressive product discounts to support those recipients.  The manufacturers did so based on those assurances.  DE.395:137, 177, 207: DE.396:215.

Absent the misrepresentations, Javat's companies would not have obtained the discounted products.   As the district court recognized, "the misrepresentations … directly affected the price at which [Javat and his co-

defendants] were able to buy th[e] goods." DE.170:7. This scheme accordingly defrauded the manufacturers of their property and is punishable as fraud.

Soto contends (Br. 49) that the misrepresentations did not defraud the manufacturers because they "received the price for the merchandise they charged." That contention ignores the fact that, because of the deception, Javat's companies obtained discounted products that they otherwise could not have acquired from the manufacturers.

*Maxwell* confirms that this conduct is fraud. There, the defendant acquired state and federal contracts to perform work as minority contractors, even though they were not minorities. 579 F.3d at 1291. The defendant argued that, although various contracts he signed had explicit provisions requiring the work to be performed by a minority contractor, he did not deprive the victims of money or property because they received the work they sought. *Id.* at 1302. This Court rejected that argument, noting that the mail- and wire-fraud statutes "also seek to punish the intent to obtain money or property from a victim by means of fraud and deceit." *Ibid.* "Regardless of the quality or cost of the work completed," the Court explained that the defendant's company "obtained construction contracts and substantial payments from the County and the United States for which it was not eligible." *Id.* at 1302-1303. The same is true

here: Javat's companies received heavily discounted products that they were otherwise not entitled to purchase.

Javat separately contends (Br. 56) that the manufacturers had no "legal property interest in controlling [his] downstream resale prices of their products." This argument focuses on the wrong point in time. As the district court explained, the deception here targeted "the nature of the bargain" between Javat's companies and the manufacturers. DE:170:6. Javat's companies falsely promised to export the products to the U.S. military and Afghan clinics in order to obtain heavy discounts from the manufacturers. Because "th[at] misrepresentation goes to the value of the bargain" struck with the manufacturers, it is a "scheme to defraud." *Takhalov*. 827 F.3d at 1313.

### 2. *Takhalov* confirms the scheme's fraudulent nature.

Javat and Soto's reliance on *Takhalov* is misplaced. That decision held that the term "'scheme to defraud,' as … used in the wire-fraud statute, refers only to those schemes in which a defendant lies about the nature of the bargain itself." 827 F.3d at 1313. *Takhalov* then offered two straightforward fraud examples: a bartender pouring a glass of cheap bourbon despite the customer ordering a top-shelf brand, and a jeweler selling a cubic zirconium despite the customer ordering a diamond. *Id*. at 1313-1314.

Similar conduct occurred here. The manufacturers offered significant price discounts to Javat's companies (and accepted less revenue) based on express promises that Javat's companies would export their products to Afghanistan for use by the U.S. military and Afghan clinics. Because those promises were lies and because they implicated "the nature of the bargain" struck between Javat's companies and the manufacturers, they constitute fraud. *Takhalov*, 827 F.3d at 1314.

Soto insists (Br. 48) that the scheme simply "encouraged manufacturers and distributors to sell goods to Javat's companies at 'deeply discounted prices.'" Javat also minimizes (Br. 57) his conduct as "assuming the bargaining position of a foreign distributor" and "trigger[ing] an impulse or excuse for [manufacturers] to offer him prices that were not generally available to domestic customers." These arguments disregard the proof that Javat's companies affirmatively promised to export the products for use by the U.S. military and Afghan clinics if the manufacturers sold them at deep discounts. *See* pp.4-9, *supra*; *see also* DE.418:15 (Javat's admissions that he made false and fraudulent representations about distributing the products abroad for U.S. military to obtain special discounts from manufacturers). Because "the misrepresentation[s] [went] to the value of the bargain," *Takhalov*, 827 F.3d at 1313, they are punishable under the wire-fraud statute.

### 3. Javat also cannot demonstrate plain error.

Javat's contention fails for an additional reason: he failed to preserve this objection when pleading guilty below.

"[B]efore entering judgment on a guilty plea, the [district] court must determine that there is a factual basis for the plea." Fed. R. Crim. P. 11(b)(3). A factual basis exists where the government proffers "evidence from which a court could reasonably find that the defendant was guilty." *United States v. Owen*, 858 F.2d 1514, 1517 (11th Cir. 1988). Javat, however, failed to contest the government's proffer as inadequate to satisfy the elements of 18 U.S.C. § 1349.

Where, as here, a defendant fails to preserve a claim that the district court misapplied Rule 11 in accepting his guilty plea, this Court reviews only for plain error. *See United States v. Presendieu*, 880 F.3d 1228, 1237 (11th Cir. 2018). As explained above, there was no error to begin with because Javat's admitted conduct involved a scheme to defraud the manufacturers.

But Javat also fails to satisfy the second requirement of plain-error review—namely, that the alleged error was "so 'plain'" under governing law that a court would be "derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Frady*, 456 U.S. 152, 163 (1982); *see United States v. Harris*, 7 F.4th 1276, 1298 (11th Cir. 2021) ("In order to show plain error, the defendants must point to some precedent from the Supreme

Court or our Court 'directly resolving' the issue."). Javat identifies no case holding that an ineligible party's fraudulent procurement of product discounts fails to qualify as wire fraud. Javat thus cannot demonstrate that the district court committed an obvious error in accepting his guilty plea.

In response, Javat stylizes (Br. 55 & n.11) his claim as attacking a "defective Indictment theory" and asserts that "a guilty plea does not bar an appeal that asserts that the indictment failed to state an offense." But the question whether Javat's indictment alleged sufficient facts to support each element of Section 1349 does not implicate the district court's jurisdiction. *See, e.g.*, *United States v. Grimon*, 923 F.3d 1302, 1306 (11th Cir. 2019) ("[E]ven if an indictment fails to allege sufficient facts to support … an interstate commerce nexus, the district court still has subject matter jurisdiction to adjudicate the case."). And when Javat entered his "unconditional plea of guilty" below, he "waive[d] all non-jurisdictional defects in [his] court proceedings." *United States v. Pierre*, 120 F.3d 1153, 1155 (11th Cir. 1997) (brackets and citation omitted). Javat accordingly waived appellate review of his non-jurisdictional attack on the indictment.[8]

---

[8] Javat cites (Br. 55 n.11) the Supreme Court's holding in *Class v. United States*, 138 S. Ct. 798, 803 (2018), that "a guilty plea [does not] by itself bar[] a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal." But *Class* is inapplicable because Javat does not

## II. Ample evidence supports the jury's finding that Soto knowingly participated in the fraud scheme.

Soto challenges (Br. 49-51) the government's evidence showing his knowledge of the fraud scheme, which underpins both the wire-fraud and Section 670 counts. His sufficiency argument lacks merit.

### A. Background.

Soto sought a judgment of acquittal at the close of the government's case and disputed the evidence showing his knowledge of, or intent to join, Javat's scheme. DE.398:31-32. The district court denied the motion. DE.398:32.

### B. Standard of Review.

This Court conducts a de novo review of sufficiency claims, asking "whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt." *Azmat,* 805 F.3d at 1035 (citation omitted). This Court will affirm unless "no reasonable construction of the evidence" supports the jury's finding of guilt. *Ibid.* (citation omitted).

---

challenge Section 1349's constitutionality. If Javat wished to preserve a challenge to the sufficiency of the indictment's alleged facts, he needed to "enter[] a 'conditional plea' in accordance with Fed. R. Crim. P. 11(a)(2)." *Pierre*, 120 F.3d at 1155. He did not do that below. *See* DE.418.

## C.    Discussion.

To convict on the wire-fraud counts, the jury had to find that Soto "knowingly … participated in a scheme to defraud someone by using false or fraudulent pretenses, representations or promises," DE.398:98, and that he joined a conspiracy with others to do so.  To convict on the Section 670 counts, the jury had to find that Soto "knowingly and willfully" "obtained a pre-retail medical product … by fraud or deception," DE.398:100, and that he joined a conspiracy to do so.  The trial proof supported the jury's verdict on these counts.

### 1.    The proof shows that Soto knowingly aided Javat's scheme to divert products into the U.S. market.

The government's evidence showed that Soto knowingly aided Javat's scheme to divert products into the U.S. market that had been designated by the manufacturers for export.

First, Soto understood that Javat's companies obtained products directly from U.S. manufacturers.  *See* DE.384:21-3 (Uniworld informing Soto about shipment "from our supplier Sklar Instruments" in Pennsylvania); DE.379-16:3-4 (Uniworld informing Soto about shipment of "product[] samples … from manufacturer—Bayer" that are "[a]ll regular usa stock"); DE:386-9:2 (International Medical informing Soto that "we are in the midst of shipping 5 or 6 containers of Equal Sweetener from the manufacturer").

Second, Soto participated in discussions about shipping these products abroad and then back to the United States via Miami, where Soto cleared them through U.S. Customs. *See* DE.379-3:2 (International Medical planned to "ship out" Andover bandages and asked if Soto would have an "issue bringing this into the US"); DE.381-1:1 (Soto copied on emails regarding shipment from Georgia, to United Kingdom, to Miami "for [Soto] to clear"); DE.386-8:1 (Soto email regarding Campbell Soup shipment from South Carolina, to United Kingdom, to Miami "so we can do the Customs clearance at Miami port"); DE.386-9:2 (email to Soto about Equal Sweetener shipment from Illinois, to United Kingdom, to Miami and asking "what documentation … you will require to clear the goods"). These emails show Soto's participation in Javat's fraud scheme because they involved shipping itineraries that made no economic sense. Obtaining products from the manufacturer in the United States, shipping them abroad, and immediately shipping them back to the United States entailed an extra $3,000-$4,000 in container charges each direction. DE.396:129.

Third, Soto charged Javat's companies double the price of other customs brokers. DE.396:90. Javat also chose to import the products through Miami, where Soto operated, rather than closer U.S. ports with cheaper shipping costs. DE.396:145-146. That Javat decided to pay significantly higher compensation

to Soto and to incur significantly higher shipping costs to Miami leads to one sensible conclusion: Soto was in on the scheme.

Fourth, the manufacturers sent large orders to Javat's companies worth hundreds of thousands of dollars on the understanding that they would be exported to Afghanistan. To divert those products into the U.S. market, Javat had to first clear them through U.S. Customs. The jury could reasonably infer that Javat would not have left this crucial step in his scheme to an unwitting customs broker. *Cf. United States v. Moreno-Gonzalez*, 662 F.3d 369, 373 (5th Cir. 2011) ("The jury could have very rationally assumed … that a sophisticated drug operation, capable of transporting thousands of pounds of drugs, would not leave its product in the hands of an unwitting dupe.").

Fifth, a co-conspirator scheduled a meeting in Dubai with Javat, other Uniworld co-conspirators, and "our logistics partners, including Luis Soto." DE.397:185. The decision to invite Soto to this meeting and characterize him as a "logistics partner" is consistent with the jury's finding that Soto knowingly participated in Javat's scheme.

At bottom, Soto's contribution to and profits from Javat's shipping operation support the jury's finding that he was a knowing participant.

## 2. The proof further shows that Soto knowingly aided Javat's deception of manufacturers and U.S. Customs.

Lest any doubt remain, the trial evidence highlighted instances where Soto assisted with efforts to disguise Javat's scheme. That also constitutes proof of knowledge. *See United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017) ("[A] jury may consider circumstantial evidence and infer intent from evidence of efforts to conceal the unlawful activity.") (citation omitted).

In 2014, Uniworld contacted Soto about importing U.S.-packaged candy products into the United States. Soto responded that he needed the manufacturer's FDA facility-registration number but warned that "this is something you do not want to ask the manufacturer because they will know you are bringing them to USA." DE.386-7:2. That admonition reveals Soto's knowledge that Uniworld had lied to the manufacturer.

In 2016, Javat copied Soto on an email instructing that the "[bill of lading] should be issued right up to Kabul." DE.381-1:1. This referred to a shipment of Andover bandages from Georgia, to the United Kingdom, to Miami. *Ibid*. Another co-conspirator further directed that the bill of lading's description be changed during transit from "[c]onfectionery products" to "[m]edical products [b]andages" and that the documents should be forwarded to Soto to clear the shipment with U.S. Customs upon arrival in Miami. *Ibid*. Finally, Soto advised

the group that the shipping paperwork "should show final destination port as Jebel Ali, Dubai … as this is where the supplier believes cargo is going." DE.381-3:1. That directive conspicuously aligned with the false representation, made by Javat's company to the candy manufacturer, about shipping its product to Afghanistan. DE.397:196.

These emails supply proof of guilt. Soto cleared a shipment of Andover bandages through U.S. Customs in Miami notwithstanding the fact that the goods were initially identified as confectionary products destined for Afghanistan. And Soto made sure that the shipping paperwork matched Javat's misrepresentations about exporting candy to Afghanistan. Neither action is consistent with Soto's assertions of ignorance regarding Javat's scheme.

Lastly, in 2017, Uniworld notified Soto that it had shipped products to Miami from "our supplier Sklar Instruments" that originated in "USA." DE.384-21:3. Soto then drafted a letter to U.S. Customs falsely stating that this shipment contained overstocked products from an overseas supplier. DE.384-23; *see also* DE.397:227-229 (similar letter for Equal Sweetener shipment from Illinois manufacturer). The discrepancy between what Soto knew about the shipment and how he characterized it to U.S. Customs further demonstrates his culpable knowledge.

In all, Soto's deceptive conduct correlates with his knowing participation in Javat's scheme. The jury's finding on this front is unimpeachable on sufficiency review.

### 3.    Soto's contrary arguments lack merit.

In response, Soto denies knowledge of the fraud scheme. His arguments, however, lack merit.

Soto first stresses (Br. 49) his lack of involvement in sales negotiations and representations between Javat's companies and the manufacturers. But, as the district court explained in its jury instructions, "[i]t's possible to prove the [d]efendant's guilt of a crime even without evidence that the [d]efendant personally performed every act charged." DE.398:103. Rather, the court stated, "[a] [d]efendant is criminally responsible for the acts of another person if the [d]efendant aids and abets the other person." *Ibid*. Here, the trial proof supports the verdict that Soto aided Javat's fraudulent diversion of products into the United States that the manufacturers had designated for export to Afghanistan.

Soto next contends (Br. 49) that the evidence showed only his knowledge that "the goods were diverted from their shipping destination and imported into the United States as gray market products." The jury was free to disagree and instead credit the government's evidence showing that Soto aided Javat's surreptitious diversion of those products from the promised destination into the

United States. Such furtive conduct is consistent with Soto's full knowledge of the scheme.

Soto further argues (Br. 50) that his conduct did not violate U.S. Customs regulations. That dispute is irrelevant to the question whether Soto knowingly aided Javat's fraud scheme and violated the charged criminal statutes. Soto lastly disclaims (*ibid.*) personal knowledge that the products he cleared for Javat involved fraud or other illegality. The evidence summarized above—which include Soto's own emails—belies that statement.

When it comes to sufficiency review, the "jury is free to choose among reasonable constructions of the evidence." *United States v. Foster*, 878 F.3d 1297, 1304 (11th Cir. 2018) (internal quotation marks and citation omitted). A rational jury—viewing the record in a light favorable to the government—could readily find that Soto knowingly participated in Javat's fraud scheme. His convictions must accordingly stand.

## III. The district court appropriately exercised its discretion in admitting three of Soto's emails under Federal Rule of Evidence 404(b).

Over Soto's objection, the government introduced three emails under Federal Rule of Evidence 404(b). The district court appropriately admitted these emails. Soto's contrary arguments (Br. 40-45) fail.

## A.    Background.

In 2015, a distributor emailed Soto about "goods from US suppliers" that it wanted "to ship … to our customers in the states."   DE.386-4:1.   The distributor asked Soto to check the goods and remove any delivery notes, address labels, and tracking devices.  *Ibid*.   Two weeks later, Soto emailed several individuals seeking a quote on "special services" for 2030 cases of product: "all shipping labels must be removed by using the heat gun" and "[s]earch for tracking devices—every single case has to be opened and checked." DE:386-5:1.  The U.S. manufacturer had previously arranged shipment of the product—Farrell-valve pressure relief bags—to Germany.  *Id*. at 10.

In 2017, the same distributor emailed Soto about "Tracking Devices!!!" and stated that Q-Med (a U.S. wholesaler) would be getting 500 Farrell-valve cases each month.   DE:386-6:2.   The distributor again instructed Soto to "[s]earch for tracking devices—every single case has to be opened and checked." *Ibid*.  After this product arrived, Soto emailed (*id*. at 1) the distributor and asked:

Last time we did all this work and you had to export the goods because the supplier requested export documents, remember?

Then you shipped it back to USA and I cleared it.

We did all that work and it was very expensive at $45 per men hour.

Please confirm if in fact you want us to do all this work???


Thanks,

Luis Soto
Absolute Freight Services, Inc

Soto moved to exclude these emails. DE.299. The government responded that the emails undermined Soto's defense that he was only helping to import U.S. goods from overseas suppliers with "inventory excesses." DE.314:1. The government further explained that the emails "demonstrate[d] Soto's complete awareness that his clients are/were lying to a supplier that expected its products to be exported" and "knowing participation in … exporting products and then bringing them right back to the US in order to generate export documents for the suppliers." *Id*. at 2. The district court denied Soto's motion. DE.327.

**B.    Standard of Review.**

This Court reviews the district court's evidentiary ruling for abuse of discretion. *See Phaknikone*, 605 F.3d at 1107.

**C.    Discussion.**

The district court appropriately authorized admission of the emails.

**1.    The emails show Soto's knowledge that his customers fraudulently diverted products designated for export.**

Rule 404(b) authorizes admission of evidence of prior acts where the evidence is "relevant to an issue other than the defendant's character," there is "sufficient proof … so that a jury could find that the defendant committed the extrinsic act," "the probative value of the evidence [is] not … substantially outweighed by its undue prejudice, and the evidence … meet[s] the other

39

requirements of Rule 403." *Phaknikone*, 605 F.3d at 1107 (internal quotation marks and citation omitted). The disputed emails satisfy this test.

*First*, the emails reveal Soto's knowledge that his customer had obtained goods from a U.S. manufacturer for export and then diverted them into the domestic market for resale. The customer had purchased medical products from the manufacturer for export to Germany, DE.386-5:10, but wanted "to ship them directly to [its] customers in the states" and hired Soto to remove tracking devices from the shipment, DE:386-4:1. And because this manufacturer "requested export documents," the customer "export[ed] the goods," "shipped it back to USA," and Soto "cleared it." DE.386-6:1.

*Second*, Soto's own words confirm that he committed these acts. In the 2015 email, Soto solicited quotations for labor to help him search and remove tracking devices from the products. DE.386-5:1. In the 2017 email, Soto recounted how he previously cleared goods that the customer had exported and then imported. *See* DE.386-6:1 ("We did all that work and it was very expensive.").

*Third*, the emails carried significant probative value. Soto's defense was that "he was doing his job," helping his customers import products, and "obey[ing] [their] directions as to what to do." DE.394:28, 30. Soto accepted the possibility that his customers had lied to the manufacturers, *id*. at 31, but

40

denied any knowledge of or involvement in that conduct. *See id*. at 29 ("[Customs brokers] don't ask [their customers] a bunch of questions."); *id*. at 31 ("He wasn't involved in a conspiracy to commit a fraud against any of these manufacturers."). Soto's emails dispelled this defense that he was an innocent customs broker who lacked knowledge of his customers' fraudulent conduct. *See United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005) ("A similarity between the other act and a charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense.").

The district court also safeguarded against unfair prejudice by instructing that the jury "must not consider this evidence to decide if [Soto] engaged in the" charged conduct. DE.397:235. The court rather advised the jury to consider the emails when deciding whether Soto "had the state of mind or intent to commit the crime," "a motive or the opportunity to commit the acts charged," or "a plan … to commit a crime"; or whether Soto instead "committed the acts charged … by accident or mistake." *Ibid*. Such "limiting instructions about the proper way to consider 404(b) evidence … further reduce[] the risk of undue prejudice." *United States v. Perry*, 14 F.4th 1253, 1275 (11th Cir. 2021).

Soto's contrary arguments merit only quick responses. He states (Br. 41-42) that the emails showed only that "the client requested Soto to perform the services of a freight forwarder." Not so: the emails reveal that the distributor

had obtained products from the manufacturer for export and approached Soto for help diverting them to the domestic market. Soto further characterizes (Br. 42) his removal of the tracking devices as "a prudent, common-sense measure" to keep the manufacturer from identifying the downstream transactions. That statement reveals the fraud: the distributor sought Soto's help in maintaining the export façade by interfering with the manufacturer's efforts to track its products. Finally, Soto insists (Br. 43) that "the emails do not show that [he] engaged … in product diversion." To the contrary, in the 2017 email, Soto recounted how "[w]e did all that work" to export, then import, and then clear the shipment because the manufacturer "requested export documents." DE.386-6:1.

## 2. The district court correctly overruled Soto's hearsay objection.

Soto briefly argues (Br. 44) that the emails contained inadmissible hearsay. The district court correctly overruled that objection, observing that the emails were Soto's and therefore admissible as a statement of the party opponent. DE.397:235 (citing Fed. R. Evid. 801(d)(2)(A)).

These emails also included the distributor's statements soliciting Soto's assistance. But those statements are not hearsay. They instead provided factual context for the jury's consideration of Soto's email responses. *See United States*

*v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) (statements offered only to show effect on listener not hearsay).

### 3.    Any error was harmless.

Admission of the three emails, even if error, did not have a substantial and injurious effect or influence on the jury's verdict because they comprised a tiny fraction of the government's proof.  DE:397:236-243.  As documented above, the government adduced other evidence that overwhelmingly established Soto's guilt on the charged crimes.  *See* pp.30-37, *supra*.

## IV.    The district court appropriately exercised its discretion in excluding Soto's expert.

Soto appeals (Br. 30-40) the district court's decision to exclude his defense expert.  This claim similarly fails.

### A.    Background.

Soto noticed his intent to a call an attorney with expertise on U.S. customs laws and FDA regulations to introduce expert testimony about the secondary or grey market—where exported goods are reimported into the United States for resale.  DE.396:239-240.  The attorney would also testify about actions that the manufacturers could have taken to prevent diversion of their exported products into the U.S. market.  DE:351:8-11 (summarizing proffered testimony).

The government objected on relevance grounds. It noted that Soto was on trial for wire fraud and obtaining pre-retail medical products by fraud or deception. Whether or not Soto complied with customs laws or FDA regulations had no bearing on these charges. DE:351:6.

The district court sustained the government's objection and excluded Soto's expert. DE:397:250. It noted that "Soto is charged with participating in a fraud scheme, not violating any specific import law or regulation." DE:397:251. As a result, the court held that the "proposed testimony regarding customs laws and/or regulations is not relevant and would likely cause jury confusion." *Ibid*. It further explained that the proposed "testimony is misleading in the sense that Mr. Soto's compliance with a particular law or regulation does not mean he lacked fraudulent intent to commit the charged offenses." DE:397:252. Finally, the court characterized the proffered testimony about various steps that manufacturers could have taken to prevent product diversion as impermissible "blame[] the victim" evidence. *Ibid*.

## B.     Standard of Review.

This Court reviews the district court's evidentiary ruling for abuse of discretion. *See Barton*, 909 F.3d at 1330.

## C.     Discussion.

The district court appropriately excluded Soto's expert.

## 1.   The proffered testimony was irrelevant.

Consistent with its gatekeeping function under Federal Rule of Evidence 702, the district court must "ensure that the proposed expert testimony is relevant to the task at hand." *Allison v. McGhan Med. Co.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (internal quotation marks and citation omitted).  The district court properly excluded Soto's expert on this ground.[9]

As he did below, Soto avers (Br. 33) that his expert would have addressed the secondary market's operation, FDA regulations, and U.S. customs law, and further opined that Soto's conduct did not raise red flags.  But Soto's adherence to customs laws and FDA regulations does not bear on whether he committed the charged fraud offenses.  As the district court observed, "Soto's compliance with customs or FDA requirements and the supposed legality of the dealings in the grey market [were] not part of the Government's case."  DE.397:251.  For these reasons, the court correctly characterized this testimony as irrelevant.  No abuse of discretion occurred.

Soto's remaining arguments lack merit.  He argues (Br. 31) that his expert would have rebutted testimony from cooperating witness Emanual Daskos that

---

[9] That Soto alleges (Br. 34-35) an infringement on his constitutional right to present witnesses does not alter operation of this evidentiary rule.  *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.").

a roundtrip export-import itinerary was economically illogical.  Because Soto

failed to proffer this topic as a basis for expert testimony, DE.351:8-11, this

Court reviews this claim for plain error.  *See United States v. King,* 73 F.3d 1564,

1571 (11th Cir. 1996).  Soto must show that (1) an error occurred, (2) the error

was plain, (3) the error affected substantial rights, and (4) the error seriously

affects the fairness, integrity, or public reputation of judicial proceedings.  *See*

*United States v. Duncan,* 400 F.3d 1297, 1301 (11th Cir. 2005).

Soto cannot meet this demanding standard.  The government asked

Daskos whether he could think of a legitimate reason for a distributor "to send

goods out somewhere, overseas, and bring them right back."  DE.396:200.

Daskos testified "[n]o" because the distributor "would be throwing money

away."  *Ibid.*  He had testified earlier that this roundtrip itinerary—exporting

goods overseas and immediately reimporting them—would add $3,000-$4,000

in extra shipping-container costs each way.  DE.396:128-129.  Soto fails to

explain how his expert—a customs and FDA regulatory attorney—would have

rebutted Daskos's testimony that this itinerary made no economic sense.

Soto further argues (Br. 33) that his expert would have rebutted testimony

from two manufacturer witnesses expressing safety concerns about a distributor

like Javat surreptitiously reimporting their medical products into the United

States.  Because Soto failed to proffer this topic as a basis for his expert's testimony, DE.351:8-11, this Court reviews this argument for plain error.

Soto again cannot meet this demanding standard.  The manufacturer witnesses testified that Javat's scheme destroyed the chain of custody, precluded the manufacturer from ensuring safe transport, and hindered the manufacturer's ability to notify customers of a product defect or recall.  DE.395:156; DE.396:56.  These witnesses further testified that manufacturers operate in a "heavily-regulated field" when selling medical products domestically and shoulder responsibility when "there's a safety issue."  DE.396:56.  And where the "products have … been pulled out of the stream," "we have no idea who touched them" and "whether they're damaged, adulterated, working, not working, sterile, not sterile."  DE.395:158.  For these reasons, the manufacturers "work very hard not to have a product diverted back" into the United States.  DE.395:159.  Soto fails to explain how the proffered expert testimony—that reimportation of these products comported with U.S. customs laws and FDA regulations—would have rebutted these manufacturer concerns.

Soto lastly argues (Br. 38) that the proffered testimony "was relevant to the *mens rea* element of the offenses charged."  The district court correctly rejected this assertion, observing that Soto's adherence to U.S. customs laws and FDA regulations was "impermissible good acts evidence" because "these laws

and regulations are not in issue." DE.397:251-252. Whether or not Soto followed them "does not bear on his intent to defraud with respect to the [manufacturers], and is therefore irrelevant." *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008); *see United States v. Camejo,* 929 F.2d 610, 613 (11th Cir. 1991) ("Evidence of good conduct is not admissible to negate criminal intent.").

### 2. Any error was harmless.

Exclusion of Soto's expert, even if error, did not have a substantial and injurious effect on the jury's verdict. The trial proof—specifically, Soto's own emails—undercut the proffered expert testimony.

First, Soto's emails disclosed the illegitimate purpose behind the roundtrip export-import shipment itineraries: to fool the manufacturer. *See* DE.381-3:1 (Soto advised that the shipping paperwork on a Georgia-United Kingdom-Miami itinerary "should show final destination port as Jebel Ali, Dubai … as this is where the supplier believes the cargo is going.").

Second, the record documented safety concerns with Javat's products. *See* DE.397:72-73 (Javat decided to "clean … up and sell" product notwithstanding bird droppings on the cases); *id*. at 74 (diabetic-test strips stored in car trunk notwithstanding manufacturer instructions to "refrigerate on arrival … between

46.4 Fahrenheit and 35.6 Fahrenheit."). The jury accordingly would have rejected any expert testimony characterizing the scheme as safe.

Third, overwhelming proof documented Soto's knowing participation in Javat's scheme to defraud the manufacturers. *See* pp.30-37, *supra*. The jury would have rejected any testimony that Soto's compliance with U.S. customs laws and FDA regulations demonstrated his lack of fraudulent intent.

## V. No error occurred at Javat's sentencing.

Javat contends (Br. 16-26) that the district court erroneously calculated the loss associated with his offense conduct under Guidelines § 2B1.1(b)(1). He further challenges (Br. 26-31) the court's enhancements under Guidelines §§ 2B1.1(b)(2)(A), 2B1.1(b)(8)(B), and 2B1.1(b)(9)(A). Soto summarily adopts these claims,[10] none of which carry merit.

### A. Background.

The district court calculated Javat's guidelines range at 324-405 months, reflecting an offense level of 41 and a criminal history category of I. DE:519:110-111. The statutory 240-month maximum, however, cabined this range. DE.402 (PSR ¶ 96). This calculation reflected several contested rulings.

1. Guidelines § 2B1.1(b) sets the defendant's offense level based on the loss associated with his conduct. The Guidelines define "loss" as the greater of

---

[10] Soto did not receive a Guidelines § 2B1.1(b)(9)(A) enhancement.

"actual" loss or "intended" loss. U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss" is defined as the reasonably foreseeable pecuniary harm that resulted from the offense, and "intended loss" is defined as the pecuniary harm that was intended to result from the offense, including pecuniary harm that would have been impossible or unlikely to occur. *Ibid.* "[T]he district court need only reach a reasonable estimate of loss," and its finding "is entitled to appropriate deference." *United States v. Melgen*, 967 F.3d 1250, 1265 (11th Cir. 2020).

The government proposed a $86.4-million loss based on the average discount (50%) that Javat's companies received from manufacturers and the total sum ($86.4 million) they paid to purchase the discounted products. This figure estimated the difference between the discounted price that Javat's companies paid for the products and the list price they would have paid had they disclosed their plan to resell the products in the United States. DE.459:1-2. Javat, by contrast, proposed a zero-dollar loss because his companies purchased the products at the manufacturers' agreed-to discounted price. *Id.* at 2.

The district court selected the government's approach as a reasonable loss estimate. DE.459:3. It cited a Ninth Circuit decision endorsing a loss calculation "approximat[ing] the difference between the full retail price of the software sold by Defendants and the [discounted] price Defendants paid for it." *Id.* at 4 (quoting *United States v. Ali*, 620 F.3d 1062, 1073 (9th Cir. 2010)). The

court, however, narrowed the calculation to $36.5 million to reflect only manufacturer losses sustained during the 2014-2017 conspiracy period. *Id*. at 7. That finding increased Javat's guidelines calculation by 22 levels. *See* U.S.S.G. § 2B1.1(b)(1)(L) (loss between $25-65 million).

2.     The district court applied three enhancements over Javat's objection.  It first found that "there were far more than 10 victims to this scheme," meriting a two-level enhancement under Guidelines § 2B1.1(b)(2)(A). DE.519:44.  It next applied a four-level enhancement under Guidelines § 2B1.1(b)(8)(B) because "the offense involved conduct described in 18 U.S.C. § 670, and the defendant was employed by, or was an agent of, an organization in the supply chain for the pre-retail medical product."  DE.519:53.  Finally, the court applied a two-level enhancement under Guidelines § 2B1.1(b)(9)(A) because "the offense involved … a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency."  DE.519:54.

3.     The district court's sentencing order criticized the resulting guidelines range.  It cited "[t]he lack of empirical evidence supporting guideline 2B1.1."  DE.459:10.  The court additionally found that the "loss amount … somewhat mispresents the harm caused" because "[a]lthough the victims were unmistakably defrauded, they chose to sell their products at the discounted

51

price" that "made economic sense." *Ibid*. It lastly found that "the numerous enhancements interact with and stack upon each other in such a way as to cause an unusually and unreasonably dramatic increase in the Guidelines range." *Id*. at 11.

The district court announced that it would vary from the guidelines using its 18 U.S.C. § 3553(a) discretion. DE.459:12. It imposed a 120-month term on Javat—a 50% variance from his effective guidelines range. DE.519:114.

**B.   Standard of Review.**

This Court reviews de novo the district court's interpretation and application of the Guidelines and reviews for clear error its underlying factual findings. *See. Maddox*, 803 F.3d at 1220.

**C.   Discussion.**

No procedural error occurred in calculating Javat's guidelines range.

**1.   The record amply supports the district court's loss-calculation approach and findings.**

The district court estimated loss by identifying the difference between the discounted price that the manufacturers charged Javat's companies and the list

price they would have charged but for Javat's fraudulent Afghanistan representations. This reflects a proper application of Guidelines § 2B1.1.

a. The district court's approach finds ample support. The First Circuit in *United States v. Martí-Lón*, 524 F.3d 295, 297 (1st Cir. 2008), addressed a similar scheme where the defendant purchased drugs at significant discount based on representations that they would be resold in Brazil. The defendant then diverted the drugs to New York for resale and grossed $21 million. The district court calculated loss by multiplying the defendant's sales revenue by the percentage of her wrongfully obtained discount. *Id.* at 301.

The First Circuit affirmed, holding that this calculation fairly reflected the actual loss because "the wrongfully obtained twenty-percent discount constituted pecuniary harm to the drug manufacturer; had the drug manufacturer sold the products to the drug wholesaler directly, it would have sold the products at the full wholesale price." 524 F.3d at 301. The court further held that this calculation likewise reflected the intended loss: "In reselling the discount vaccines to the New York drug wholesaler, it was entirely foreseeable to defendant that [the pharmaceutical company] was being deprived of the opportunity to sell those same vaccines at a non-discounted price." *Id.* at 302.

So too here. Javat fraudulently purchased goods from the manufacturers at 50% discount. The total amount of discounts received reflects the

manufacturers' actual losses (because they would have otherwise sold the products directly to U.S. distributors at their list prices) and Javat's intended loss (because he foreseeably deprived the manufacturers of the opportunity to sell their products to U.S. distributors at their list prices).

Other courts have similarly assessed loss in reference to the total discount that the defendant fraudulently obtained from the supplier. *See, e.g., United States v. White*, 846 F.3d 170, 179-180 (6th Cir. 2017) (loss calculation based on difference between military-rate airfares that defendant fraudulently booked and the next-cheapest fare); *United States v. Farano*, 749 F.3d 658, 665 (7th Cir. 2014) (loss calculation based on discounts that U.S. Department of Housing provided when selling homes to defendants based on fraudulent representations that defendants would resell the homes to low- and middle-income persons); *Ali*, 620 F.3d at 1073 (loss amount based on difference between full-retail price of software and discounted educational-user price that defendants paid). The district court accordingly employed a reasonable approach for estimating loss and Javat has shown no clear error. *See United States v. Cavallo*, 790 F.3d 1202, 1232 (11th Cir. 2015) ("[W]e review a district court's determination of monetary loss for clear error.").

b.      Javat states (Br. 17, 19) that the district court's tally impermissibly counted the manufacturers' "lost potential profits" and "consequential damages."  To the contrary, the court followed ordinary loss principles.

Javat purchased products from U.S. manufacturers at deep discounts, resold them to U.S. distributors, and profited off the margins.   The record establishes that, "had the … manufacturer sold the products to the … wholesaler directly, it would have sold the products at the full wholesale price."  *Martí-Lón*, 524 F.3d at 301; *see* DE.402 (PSR ¶ 22) ("Javat typically obtained products at discounts of 40% to 60% below the prices at which the goods would have been offered by the manufacturers if he had told the truth; (i.e. the generally available domestic wholesale price).").  As a consequence, Javat's "wrongfully obtained … discount constituted pecuniary harm to the … manufacturer."  *Martí-Lón*, 524 F.3d at 301.  That measure likewise reflects the intended loss because "it was entirely foreseeable to [Javat] that [the manufacturer] was being deprived of the opportunity to sell those same [products] at a non-discounted price."  *Id*. at 302; *see* DE.402 (PSR ¶ 14) ("Javat and his agents were actually looking to obtain the manufacturers' products at discounted prices, not generally offered to distributors and wholesalers in the United States, in order to sell such products to their U.S. based customers at a significant profit.").

c. Javat's other objections lack merit. He notes (Br. 19-20) that courts calculate loss in theft cases based on "[t]he fair market value of the property unlawfully taken, copied, or destroyed." U.S.S.G. 2B1.1, cmt. 3(C)(i). But this is a fraud case and the loss calculation properly focuses on the discounts that Javat fraudulently obtained. Javat cites (Br. 21) commentary advising courts to reduce the loss calculation by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant … to the victim before the offense was detected." U.S.S.G. 2B1.1, cmt. 3(E)(i). But that provision is inapplicable because Javat never returned his ill-gotten discounts to the manufacturers.[11]

Javat's invocation (Br. 21-23) of *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017), is misplaced. The Court in *Stein* held that the government failed to show the victim-investors' reliance on the defendant's fraudulent statements when purchasing the securities. *Id.* at 1153-1154. The record here—which the district court credited, DE.459:6-7—amply demonstrates the opposite: the manufacturers relied on Javat's misrepresentations to discount their products. Javat so admitted at his plea hearing. *See* DE.418:15 ("Based on these false and fraudulent representations, the victim companies sold their products to Javat at

---

[11] Javat's mortgage-fraud hypothetical (Br. 18) fails for this reason. If the borrower fraudulently obtains a loan but fully repays the bank under the loan terms, the returned money offsets the loss. Javat has not returned anything.

deeply discounted prices, that they would not have otherwise offered but for the false and fraudulent representations."). The manufacturer witnesses confirmed this at Soto's trial and the Probation Office did before sentencing. *See* p.24, *supra*; DE.402 (PSR ¶ 16). In addition, *Stein* "focus[ed] on the calculation of actual loss" because "the government did not argue for an intended loss calculation." 846 F.3d at 1152. The government here, by contrast, argued that Javat's fraudulently obtained discounts also reflected intended loss. *See* pp.53-54, *supra*; DE.420:19. *Stein* is thus inapplicable for this second reason.[12]

Javat wrongly criticizes (Br. 24-25) the district court's loss calculation as speculative. The court found that Javat's companies, on average, obtained a 50% discount off the manufacturer's list price, DE.459:7, based on evidence adduced at Soto's trial and information on Javat's deal-profitability sheets showing the manufacturer's list price and discount, DE.420:22-24. The court further found—citing Javat's accounting records—that Javat's companies spent $36.5 million to buy discounted products during the conspiracy. DE.459:7 (citing DE.420:25).[13] No clear error occurred with respect to either finding.

---

[12] Javat further cites (Br. 22) *Stein*'s holding that the district court there failed to consider whether intervening events contributed to investor losses, *see* 846 F.3d at 1154-1156, but Javat has never identified an intervening event that prompted the manufacturers to issue the discounts to his companies.

[13] Javat criticizes (Br. 26) the government's failure to obtain each manufacturer's pricing records. As the government explained below, its

Finally, Javat asserts (Br. 24) a dearth of evidence that the manufacturers "could have found additional customers willing to pay" the domestic list prices for the products that his companies fraudulently purchased. That contention fails for two independent reasons. On the actual-loss calculation, Javat disregards the trial testimony that the manufacturers typically sold their products in the United States at list price. DE.395:141-142, 149, 181, DE.396:52-54; DE.397:10-11. This record confirms that the difference between the list price and Javat's discounted price fairly estimates each's manufacturers' pecuniary harm. On the intended-loss calculation, Javat's contention is irrelevant. As the deal-profitability sheets show, Javat had the list price top of mind when his company sought discounts from each manufacturer. DE.397:44. Because Javat intended to deprive the manufacturer of the opportunity to sell its products at its list price, his discount reasonably reflects the pecuniary harm that was intended to result from the offense.

d. Javat separately complains (Br. 24-25) that the district court quashed his subpoenas seeking the manufacturers' transactional and pricing records, thus denying him an opportunity to ascertain whether they sold their products at list price. The court properly exercised its discretion here.

---

calculations were derived from Javat's own records and accounting software. DE.420:22-25.

In October 2019, the Probation Office adopted the government's proposed loss-calculation approach based on the difference between each manufacturer's list price and Javat's discounted price. DE.402 (PSR ¶ 39). In December 2019, six days before his sentencing hearing, Javat sought subpoenas requiring the manufacturers to disclose their pricing records. DE.423. The district court denied the motion, noting "there is not sufficient time for any realistic compliance" before sentencing. DE.431. The court further found that "the burden of compliance outweighs any likely probative value." *Ibid*.

"The issuance of subpoenas under Fed. R. Crim. P. 17 is within the trial court's discretion, and timeliness is one of the factors the trial court may consider." *United States v. Perez-Tosta*, 36 F.3d 1552, 1556 n.2 (11th Cir. 1994). Javat cannot surmount that hurdle given his lack of diligence. In the alternative, the district court fairly determined that the subpoenaed records carried minimal probative value. Even assuming the records showed that manufacturers offered some discounts to U.S. customers, Javat adduced no evidence that they came close to his 50% discount. *See* DE.395:145 (Sklar would "never approve that kind of discount in the United States, ever"); DE.395:181 (occasional Andover discount "of five to seven percent"); DE.396:65 (Parkell "would be out of business" if it sold products at Javat's discounted price). The court thus fairly determined that the sought-after records would not meaningfully alter the loss

calculation—particularly given that the court's calculation ($36.5 million) was far above the $25-million threshold for Javat's 22-level increase. *See* U.S.S.G. § 2B1.1(b)(1)(L).

## 2. The record amply supports the victim enhancement.

Guidelines § 2B1.1(b)(2)(A) provides an enhancement where the offense "involved 10 or more victims." The district court found "far more than 10 victims to this scheme." DE.519:44. No clear error occurred in this finding.

Javat accepts (Br. 30) that the government identified five victims at Soto's trial: Sklar, Andover, Parkell, Bayer, and Demet's. The trial proof also identified three additional victims. *See* DE.397: 221-228 (Storck Candy, Campbell Soups, Equal Sweetener). The government's evidence further showed that Javat's scheme reached many others. *See* DE.384-9 (update on discussions with 37 manufacturers); DE.386-1 (weekly shipping reports listing various manufacturers). Of note, Uniworld approached U.S. distributors and offered to resell products from "Convatec, 3M, Braun, Bard, Biogel Gloves, Sklar and various Lab Companies" at "significant cost savings" due to its "procurement strategies." DE.385-8. Based on this record, the district court permissibly found by a preponderance that Javat's companies acquired discounted products from at least 10 manufacturers using the same fraudulent strategies.

In response, Javat highlights (Br. 30-31) the absence of pricing data from the manufacturers, but such data is not a prerequisite. Records and emails show that Javat's companies approached dozens of U.S. manufacturers and subsequently advertised their ability to resell their products domestically at steep discounts. The district court fairly inferred that Javat ran the same fraudulent playbook with those manufacturers.

Javat renews his assertion (Br. 31) that no manufacturer suffered pecuniary harm. As shown above, that claim lacks merit. *See* pp.52-60, supra.

### 3. The record amply supports the enhancement for theft or diversion of pre-retail medical products.

Guidelines § 2B1.1(b)(8)(B) provides an enhancement where the offense "involved conduct described in 18 U.S.C. § 670, and the defendant was employed by, or was an agent of, an organization in the supply chain for the pre-retail medical product." No clear error occurred in the district court's application of this provision.

Section 670 punishes an individual who "embezzles, steals, or by fraud or deception obtains, or knowingly and unlawfully takes, carries away, or conceals a pre-retail medical product." 18 U.S.C. § 670(a)(1). Javat's plea admissions demonstrate that he "obtain[ed]" "by fraud or deception" pre-retail medical products. Namely, Javat "contacted various victim companies under the false pretense of being a large supplier of medical, surgical and food products to the

61

United States military stationed abroad" and "the victim companies sold their products to Javat at deeply discounted prices[] that they would not have otherwise offered but for the false and fraudulent representations." DE:418:15.

The record further establishes that Javat was employed by, or was an agent of, an organization in the pre-retail medical-product supply chain. Javat was chairman of Uniworld—a "'global supply chain management company.'" DE.402 (PSR ¶ 9). Javat also personally solicited Sklar to sell discounted surgical products for Uniworld to "supply the 67th Afghan National Army and Police Hospital." DE.395:45-46. And Javat was copied on advertising emails to U.S. distributors that described Uniworld as "a secondary wholesaler of medical, surgical, OTC and food products." DE.385-8.

In response, Javat observes (Br. 26-27) that he did not plead guilty to a Section 670 offense. That is irrelevant. The enhancement applies where "the offense *involved conduct* described in 18 U.S.C. § 670." U.S.S.G. § 2B1.1(b)(8)(B) (emphasis added).

Javat further argues (Br. 27-29) that Section 670 proscribes only the theft of pre-retail medical products and not a fraudulent scheme to obtain them. That is wrong. As the district court recognized, "the language of § 670 unambiguously prohibits the acquisition, by fraud or deception, of pre-retail medical products." DE.170:8. Congress used disjunctive language: the statute

punishes an individual who "embezzles, steals, *or by fraud or deception obtains*, or knowingly and unlawfully takes, carries away, or conceals a pre-retail medical product." 18 U.S.C. § 670(a)(1) (emphasis added). Construing this provision to cover only theft, as Javat invites, impermissibly reads an entire clause out of the statute. *See Advoc. Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1654 (2017) (applying "presumption that each word Congress uses is there for a reason"); *United States v. Velez*, 586 F.3d 875, 877 (11th Cir. 2009) ("[W]e must not read any provision, or even any word, of a statute so as to make it superfluous.") (internal quotation marks and citation omitted).

Javat lastly contends (Br. 29) that he is not an employee or agent of an organization in the supply chain. But the term "supply chain" includes a "wholesaler." 18 U.S.C. § 670(e)(6) (cross referenced in U.S.S.G. 2B1.1, cmt. n.1). As documented above, Javat served as chairman of Uniworld—a medical-equipment wholesaler.

### 4. The record amply supports the enhancement for misrepresenting a government agency.

Guidelines § 2B1.1(b)(9)(A) provides an enhancement where "the offense involved … a misrepresentation that the defendant was acting on behalf of … a government agency." No clear error occurred in the district court's application of this provision.

Javat's companies portrayed themselves as a communication conduit for the Afghan government. They produced official-looking government documents seeking to purchase the manufacturers' products. *See* DE.380-9:12 (Bayer export-compliance form signed by Afghan agency); DE.382-4:2 (request for Sklar medical products); DE.383-10 (invitation for bids on surgical instruments). Javat's companies also touted ongoing partnerships with the government officials. DE.395:184 (Saif Traders: "I would like to take this opportunity to explain how our business works with the Ministry of Health/ARDS, Afghanistan Reconstruction and Development Services."); DE:396:20 (Javat: "I am meeting ARDS director on Thursday morning."); DE.396:32 (Uniworld: "We've investigated your concern with the mentors at ARDS."). And they forwarded responses purportedly from the Afghan government. DE.396:8-9, 37-38.

As this record shows, Javat and his companies represented that they were acting on the Afghan government's behalf. Indeed, this Court confronted a similar record in *United States v. Kalaycioglu*, 210 Fed. Appx. 825 (11th Cir. 2006). The defendant represented to investors that he had handled financing matters for the Canadian government and produced Canadian government identification and credit cards. Such actions, the Court held, demonstrated that

the defendant had "acted on behalf of a foreign government" for purposes of a similarly worded enhancement. *Id.* at 836. The same is true here.

Javat responds (Br. 30) that he "made it clear to any and all sellers that he was an independent wholesaler and distributor for profit and was not part of any government." But Guidelines § 2B1.1(b)(9)(A) does not require that the defendant be employed by or otherwise work for the government agency. He need only misrepresent that he is acting "on behalf of" the agency to trigger the enhancement. Javat did precisely that.

### 5. Any error was harmless.

Even if the district court erred in any of these rulings, it was harmless. *See United States v. Barner*, 572 F.3d 1239, 1248 (11th Cir. 2009) (holding that "[a] Sentencing Guidelines miscalculation is harmless if the district court would have imposed the same sentence without the error").

In a written order, the district court criticized Guidelines § 2B1.1's loss calculation as empirically unsound and overstating the seriousness of Javat's scheme. DE.459:10. It further concluded that "the numerous enhancements interact[ed] with and stack[ed] upon each other in such a way as to cause an unusually and unreasonably dramatic increase in the Guidelines range." *Id.* at 11; *see* DE.519:113 ("I don't think [the fraud guidelines] have the application

they might in another case."). Over government objection, the court sentenced Javat to 120 months—a 50% variance below his guidelines range. DE.519:114.

The district court's comments show that it rejected the guidelines range and fixed Javat's sentence using the 18 U.S.C. § 3553(a) factors. Because that range—and, particularly, the loss calculation—had no effect on Javat's final sentence, any error in these rulings would be harmless.

## VI. No error occurred at Soto's sentencing.

Soto challenges (Br. 51-53) the district court's denial of a minor-role reduction under Guidelines § 3B1.2 and imposition of a special-skill enhancement under Guidelines § 3B1.3. Neither ruling constitutes clear error.

### A. Background.

The district court calculated Soto's guidelines range at 210-262 months based on an offense level of 37 and a criminal history category of I. DE.519:120-121. In doing so, the court denied Soto's request for a two-level minor-role reduction under Guidelines § 3B1.2. *Id.* at 66-67. It also overruled Soto's objection to the two-level enhancement under Guidelines § 3B1.3 for using a special skill. *Id.* at 64. But referencing its written order and its sentencing of Javat, the court announced that Soto's guidelines range "result[ed] in an unreasonable sentence." *Id.* at 137-138. Over government objection, the court granted a significant variance and imposed a 72-month term. *Id.* at 138.

## B.    Standard of Review.

This Court reviews the district court's denial of a minor-role reduction for clear error. *See United States v. Rodriguez De Varon*, 175 F.3d 930, 937 (11th Cir. 1999) (en banc). The court's finding that Soto possessed a special skill is also a factual finding subject to clear-error review. *See United States v. De La Cruz Suarez*, 601 F.3d 1202, 1219 (11th Cir. 2010).

## C.    Discussion.

Soto has not shown clear error in either ruling.

### 1.    The record amply supports the district court's denial of a minor-role reduction.

The district court committed no clear error in denying a minor-role reduction. The trial evidence demonstrated that Soto served as an indispensable partner to Javat and his companies by fraudulently clearing imported goods into the United States that had been marked by the manufacturers for export. Soto also helped Javat's companies and co-conspirators disguise this scheme from the manufacturers. *See* pp.34-35, *supra*. Soto also drafted letters to U.S. Customs falsely stating that shipments contained overstocked products from overseas suppliers. *See* p.35, *supra*. Finally, a co-conspirator referred to Soto as "our logistics partner[]" for a planned meeting with Javat. DE.397:185. That label

confirms Soto's significant role in Javat's scheme and supports the district court's ruling below.

In response, Soto asserts (Br. 52) that he "had no propriet[ary] interest in the offense other than his normal fixed fees." That ignores the trial testimony that Soto charged Javat double the fee of other customs brokers. DE.396:90. Soto again denies (Br. 52) knowledge of Javat's fraudulent representations to manufacturers. But the jury rejected this defense at trial and the district court permissibly did the same at sentencing.

### 2. The record amply supports the district court's finding that Soto used a special skill.

The district court committed no clear error in finding that Soto used a special skill to commit the charged offenses. The court cited testimony from a defense witness—a veteran customs broker—about the job's responsibilities. DE.519:64. The witness testified that a customs broker is "an expert in the transactional process" of importing goods. DE.398:35. The broker must understand customs regulations, the proper classification of products, and the procedures for clearing cargo—including the different forms and government agencies involved in the process. DE.398:34-35. Finally, the broker must pass an exam covering these topics and complete a background check before obtaining a license. DE.398:34.

That testimony supports the district court's finding that Soto had "a skill not possessed by members of the general public" that "usually requir[es] substantial education, training or licensing." U.S.S.G. § 3B1.3, cmt. 4. Soto's contrary claim (Br. 53) that a customs broker requires "no special degree or training" disregards his own witness's testimony.

### 3. Any error was harmless.

Even if the district court erred in either ruling, it was harmless.

The district court remarked that Soto's guidelines range "result[ed] in an unreasonable sentence" and incorporated its order criticizing the guidelines' operation. DE.519:138. The court then weighed "the relative culpability of the various parties," recognized that Javat and another co-conspirator "are certainly more culpable," and imposed a 72-month term—a 66% variance below the guidelines range. *Ibid*. As with Javat, the court's comments show that it fixed Soto's sentence using 18 U.S.C. § 3553(a). Because the guidelines range had no effect on his final sentence, any error in these rulings would be harmless.

## VII. The district court properly calculated restitution.

Javat challenges (Br. 32-44) the district court's $29-million restitution judgment. Soto summarily adopts these claims. None warrant reversal.

## A. Background.

1. To "make victims of crime whole," *United States v. Collins*, 854 F.3d 1324, 1329 (11th Cir. 2017) (citation omitted), the Mandatory Victims Restitution Act (MVRA) states that district courts "shall order" a defendant to "make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). The term "victim" refers to "a person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). "The restitution award must be the full amount of the victim's loss that was actually and proximately caused by the defendant's conduct." *Collins*, 854 F.3d at 1329.

That said, "the determination of the restitution amount is by nature an inexact science." *United States v. Martin*, 803 F.3d 581, 595 (11th Cir. 2015) (citation omitted). "[T]he government need not calculate the victim's actual loss with laser-like precision, but may instead provide a 'reasonable estimate' of that amount." *Ibid.* (citation omitted).

2. In advance of the December 2019 sentencing hearing, the Probation Office advised that the MVRA applied and over 40 victims suffered losses. *See* DE.402 (PSR ¶ 47). But because the government had not provided the victims' names and contact information, the Probation Office had not transmitted victim declarations to them. *Ibid.* Consistent with 18 U.S.C. § 3664(d)(5), the Probation Office recommended that the district court set a separate date to

70

determine losses. *Id.* ¶ 48. The court agreed, noting that "the claims of loss almost always come in … after sentencing," DE:519:43, and deferred its determination to a later date.

3. In March 2020, the district court convened a restitution hearing. It rejected Javat's contention that the manufacturers suffered no actual loss from his scheme. DE:551:6-7. But because Javat's counsel objected to late receipt of paperwork from several manufacturers, the court agreed to resolve those claims at a later date. *Id.* at 9, 22-23. The court then reviewed claims from eight manufacturers and calculated $7.1 million in losses. *Id.* at 551:28-67, 96.

Those calculations reflect the difference between the manufacturer's list price and the discounted price that Javat received. Javat objected that the list price served as an unreliable indicator of the manufacturer's actual loss. *See, e.g.*, DE.551:32 ("Parkell has not put forth any evidence it in fact … command[ed] any sales at its 2015 dealer one price."); *id.* at 34 ("[Bayer] couldn't possibly have just one price all the time … It's a generic product aspirin … that compete[s] with other products."). The district court overruled the objection and explained that restitution "is an inexact science," the court "need[ed] to come up with a reasonable estimate," and the list price "is the best evidence [it] ha[d] seen of that." *Id.* at 44. The court further criticized Javat's repeated claim that "there is just no loss" as "not a credible argument": "There may be a way to come in

and show that the restitution amount should be lower but simply continuing to argue that [the manufacturers] didn't lose anything … flies in the face of [Javat's] documents and the testimony at trial and the whole reason for the fraud." *Ibid*.

3.    In April 2021, the district court reconvened the restitution hearing, reviewed claims from the remaining manufacturers, and entered a $29-million restitution judgment.  DE.723:100.

Javat again attacked reliance on the manufacturer's list price.  In his view, the district court had to ascertain "[w]hat is the market out there paying for [the products] rather than what somebody says their aspirational price is." DE.723:34.  "There's been no showing that anybody else in the marketplace would have paid those aspirational prices."  *Id*. at 43.  Javat maintained that his fraudulently obtained discounted price "was the highest offer that [the manufacturers] could capture" because "[h]ad they had another offer higher, naturally they would have accepted the higher offer."  *Id*. at 44.

The district court observed that the manufacturers had non-economic reasons to sell discounted products to Javat: "to protect [their] export market" or "sales to the military."  DE.723:44.  It criticized Javat for offering "a lot of speculation" and "not recogniz[ing] the realities of the marketplace."  *Id*. at 90. Finally, the court rejected Javat's contention that "the[] goods" he fraudulently

obtained otherwise "would not have been sold in the United States at the prices [the manufacturers] generally charge in the United States." *Ibid.*

**B.     Standard of Review.**

This Court conducts a de novo review of the restitution order's legality and examines the district court's factual findings for clear error. *See Edwards*, 728 F.3d at 1291.

**C.     Discussion.**

Javat asserts procedural errors and challenges the ultimate restitution calculation. Both claims fail.

**1.     No procedural error occurred at the restitution hearing.**

First, Javat asserts (Br. 33) noncompliance with 18 U.S.C. § 3664(a), which states "the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order." Because the Probation Office provided the district court with a restitution report, the statute is satisfied. DE.723:21. Javat also objects (Br. 33) that "[t]he government … undert[ook] its own information collection efforts directly with the drug manufacturers," but nothing in Section 3664(a) prohibits the government from contacting victims. Finally, even if Javat identified a technical deviation from these procedures, reversal would be unwarranted. The

MVRA "grants a district court discretion to choose the procedures that will best aid the court in assessing the amount of loss," *United States v. Vandeberg*, 201 F.3d 805, 813 (6th Cir. 2000), and Javat has shown no abuse here.

Second, Javat complains (Br. 33) about his receipt of loss documentation days before the restitution hearing. The district court expressed "sympathy with [Javat's] position on the late receipt," DE.551:10, and deferred consideration of those claims to a later hearing, *id.* at 63-64, 70-71, 78, 83, 84. Javat has shown no abuse of discretion in the court's handling of this issue. *See United States v. Valladares*, 544 F.3d 1257, 1261 (11th Cir. 2008) (reviewing continuance rulings for abuse of discretion). Moreover, a district court's continuance denial constitutes reversible error only where the defendant "identif[ies] relevant, non-cumulative evidence that would have been presented if [his] request for a continuance had been granted." *Id.* at 1262 (citation omitted). Javat's perfunctory assertions do not fit that bill.

Third, Javat takes issue (Br. 33) with the district court's decision to quash his subpoenas seeking manufacturing pricing data. As explained above, no abuse of discretion occurred with respect to the quashing of Javat's eleventh-hour sentencing-hearing subpoenas. *See* pp.58-60, *supra*.

Javat served a second set of subpoenas on April 15, 2021—two weeks before the continued restitution hearing—broadly seeking records concerning

74

each manufacturer's transactions with and purchase offers from U.S. distributors for the products that Javat fraudulently obtained. Javat further demanded that each manufacturer's representative appear at the hearing. DE.712:2-3.

The district court similarly quashed these subpoenas: "[r]equiring compliance with these subpoenas served less than two weeks prior to the final restitution hearing would be unreasonable, particularly in light of the concerns related to travel during the pandemic and the breadth of the document requests." DE.713:2. The court further noted that Javat "had ample opportunity to serve the subpoenas in a timely manner after receiving the Government's final documents on February 25, 2021." *Ibid*. Javat fails to show an abuse of discretion in this untimeliness holding. *See Perez-Tosta*, 36 F.3d at 1556 n.2

Fourth, Javat objects (Br. 34) that the manufacturers pegged restitution losses to their list prices. Yet, as this Court has recognized, the seller's list price can reflect the product's fair market value. *See United States v. Robertson*, 493 F.3d 1322, 1333 (11th Cir. 2007) ("fair market price" of fraudulently obtained software units "was either *the wholesale price or the retail price*, because [the victim company] sold to both distributors and end users") (emphasis added). Of course, Javat contests the reliability of the list prices reported by the

manufacturers here. But that claim goes to the weight of the evidence supporting the district court's restitution findings, not to the procedures it employed.

## 2. No clear error exists in the district court's loss calculation.

Two factual findings undergird the district court's restitution calculation. Regarding the products that Javat fraudulently obtained, the court found that the manufacturers could have instead sold them to U.S. distributors. They were not "surplus goods." DE.723:90. The court further found that the list prices reflected "the prices [the manufacturers] generally charge in the United States." *Ibid*. The court thus viewed the list price as reflecting "a reasonable estimate" of the price the manufacturers would have collected had they sold their products on the U.S. market rather than to Javat. DE.551:44.

These findings easily satisfy clear-error review.

### a. The record amply supports the court's findings.

The district court's two findings are well supported. Testimony at Soto's trial confirmed that each of the testifying manufacturers had a regular and established U.S.-market presence. DE.395:9-10, 172-174, 203-204; DE.396:205-210. In addition, Javat obtained products from multiple manufacturers and then surreptitiously resold them to U.S. distributors at lower prices than the manufacturer. *See* DE.385-8 (Uniworld email: "Through our procurement strategies we are able to provide significant cost savings on to our customers

even though they may be direct with the same manufacturers."). In one instance, Javat sold his fraudulently obtained products to the same distributor as the manufacturer, undercutting that manufacturer's direct sales. DE.395:172, 192, 195-196 (Andover). The fact that Javat's scheme succeeded demonstrates U.S.-market demand for the products that he fraudulently obtained.

The record further establishes the list price as the price that the manufacturers generally charged U.S. distributors that purchased their products. The district court heard such testimony at Soto's trial. *See* p.24, *supra*. The manufacturers also submitted declarations and invoices identifying the prices they would have charged domestically for the products. *See, e.g.*, DE.714-2.[14] The court fairly adopted this marker for its restitution calculation.

Of course, the district court did not view the list price as an inexorable command. *See* DE.551:44 ("There are some problems with it."). One manufacturer acknowledged at Soto's trial that it occasionally offered discounts to buyers based on the volume of products purchased. DE.395:181. Javat flagged other discount examples below. DE.551:58; DE.723:49.

But those instances do not demonstrate clear error. This Court has emphasized that restitution is an "inexact science" that requires only a

---

[14] The complete restitution exhibits—spanning over 1,200 pages—were filed under seal due to sensitive pricing information. DE.725; DE.731. The government will lodge copies with this Court upon request.

"reasonable estimate" of victim losses. *Martin*, 803 F.3d at 595 (citation omitted). Given the record below and the dearth of evidence that manufacturers systematically deviated from their list prices, the district court fairly selected that measure for its calculation. There thus cannot be a "definite and firm conviction that the district court committed a clear error of judgment in setting the award amount." *United States v. Rothenberg*, 923 F.3d 1309, 1328 (11th Cir. 2019).

### b. Javat's contrary arguments lack merit.

Javat recycles (Br. 36-40) his argument that his fraud scheme caused no actual loss to manufacturers. He asserts (Br. 37) that the manufacturers "profited from the sales to [him]" and proclaims "no evidence" that they could have sold their products at list prices.[15] As just discussed, the district court fairly found that these manufacturers could have sold the products that Javat fraudulently obtained and that their list prices reflected a fair estimate of what the manufacturers could have charged on the U.S. market.

---

[15] Javat chides (Br. 37) the manufacturers for "forc[ing] U.S. consumers to pay more for the products than their foreign counterparts." But Javat acknowledged that he received substantially discounted products based on misrepresentations that his companies would export the products for use *by the U.S. military abroad*. DE.418:15. The district court also heard uncontested testimony at Soto's trial that manufacturers charge higher domestic prices because, unlike international sales, they must pay all regulatory, marketing, and storage costs. DE.396:61

Javat calls (Br. 42) the list prices "aspirational" and asserts a dearth of evidence on whether the manufacturers "could have sold their [products] into the domestic market and at what price." As just explained, the district court permissibly credited the evidence and declarations confirming that the manufacturers regularly sold their products in the U.S. market at the list price. Javat relatedly asserts (Br. 43) "a complete failure of proof on the issue of fair market value" of the products. But this Court and others have recognized that the seller's standard price approximates a product's fair market value for restitution purposes. *See Robertson*, 493 F.3d at 1333; *see, e.g.*, *United States v. Sterling*, 685 Fed. Appx. 880, 885 (11th Cir. 2017) (wholesale price of authentic DVDs); *United States v. Lively*, 20 F.3d 193, 203 (6th Cir. 1994) (retail price of fraudulently obtained merchandise); *United States v. Angelica*, 951 F.2d 1007, 1010 (9th Cir. 1991) (retail price of fraudulently obtained diamonds).

Finally, Javat still has not proposed an alternative framework for measuring manufacturer losses. As the district court noted, his continued assertion of zero loss is "not a credible argument" based on the record. DE.551:44. And to the extent Javat demands access to each manufacturer's pricing records and a hearing to audit every discount offered during the conspiracy period, this Court's case law does not demand such "laser-like precision." *Martin*, 803 F.3d at 595 (citation omitted); *see United States v. Simon*,

12 F.4th 1, 64 (1st Cir. 2021) ("[H]earings to quantify restitution amounts should not be allowed to spawn mini-trials.").[16]

Javat's citations (Br. 38, 41) lend him no support. In *United States v. Thuna*, 382 F. Supp. 3d 166 (D.P.R. 2019), the defendant pleaded guilty to introducing misbranded drugs into the marketplace. Drug manufacturer Eli Lilly filed a restitution claim asserting that the defendant's misbranded products displaced sales of its legitimate products. *Id.* at 169. The district court rejected this claim. It observed that "restitution must be based on the offense of conviction," *id.* at 172 (citation omitted), and "Lilly's alleged harm [was] not 'directly' caused by any element of [the defendant's] offense," *id.* at 171. As a result, "Lilly [was] not a victim of [the defendant's] crime" for restitution purposes. *Id.* at 172.

Contrast that with the record here. Javat admitted that his "false and fraudulent representations" caused "the victim companies [to sell] their products to Javat at deeply discounted prices[] that they would not have otherwise offered but for the false and fraudulent representations." DE.418:15. This admission

---

[16] Javat suggested below that the district court might measure restitution based on his profits. DE.723:41-42. Javat has not renewed this suggestion on appeal, and for good reason. It lacks support. *See United States v. Gallant*, 537 F.3d 1202, 1247 (10th Cir. 2008) ("[T]he MVRA requires proof of actual loss and does not allow alternative metrics, such as gain."). It is particularly unwarranted here given that Javat advertised his fraudulently acquired products at lower prices that undercut the manufacturers' own sales. *See* DE.385-8.

shows that the manufacturers were "directly and proximately harmed" by Javat's offense. 18 U.S.C. § 3663A(a)(2). Thus, unlike Ely Lilly in *Thuna*, the manufacturers here qualify as victims under the MVRA.

*United States v. Ferdman*, 779 F.3d 1129 (10th Cir. 2015), is similarly inapposite. The defendant was convicted of fraudulently procuring Sprint phones. Before sentencing, a Sprint representative submitted an unsworn and unverified letter asserting over $45,000 in lost retail sales, but provided no verifying affidavits or receipts. *Id.* at 1134. The district court nonetheless ordered restitution. On appeal, however, the Tenth Circuit found that the government failed to "present at least some evidence … from which the court could reasonably infer lost sales." *Id*. at 1139.

This record, by contrast, contains such evidence. Testimony at Soto's trial supports the finding that the manufacturers generally relied on list prices for domestic sales, and the manufacturers submitted sworn declarations and accompanying documents connecting their lost sales revenue to the list prices. *See* p.77 & n.14, *supra*. Unlike *Ferdman*, the district court here had a sufficient foundation to calculate restitution based on the manufacturer's list price.

## VIII. The district court entered valid forfeiture orders against Javat.

Javat (Br. 44-55) appeals the district court's $26-million forfeiture money judgment and order of forfeiture regarding two properties. His claims fail.

## A.    Background.

1.    After Javat pleaded guilty, the government sought a preliminary forfeiture order and a $26-million forfeiture money judgment—reflecting Javat's total gain during the conspiracy period.  DE.448.  The district court initially entered the order, but Javat alleged defects with the government's motion.  DE.519:17-18.  Javat's counsel asked the court to vacate the preliminary order, *id.* at 18-19, and the court agreed.  DE.458.  At sentencing, the court stated that it was "ordering forfeiture" and would have "post-sentencing filings to deal with that issue."  DE.519:116.

Javat subsequently objected to forfeiture on seven grounds: the indictment did not adequately allege forfeiture; the government failed to comply with the procedures in Federal Rule of Criminal Procedure 32.2; the government failed to prove Javat's profits from his criminal offense; the applicable statutes did not authorize forfeiture in this case; the district court could not issue a forfeiture-money judgment; the government failed to show that Javat obtained the funds under *Honeycutt v. United States*, 137 S. Ct. 1626 (2017); and the forfeiture request violated the Eighth Amendment.  DE.474.

The district court rejected the first two procedural arguments: the indictment, notwithstanding an erroneous statutory citation, adequately notified Javat that the government sought to forfeit his fraud proceeds; and the

government's deviation from Rule 32.2 was harmless because Javat had notice of the forfeiture allegation and a full opportunity to contest it. DE.498:6-9.

The government filed a revised motion responding to Javat's remaining claims. DE.516. The motion further explained that the government had calculated forfeiture using Javat's accounting software (found on a co-conspirator's computer) that showed the money his companies spent acquiring discounted products and the revenue he obtained selling them. *Id*. at 9-10.

At the forfeiture hearing, the district court accepted the government's position and found that Javat had obtained $26 million from his fraud scheme. DE.551:139. The court subsequently entered a preliminary forfeiture order and forfeiture-money judgment in that amount. DE.536.

2. The government subsequently requested a preliminary forfeiture order for substitute property to partially satisfy the forfeiture-money judgment and identified a Washington, D.C. condominium and the Calhoun, Georgia warehouse as substitute assets. DE.579. Javat opposed the motion, arguing that the district court lacked jurisdiction to enter a forfeiture order with respect to out-of-state properties; substitute-asset forfeiture was unavailable under the applicable forfeiture provision, 18 U.S.C. § 981; and the government had not proved either Javat's ownership of the condominium and warehouse or the unavailability of the proceeds of his crime. DE.588.

The district court granted the government's motion for preliminary forfeiture of the properties as substitute assets. First, the court held that it had jurisdiction to order forfeiture of the out-of-state properties. DE.641:12 n.4. Second, the court held that substitute-asset forfeiture was available. *Id.* at 6-8. Third, the court found that the government had established Javat's ownership interest in the properties based on Javat's counsel's representations during the bond hearing. *Id.* at 8-12. And fourth, it found that the government had met its burden under 21 U.S.C. § 853(p) for the substitute-asset forfeiture. *Id.* at 12-14.

3.      Javat appealed the order, but this Court affirmed because (1) the district court had statutory authority to order preliminary forfeiture of the condominium and warehouse; (2) the court had jurisdiction over those properties; (3) the court did not err in finding that Javat had rendered the proceeds of his crime unavailable; and (4) substitute-asset forfeiture was available in Javat's case under the procedures in 21 U.S.C. § 853(p). *See United States v. Javat*, No. 20-13310, 2022 WL 703940, at *4-7 (11th Cir. Mar. 9, 2022).

The district court subsequently entered a final order of forfeiture with respect to these properties. DE.744.

**B.    Standard of Review.**

This Court conducts a de novo review of the district court's legal rulings and examines any related factual findings for clear error.  *See Waked Hatum*, 969 F.3d at 1161-1162.

**C.    Discussion.**

Javat challenges the district court's forfeiture orders on five grounds.  Each lacks merit or is foreclosed by this Court's decisions.

**1.    The forfeiture orders were validly incorporated into Javat's final judgment.**

Javat contends (Br. 45-47) that the forfeiture orders cannot be enforced because the district court failed to incorporate them into its final judgment. Because Javat did not raise this claim below, appellate review is restricted to plain error.  *See United States v. Sosa*, 782 F.3d 630, 637 (11th Cir. 2015); *see also United States v. Spirito*, 36 F.4th 191, 213 (4th Cir. 2022) (reviewing identical claim for plain error).  Javat must show (1) error, (2) that is plain, (3) affected his substantial rights, and (4) seriously affected the fairness, integrity, or public reputation of the proceedings.  *See United States v. Olano*, 507 U.S. 725, 732-736 (1993).  He fails all four prongs.

For starters, no error occurred.  Federal Rule of Criminal Procedure 32.2(b)(4) states that the district court "must include the forfeiture when orally

85

announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing" and "must also include the forfeiture order, directly or by reference, in the judgment." The district court did just that. It twice informed Javat at sentencing that it would enter a forfeiture order. DE.519:20, 116. The final judgment also stated that "[f]orfeiture of [Javat's] right, title and interest in certain property is hereby ordered" and referenced the preliminary forfeiture order. DE.718:6. Because the court complied with Rule 32.2(b)(4), no error—much less clear or obvious error—occurred.

To the extent error occurred, Rule 32.2(b)(4) states that it "may be corrected at any time under Rule 36," which authorizes the district court to "at any time correct a clerical error in a judgment." Fed. R. Crim. P. 36. This Court has accordingly held that a district court's failure to incorporate forfeiture into its final judgment can be fixed at any time. *See Borgesano v. United States*, No. 20-11453, 2021 WL 2879696, at *4 (11th Cir. July 9, 2021) (amendment of final judgment to include forfeiture "is clerical in nature not substantive"); *United States v. Cano*, 558 Fed. Appx. 936, 940-941 (11th Cir. 2014) (affirming district court's order amending judgment to reference previously omitted forfeiture order). Thus, even if this Court discerns a deviation from Rule 32.2(b), the

district court's forfeiture orders remain valid.[17]  *See United States v. Dahda*, 852 F.3d 1282, 1298 (10th Cir. 2017) (holding that "the failure to state the forfeiture amount in the judgment does not warrant vacatur of the forfeiture," but "call[ing] the oversight to the attention of the district court so that it may correct the judgment"); *United States v. Zorrilla-Echevarria*, 671 F.3d 1, 10 (1st Cir. 2011) ("[T]he fact that the district court did not initially include the forfeiture in the judgment does not render the forfeiture invalid.").

Javat also fails to explain how this asserted error prejudiced him.  The district court informed Javat at sentencing that it would order forfeiture, Javat participated fully in the forfeiture litigation, and the court resolved every objection he advanced.  Because Javat cannot establish that the alleged Rule 32.2 error deprived him of a procedural protection or affected the fairness and integrity of these proceedings, the third and fourth prongs of plain-error review independently foreclose relief.

In response, Javat unpersuasively invokes (Br. 46) the district court's decision in *United States v. Canela*, No. 3:02-cr-00072, 2019 WL 2543503 (M.D.

---

[17]  Javat cites (Br. 45) *United States v. Pease*, 331 F.3d 809, 813 (11th Cir. 2003), which held that a district court must "include an order of forfeiture in its judgment *if* forfeiture to the United States is to come to fruition."  This Court subsequently observed, however, that Rule 32.2's amended language superseded *Pease*.  *See Cano*, 558 Fed. Appx. at 940.

Tenn. Jun. 20, 2019). There, "the issue of forfeiture was never even mentioned—by the government, defense counsel, or the court—a single time during the entirety of the sentencing hearing." *Id*. at *2. The court nonetheless entered a preliminary forfeiture order. *Id*. at *1. Over a decade later, the government sought forfeiture of specific assets owned by the defendant, *id*. at *2, but the court refused, holding that no valid forfeiture judgment had been entered, *id*. at *8. The court further held that it would not entertain a motion to amend the judgment to include forfeiture because the court did not "ensure that the defendant kn[ew] of the forfeiture at sentencing," as Rule 32.2(b)(4) requires. *Id*. at *9. Assuming *Canela*'s analysis is correct, it does not apply here because the district court twice advised Javat at sentencing that he would face forfeiture.

### 2. The indictment adequately apprised Javat that the government would seek forfeiture.

Javat argues (Br. 47-51) that the indictment failed to apprise him of the forfeiture allegation. The district court properly rejected this claim.

The superseding indictment alleged that each defendant, upon conviction, "shall forfeit to the United States of America, all property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such violation." DE.145:11. The indictment then cited 18 U.S.C. § 982(a)(2)(A). *Id*. at 12. That was a mistake because Section 982(a)(2)(A) authorizes forfeiture for

wire-fraud schemes affecting a financial institution. The indictment should have referenced Section 981(a)(1)(C), which authorizes forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to" a wire-fraud offense.[18]

The district court held that this citation error was harmless because "the Superseding Indictment clearly notified [Javat] that the United States [was] seeking to forfeit [his] fraud proceeds." DE.498:8. Moreover, the government's pretrial pleadings acknowledged the error and provided the correct citation. *Id.* at 7 (citing DE.161:18 n.6). The court accordingly held that Javat "had more than sufficient notice of the appropriate statutory basis" for forfeiture. *Ibid.*

The district court was right. Federal Rule of Criminal Procedure 7(c)(2) provides that, "[u]nless the defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction." That is the case here. The superseding indictment and the government's corrected citation fully apprised Javat that he would face forfeiture under Section 981(a)(1)(C) in the event of conviction. Javat and his counsel further acknowledged that his guilty

---

[18] Section 981(a)(1)(C) authorizes forfeiture in connection to a "specified unlawful activity" listed in 18 U.S.C. § 1956(c)(7). Section 1956(c)(7)(A), in turn, references 18 U.S.C. § 1961(1), which refers to any act indictable under Section 1343.

plea would trigger forfeiture. DE.418:7, 12. Because Javat has failed to show that he was misled or prejudiced by the government's incorrect citation, Rule 7(c)(2) forecloses his request for reversal. *See United States v. Bennett,* 368 F.3d 1343, 1355 (11th Cir. 2004) (declining to reverse conviction absent "indication that [defendant] was prejudiced by the incorrect citation"), *vacated on other grounds,* 543 U.S. 1110 (2005).

In fact, this Court addressed the same circumstance in *United States v. Wall*, 285 Fed. Appx. 675 (11th Cir. 2008), where the indictment mistakenly cited 18 U.S.C. § 982 instead of § 981. The Court declined to reverse the forfeiture order. Invoking Rule 7(c), the Court held that "[s]ince the indictment clearly notified the [defendants] that the Government sought to forfeit their fraud proceeds, the [defendants] were not prejudiced by the scrivener's error, and absent prejudice, a scrivener's error in the indictment is not grounds for reversal." *Id.* at 8. The same outcome is warranted here.

Javat responds (Br. 48, 50) that the district court impermissibly "remov[ed] the grand jury from the forfeiture process" and "amend[ed] the forfeiture authority cited in the Indictment." To the contrary, the court followed Rule 7(c)(2)'s dictates, cataloged the dearth of prejudice, and recognized that the citation error did not supply grounds for reversal of the forfeiture orders.

Javat asserts prejudice (Br. 49) based on the possibility that Section 981(a)(1)(C) authorizes a "harsher" forfeiture penalty than Section 982(a)(2)(A) because it permits forfeiture "beyond property personally acquired by [him] to that obtained by … codefendants and coconspirators." Javat's argument appears to rest on the suggestion that the Supreme Court's decision in *Honeycutt* limits the sweep of forfeiture under Section 982(a)(2)(A), but not Section 981(a)(1)(C).[19]

This prejudice allegation fails to two reasons. First, it intimates that Javat entered his guilty plea on the understanding that Section 982(a)(2)(A), rather than Section 981(a)(1)(C), governed his forfeiture obligations. That is factually suspect because the government provided Javat and his counsel with the correct forfeiture provision *before* his plea; and because Javat fails to show that any lingering confusion vitiated the knowing and voluntary nature of the plea. *See United States v. Viveros*, 298 Fed. Appx. 817, 819-820 (11th Cir. 2008) (declining to vacate guilty plea where "[a] review of the record as a whole indicates that [defendant] was aware that he would have to forfeit any property subject to the drug forfeiture statutes").

---

[19] In *Honeycutt*, the Supreme Court interpreted the forfeiture provision in 21 U.S.C. § 853(a) to reach only "property the defendant himself actually acquired as a result of the crime." 137 S. Ct. at 1635.

Second, and in any event, Javat's asserted distinction between the two statutory provisions is illusory in this case. As the government explained below, Javat—as the leader and mastermind of this fraud scheme—*personally* acquired all proceeds generated by the scheme within the meaning of *Honeycutt*. DE.516:11-12; *see also United States v. Elbeblawy*, 839 Fed. Appx. 398, 400 (11th Cir. 2021) ("Since *Honeycutt*, we have held that conspiracy leaders or 'masterminds' who control criminal enterprises jointly acquire the proceeds of the conspiracy with their co-conspirators."). Therefore, even assuming that Section 981 and Section 982 might operate differently in some cases, they sweep identically here. The indictment's incorrect citation thus did not mislead Javat.

### 3. The forfeiture order satisfied 18 U.S.C. § 981(a)(1)(C).

Section 981(a)(1)(C) authorizes the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" a wire-fraud offense. The statute defines "proceeds" as "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." 18 U.S.C. § 981(a)(2)(B). The statute further states that "[t]he direct costs shall not include any part of the overhead expenses of the entity providing the goods or services." *Ibid.*

The government's forfeiture calculation, which the district court adopted, followed this framework. Javat's accounting software showed that his

companies purchased $36.5 million in discounted products from manufacturers and collected $62.7 million when reselling them to U.S. distributors. DE.516:9. Javat's scheme accordingly netted over $26 million in revenue.[20] *Id.* at 10. Because that revenue reflects the total money acquired through Javat's fraud scheme, the district court permissibly ordered him to forfeit that amount.

As Javat tells it (Br. 51-52), the district court found that the government had not adequately traced these proceeds to him. That contention misreads the transcript. The district court accepted the government's calculation of "revenues coming into *this criminal enterprise*" as the difference between "the cost of goods" and "the amount that they sold them for." DE.551:112 (emphasis added); *id.* at 113 ("They pretty much traced it, haven't they?").

The district court separately observed that "Javat had expenses" such as "shipping charges," "pay[ments] for Mr. Soto," and "pay[ments] for employees." DE.551:115-116. Noting the government's proposed calculation reflected only "the gross revenue minus cost of goods sold," the court expressed concern that the calculation was "not a proceeds to Javat number" because it did not subtract "any of the other expenses that this activity was forced to … pay." *Id.* at 115.

---

[20] Javat does not contest the factual record supporting these calculations.

Quoting Section 981(a)(2)(B), the government replied that the forfeiture calculation should exclude "the direct costs incurred in providing the goods and services," but noted that "the overhead expenses of the entity" do not constitute such "direct costs." DE.551:117. The government accordingly argued, and the district court agreed, that Javat was not entitled to offset the forfeiture amount based on his payments to employees and co-conspirators. *Ibid.* That reflects a proper application of the statute.[21] *Cf. United States v. Neff*, 787 Fed. Appx. 81, 96 (3d Cir. 2019) (defendant not entitled to deduct marketing costs, credit fees, and salary expenditures from "proceeds" for 18 U.S.C. § 1963(a)(3) forfeiture).

Because the district court tethered its forfeiture calculation to the $26-million revenue obtained by Javat's companies in reselling the fraudulently acquired products, this revenue "constitutes or is derived from proceeds traceable to" Javat's fraud scheme. 18 U.S.C. § 981(a)(1)(C). The district court correctly held that this amount was subject to forfeiture.

---

[21] The government further noted that Javat "ha[d] the burden of proof with respect to the issue of direct costs." DE.551:117 (quoting 18 U.S.C. § 981(a)(2)(B)). In proceedings below, Javat failed to propose a specific deduction based on direct costs, much less tender evidence supporting one.

### 4. The district court permissibly entered a forfeiture-money judgment.

The district court entered a forfeiture-money judgment reflecting Javat's $26-million obligation. DE.536. Javat contends (Br. 52-53) that the district court lacked authority to do this. That claim fails in the face of this Court's unbroken "precedent condon[ing] forfeiture money judgments." *Waked Hatum*, 969 F.3d at 1163. Javat responds that a forfeiture-money judgment should not be available under 18 U.S.C. § 981(a)(1)(C), but that specific argument is foreclosed. *See United States v. Farias*, 836 F.3d 1315, 1331 (11th Cir. 2016) ("Section 981(a)(1)(C) authorized a forfeiture money judgment for the conspiracy to traffic in stolen goods."). Javat further asserts (Br. 53) that any forfeiture-money judgment requires "tracing." As just explained, the district court found that here. *See* pp.92-94, *supra*.

### 5. This Court already rejected Javat's challenges to the district court's order authorizing substitute-asset forfeiture.

Javat contests (Br. 54-55) the district court's order directing him to forfeit his ownership interests in the Washington, D.C. condominium and Georgia warehouse. His brief then raises five claims in a single sentence. The Court should deem these claims waived given the absence of developed argument, legal authorities, or record citations. *See NLRB v. McClain of Georgia, Inc.,* 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner,

without supporting arguments and citation to authorities, are generally deemed to be waived.").

In any event, all lack merit. As just explained, the district court entered valid forfeiture orders and a forfeiture-money judgment.

The district court also found that Javat had ownership interests in the two properties and that he had dissipated the proceeds of his fraud scheme, thereby satisfying the requirements for substitute-asset forfeiture under 21 U.S.C. § 853(p). DE.641:8-13. The court further held that substitute-asset forfeiture was available in Javat's case. *Id.* at 6-8. Because this Court previously affirmed the district court's factual findings and legal holding, *see Javat*, 2022 WL 703940, at *5-7, the law-of-the-case doctrine forecloses Javat's attempt to relitigate these matters now. *See Heathcoat v. Potts,* 905 F.2d 367, 370 (11th Cir. 1990) ("[T]he findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the trial court or on a later appeal.") (internal quotation marks and citation omitted).

## IX. The district court properly dismissed Calh's and Pennco's petitions asserting ownership of the properties that the court ordered Javat to forfeit as substitute assets.

Calh Holdings Corporation and Pennco LLC separately appeal the district court's order dismissing their petitions asserting ownership over the Georgia warehouse and Washington, D.C. condominium at issue in Javat's substitute-

asset-forfeiture order.  The district court correctly found, however, that Calh and Pennco lacked standing to file those petitions.

### A.    Background.

Calh is the record title holder of the Georgia warehouse and Pennco is the record title holder of the D.C. condominium.  DE.596:2.  The entities asserted that they, not Javat, owned these properties.  *Id.* at 3.

1.    After the government sought a preliminary order directing Javat to forfeit his ownership in the properties, DE.579, Calh and Pennco moved to intervene under Federal Rule of Civil Procedure 24, DE.596.  The district court denied the motions, concluding that their sole method of challenging forfeiture was an ancillary proceeding under 21 U.S.C. § 853(n)(2).  DE.641:14-16.  The court then entered a preliminary forfeiture order as to the properties.  DE.643.

Calh and Pennco appealed, but this Court dismissed their appeals.  The Court held that "the district court properly denied [their] motion to intervene because section 853(n)—and not Federal Rule of Civil Procedure 24—provides the exclusive means for third parties to challenge a criminal forfeiture."  *Javat*, 2022 WL 703940, at *3.

2.    Federal law provides that "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States … may … petition the court for a hearing to adjudicate the

validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2). If the petitioner establishes "a legal right, title, or interest in the property" that "was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts," "the court shall amend the order of forfeiture." 21 U.S.C. § 853(n)(6)(A).

Calh and Pennco filed petitions asserting that they, not Javat, owned the condo and warehouse. DE.671; DE.672. After conducting a hearing, the district court issued findings of fact:

Calh: The corporation purchased the Georgia warehouse in 2008. Javat served as Calh's sole shareholder until 2018, when he transferred his shares to an irrevocable trust. DE.742:5. Two years earlier, Javat discussed placing the warehouse into a trust based on guidance that "a separate structure would be preferable, as to shield the existing real estate from any potential commercial matter/liability." *Ibid*. Javat established the trust in 2018 and named his wife and children as beneficiaries. *Ibid*. But Javat also requested that the trustee "consult with [him] from time to time and take into account [his] expressed wishes regarding the administration of the trust"—including his "wish that during [his] lifetime the trust is operated primarily for [his] benefit." *Id*. at 5-6.

Pennco: The company owned the D.C. condominium and was managed by James Sipprell (an indicted co-conspirator in this case). DE.742:6. Pennco's

98

owner is an irrevocable trust created by Javat, for his benefit, with a similar request that it consider Javat's "wishes" for its administration. *Ibid*. A Local Representation Agreement identified Javat as Pennco's "ultimate beneficial owner" and stated that the trust provided "local representation, accounting, corporate secretarial, legal and other services to Pennco as mutually agreed upon with Javat." *Ibid*. (alterations and brackets omitted).

Sipprell signed Pennco's purchase documents for the D.C. condominium, but Javat participated in the purchase discussions and negotiations. DE.742:7. Of note, the relator's draft contract listed Javat as the all-cash buyer. *Ibid*. In response, Javat's employee advised: "Is it best to hold the property in joint names or via a Delaware company that in turn is held by a Trust." *Ibid*. The relator subsequently listed Javat's wife as the all-cash buyer and arranged to send documents to Javat's employee "so that he c[ould] review on the Javat[s'] … behalf and click the signing/initials on Javat's wife's behalf." *Ibid*. (brackets omitted). The relator also requested a letter from Javat's wife and Javat's banker pledging funds for the purchase. *Ibid*.

A later email chain advised that the D.C. condominium should instead be placed in Pennco's name and identified the Javats as the "principals in the transaction." DE.742:7. The closing instructions specified that Sipprell "will be

signing for Mr. Javat." *Id.* at 8. The property was purchased for $2.3 million in February 2016—the same month that Pennco and the trust were formed. *Ibid.*

Because Pennco lacked a bank account, condominium payments initially came from elsewhere. Sipprell paid a tax bill and a monthly maintenance charge from a Calh account. DE.742:8. Javat's wife also tried to set up a direct-debit payment from her bank account for the maintenance charge. *Id.* at 8-9.

3.     The district court next turned to the legal dispute. It accepted that Calh and Pennco—rather than their shareholders or members—owned the two properties. DE.742:9. The court nonetheless held that Calh and Pennco lacked standing to contest the properties' forfeiture. *Id.* at 10.

The district court observed that "'straw owners' of property that is seized do not necessarily suffer an injury that is sufficient to demonstrate standing." DE.742:10 (quoting *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262 n.5 (11th Cir. 2006)) (alterations omitted)) Additionally, a person who "act[s] as a nominee for persons whose property is subject to the forfeiture" "cannot have a vested interest in property." *Ibid.* (quoting *United States v. Weiss*, 467 F.3d 1300, 1303 n.1 (11th Cir. 2006)) (brackets omitted). Finally, the court noted that "[p]ossession of bare legal title by one who does not exercise dominion and control over the property is insufficient … to establish standing to challenge a forfeiture"; instead, "[c]ourts look behind the formal title to determine whether

the record title owner is a 'strawman' set up to conceal the financial affairs or illegal dealings of someone else." *Ibid.* (quoting *United States v. A Single Fam. Residence & Real Prop. Located at 900 Rio Vista Blvd.*, 803 F.2d 625, 630 (11th Cir. 1986)).

Based on the hearing evidence, the district court found that "Javat used Calh and Pennco as 'straw owners' to conceal his financial affairs in that the properties are truly Javat's properties, despite the fact that they are titled in Calh's and Pennco's names." DE.742:11. It noted a dearth of "any evidence whatsoever of [Calh's and Pennco's] use or possession of the Calhoun Warehouse and the Washington, D.C. Apartment or any evidence that tends to indicate that Calh and Pennco have any interest in the properties beyond mere title." *Ibid.* The court further noted that "Calh and Pennco did not present evidence of separate actions taken by them as entities." *Ibid.* Rather, "the facts established at the hearing show that Javat oversaw or controlled all actions … taken by Calh and Pennco." *Ibid.*

The district court further observed that the warehouse and condominium "can be directly traced to the hands of Javat." DE.742:11. It noted that Javat asserted ownership of the properties at the magistrate judge's bond hearing. *Id.* at 12. The court further noted that Sipprell—"a coconspirator in Javat's fraudulent scheme"—had a "management role for both Calh and Pennco." *Ibid.*

101

That involvement "is consistent with the inference that … Sipprell would assist Javat in using 'straw owners' to hold title of Javat's properties to conceal his financial affairs." *Ibid*. The court lastly observed that Sipprell recently died and that Calh and Pennco had not offered any meaningful evidence identifying the individual now acting as their authorized representatives in this litigation. *Ibid*.

The district court ultimately characterized each entity as a straw owner acting on Javat's behalf. As to Calh, the court credited evidence that: (1) Javat was the corporation's sole shareholder and director when it purchased the Georgia warehouse; (2) Sipprell helped manage Calh; (3) Javat was the person who placed the warehouse into a trust structure; (4) Javat and Calh interchanged funds; and (5) after Javat transferred his Calh shares to the trust, he asked the trustee to operate the trust for his benefit. DE.742:13. As to Pennco, the court noted similar evidence and further highlighted: (1) trustee documents identifying Javat as Pennco's "ultimate beneficial owner"; (2) evidence showing that Javat purchased the D.C. condominium in Pennco's name; (3) emails showing that Javat initially considered purchasing the property in his or his wife's name, used his own funds for the purchase, and ultimately decided to have Pennco (which he created for his benefit) purchase the property; (4) Pennco lacked a bank account for at least 10 months of its existence; and (5) the absence of evidence

that Pennco used or possessed the property or engaged in legitimate business activities. *Id*. at 13-14.

Based on this evidence, the district court found that "the properties are actually Javat's" and rejected the contention that "Calh and Pennco would suffer an actual injury if the properties were forfeited." DE.742:14. The court accordingly dismissed their petitions for lack of standing. *Ibid*.

**B.      Standard of Review.**

This Court conducts a de novo review of the district court's legal rulings and examines any related factual findings for clear error. *See Waked Hatum*, 969 F.3d at 1161-1162.

**C.      Discussion.**

Calh and Pennco attack the district court's preliminary order authorizing forfeiture of Javat's ownership in these properties (DE.643) and its subsequent order dismissing their petitions (DE.742). Each approach fails.

**1.      This Court's prior decision precludes Calh and Pennco's attack on the preliminary forfeiture order.**

Calh and Pennco first ask (Br. 27-40) this Court to vacate the district court's preliminary order authorizing forfeiture of Javat's ownership in these properties. They assert that the court never confirmed Javat's ownership over the properties and, therefore, lacked authority to enter the order.

This Court previously held, however, that Calh and Pennco had no right to participate in the preliminary forfeiture proceeding. *See Javat*, 2022 WL 703940, at *3. This Court further held that Calh and Pennco "had no basis to appeal the preliminary order of forfeiture as to Javat" because that order did not address "their ownership interests in the condominium and warehouse." *Ibid.*; *see United States v. Cone*, 627 F.3d 1356, 1358 (11th Cir. 2010) ("Nowhere do the provisions [of Section 853(n) or Fed. R. Crim. P 32.2] grant petitioners a private cause of action or right to appeal a court's ruling outside of an ancillary forfeiture proceeding."). Under the law-of-the-case doctrine, the Court's previous decision precludes Calh and Pennco's challenge to the preliminary forfeiture order.

But even if Calh and Pennco could retroactively attack the preliminary forfeiture order issued against Javat, this Court's previous decision further forecloses each of their objections on the merits.

Calh and Pennco assert (Br. 31-33) that the district court never found that Javat owned the properties before issuing the preliminary order. To the contrary, the court cited representations by Javat's counsel at the bond hearing that his family trust owned the properties—specifically, that his "family ha[d] ownership of the entity that is the titleholder of the properties." DE.641:10. Counsel further stated that "the owners of the property, the owners of record, are corporations, and the owners of those corporations are the Javat family."

*Ibid.* (brackets omitted). Based on that presentation, the magistrate judge permitted Javat to offer the properties as bond collateral. *Ibid.* The district court relied on those representations to ascertain Javat's ownership. *Id.* at 11.

On appeal, this Court rejected Javat's contention that the district court erroneously "left the issue of ownership of the condominium and warehouse unresolved" and it further found "[t]he record … clear that Javat—and not others outside his family—had an interest in the properties." *Javat*, 2022 WL 703940, at *6 (quotation marks omitted). That holding resolves Calh and Pennco's present claim and confirms the preliminary forfeiture order's validity.

Calh and Pennco renew (Br. 35-37) the contention that the district court erred in denying their motions to intervene in the preliminary forfeiture proceeding. But this Court previously affirmed the court's denial and held that an ancillary proceeding under Section 853(n) "provide[d] the exclusive means for [Calh and Pennco] to challenge a criminal forfeiture." *Javat*, 2022 WL 703940, at *3. That holding forecloses this objection.

Calh and Pennco lastly assert (Br. 38-39) that the district court lacked jurisdiction over the condominium and warehouse because they are located outside Florida. Javat previously raised the same claim but this Court held that "[the district court] had jurisdiction over the properties without regard to their location." *Javat*, 2022 WL 703940, at *5 (citing 21 U.S.C. § 853(l)) (internal

quotation marks omitted).  That holding resolves Calh and Pennco's present claim and confirms the district court's jurisdiction.[22]

### 2. The district court properly dismissed Calh's and Pennco's petitions under 21 U.S.C. § 853(n) for lack of standing.

Calh and Pennco further challenge (Br. 41-54) the district court's order dismissing their petitions asserting ownership in the Georgia warehouse and the D.C. condominium.  They fault the court's legal analysis and factfinding.

### a. The court applied the correct legal framework.

A third party has standing to file a claim to criminally forfeited property if it demonstrates "the existence of an injury."  *Via Mat Int'l S. Am. Ltd.*, 446 F.3d at 1262.  A third party typically does this by demonstrating ownership or a possessory interest.  *Id*. at 1262-1263.  That said, "straw owners … do not necessarily suffer an injury that is sufficient to demonstrate standing."  *Id.* at 1262 n.5 (internal quotation marks omitted).  The reason: "[p]eople engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name."  *United States v. Carrell*, 252 F.3d 1193, 1204 (11th Cir. 2001) (citation omitted).  This Court has accordingly advised district courts to "look behind the formal title to determine whether the record title owner is a

---

[22] Calh and Pennco further discuss subject-matter jurisdiction, standing, issue preclusion, due process, and burdens of proof.  The Court's previous decision resolved these matters or they are irrelevant to the present dispute.

'strawman'" when considering standing. *Ibid*. "Such owners do not themselves suffer an injury when the property is taken." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (cited with approval in *Via Mat Int'l S. Am. Ltd.*, 446 F.3d at 1262 n.5).

The district court applied this framework below. Calh and Pennco nonetheless object on four grounds.

i.      Calh and Pennco argue (Br. 41-44) that the district court's ruling contravened *United States v. Gilbert*, 244 F.3d 888 (11th Cir. 2001). That decision has no bearing on this dispute.

In *Gilbert*, the jury found that the Bell Gardens Bicycle Club constituted or was derived from proceeds that Defendants Benjamin Kramer and Michael Gilbert obtained directly or indirectly from racketeering activity and that the Club was subject to forfeiture. 244 F.3d at 899. The jury did not, however delineate between Kramer's and Gilbert's individual ownership interests in the Club. *Id*. at 900. The district court entered the government's proposed forfeiture order, seized the Club, appointed an interim trustee, and restrained Kramer's and Gilbert's transfer of profits or interests. *Ibid*. On appeal, this Court vacated the forfeiture judgment as to Gilbert and the district court's order restraining his use of the Club. *Id*. at 903. Kramer's forfeiture judgment, however, remained intact. *Id*. at 905. On remand, the government sought to compel Gilbert to file

107

a third-party petition asserting ownership of the Club, thereby permitting the district court to resolve in an ancillary proceeding whether Gilbert or the government (by virtue of Kramer's forfeiture judgment) had superior title. The court, however, declined to order that relief. *Id*. at 904-905.

This Court affirmed on multiple independent grounds. First, it held that the government could not compel Gilbert to file a third-party petition. 244 F.3d at 912-913. Second, even if such a petition could be compelled, the Court noted that Gilbert (a defendant in the original proceeding) had "a statutory right to have the amount of property subject to forfeiture determined by a jury." *Id*. at 915; *see generally* Fed. R. Crim. P. 32.2(b)(5). Because "the jury never made that determination" regarding Gilbert's and Kramer's respective ownerships in the Club, "those questions must remain unanswered" because "the court has no authority to amend the jury's verdict." 244 F.3d at 916. Third, even if the jury's forfeiture judgment could be retroactively corrected on the ownership issue, the district court could not take such action here because its "prior findings on the issue of ownership are in direct conflict." *Id*. at 917. The court previously found both that "Gilbert actually owned a forfeitable interest in the Club" and that the "Gilberts were just `straw persons.'" *Ibid*. (emphasis and alteration omitted). Fourth, the underlying forfeiture judgment against Kramer—which the government sought to execute—was invalid because it "effect[ed] an *in rem,*

rather than an *in personam*, forfeiture." *Id.* at 918. And fifth, "the evidence at trial conclusively established that Benjamin Kramer did not own what the jury attempted to forfeit by its verdict—the Bell Gardens Bicycle Club." *Ibid.* The proof instead showed that Kramer had a silent interest in a general partnership (LCP), which, in turn, owned a portion of the Club. *Id.* at 922. Only "Kramer's silent interest in LCP . … should have been targeted for forfeiture." *Ibid.*

*Gilbert*'s holdings have no bearing on the district court's standing inquiry. Nor are any of the identified errors present here:

- The government did not seek an order compelling Calh and Pennco to file third-party petitions.

- Javat waived the right to a jury determination of forfeiture. DE.418:7. Calh and Pennco also had no jury right in the ancillary proceeding. *See* 21 U.S.C. § 853(n)(2) ("The hearing shall be held before the court alone, without a jury.").

- The district court made no contradictory factual findings regarding ownership.

- The forfeiture judgment against Javat effected an *in personam* forfeiture. DE.536.

- The forfeiture judgment targeted property ($26 million in revenue) that Javat derived from the wire-fraud offense. *See* pp.92-94, *supra*. The substitute-asset forfeiture order addressed property that, per the district court's factual findings, Javat owned. *See* pp.95-96, *supra*.

ii. Calh and Pennco (Br. 45) argue that "[a] possessory interest in property is sufficient to establish Article III standing." That may be the default

rule, but it does not apply to straw owners. *See Via Mat Int'l S. Am. Ltd.*, 446 F.3d at 1262 n.5.

iii.    Calh and Pennco fault (Br. 46-48) the district court for failing to consult Florida law in this inquiry. That contention fails. The district court was bound to follow this Court's precedents when administering a federal forfeiture statute. Moreover, Calh and Pennco fail to explain the relevance of Florida law; their owners (two Delaware irrevocable trusts) and the forfeited properties (in D.C. and Georgia) are located elsewhere. More importantly, this Court has held that the question "whether the [third party's] interest in the Forfeited Property is superior and thus renders the forfeiture order invalid under § 853(n)(6) is *a matter of federal law*." *United States v. Shefton*, 548 F.3d 1360, 1364 (11th Cir. 2008) (emphasis added).[23]

---

[23] In any event, Calh and Pennco's cited case aligns with the district court's analysis. In *Advertects, Inc. v. Sawyer Industries, Inc.,* 84 So.2d 21 (Fla. 1955), the Florida Supreme Court affirmed a trial court judgment refusing to pierce the corporate veil and require individual shareholders to satisfy a judgment against the corporation. The court, however, explained that such relief would be appropriate based on "a preliminary showing that the corporation is in actuality the alter ego of the stockholders" and that corporation was either "organized or … employed by the stockholders for fraudulent or misleading purposes," its assets were "converted or … depleted for the personal benefit of the individual stockholders," or "property belonging to the corporation can be traced into the hands of the stockholders." *Id.* at 24. The district court's analysis of Calh's and Pennco's ownership, administration, activities, and communications tracks those considerations.

iv.    Calh and Pennco contend (Br. 48) that the district court should have assessed their ownership interests in the properties as of the date of the preliminary forfeiture order, and not before.   Their assertion disregards 21 U.S.C. § 853(n)(6)(A), which requires that the third-party claimant possess a right to, or interest in, the forfeited property "at the time of the commission of the acts which gave rise to the forfeiture."   *See United States v. Kennedy*, 201 F.3d 1324, 1331 (11th Cir. 2000) ("[Third party] cannot prevail under section 853(n)(6)(A) because even if she had an interest that was superior to her former husband's, no such interest was vested at the time of the act giving rise to the forfeiture.").

### b.    No clear error exists in the court's finding that Calh and Pennco are straw owners.

Calh and Pennco challenge (Br. 50-54) the district court's finding that they were straw owners of the Georgia warehouse and the D.C. condominium.   The clear-error standard dooms this claim.

Calh and Pennco stress (Br. 50-51) their lawful establishment under Delaware law, ownership by irrevocable Delaware trusts, and operation under Delaware law.   They also state (Br. 52) that their governing boards approved purchase of the properties.   These observations do not address this Court's directive to "look behind the formal title to determine whether the record title

owner is a 'strawman,'" *Carrell*, 252 F.3d at 1204 (citation omitted), by asking whether the title owner actually "exercise[s] dominion and control over the property," *A Single Fam. Residence*, 803 F.2d at 630.  That is precisely what the district court did below.

Calh and Pennco highlight (Br. 51) Javat's communications to the trustees acknowledging that he "cannot restrict [their] discretion or direct the way in which [they] exercise [their] powers under the trust."  The district court—as factfinder—appropriately discredited that communication because, in the very next sentence, Javat asked the trustees to "consult with [him]" and "take into account [his] expressed wishes regarding the administration of the trust."  DE.742:6.  The court further cited examples confirming Javat's influence over each trust's activities and purchases—including, for instance, having his co-conspirator (Sipprell) manage them.

Calh and Pennco claim (Br. 52) "no evidence that [they] engaged in or were used for any fraudulent activity or injured anyone."  But the government sought forfeiture of the properties as substitute assets under 21 U.S.C. § 853(p).  That provision "permits the Government to confiscate property *untainted* by the crime."  *Honeycutt*, 137 S. Ct. at 1633 (emphasis added).

Calh and Pennco object (Br. 53) that the district court considered evidence predating the fraud scheme.  This is factually wrong.  Javat's scheme started in

112

2014. DE.418:14. Nearly every transaction documented by the court occurred after that. Of note, Javat transferred his sole ownership of Calh (which owned the Georgia warehouse) to a just-formed trust in 2018. DE.742:5. Pennco and its trust were created in 2016 when Javat arranged the D.C. condominium purchase. *Id*. at 7-8.[24] In any event, Javat's entire course of dealing with Calh and Pennco bears on whether the latter operated independently or as straw entities. *Cf. Medina & Medina Inc. v. Hormel Foods Corp.*, 840 F.3d 26, 32 (1st Cir. 2016) (agreeing that "the entire course of dealing between [two parties] during the relevant time period is helpful in understanding the business relationship").

Calh and Pennco lastly offer (Br. 53) conclusory statements that Javat's conduct reflects "normal business and estate planning" and that "the trusts were controlling the Realty." That argument disregards the record. As the district court succinctly summarized, "Calh and Pennco did not present evidence of separate actions taken by them as entities" "except for their formation, changes in their ownership structure …, and involvement in obtaining the properties." DE.742:11. Rather, "Javat oversaw or controlled all actions … taken by Calh and Pennco." *Ibid*. Based on that dominion and control, the court found "simply no basis" for the proposition that "Calh and Pennco would suffer an

---

[24] Calh and Pennco argue (Br. 53) that the district court erred in considering evidence predating the issuance of the preliminary forfeiture order. As explained, that contention lacks merit. *See* p.111, *supra*.

actual injury if the properties were forfeited." *Id*. at 14. That finding easily

withstands clear-error review.

## CONCLUSION

The Court should affirm the district court's judgments.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
United States Attorney

KENNETH A. POLITE
Assistant Attorney General

LISA TOBIN RUBIO
Chief, Appellate Division

LISA H. MILLER
Deputy Assistant Attorney General

DANIEL MATZKIN
Deputy Chief
Southern District of Florida

/s/David M. Lieberman
DAVID M. LIEBERMAN
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 262-6805
david.lieberman@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 24,000 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  The government's unopposed motion for excess words (filed on June 28, 2022) remains pending before the Court.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared on a proportionally spaced typeface using Microsoft Office 365 in 14-point Calisto MT font.

                                                  /s/David M. Lieberman

**CERTIFICATE OF SERVICE**

I hereby certify that seven copies of the foregoing Brief for the United States were mailed to the Clerk of Court via Federal Express on July 18, 2022, and that, on the same day, the foregoing brief was filed using CM/ECF and served via CM/ECF on counsel of record.

                                                  /s/David M. Lieberman